Manuel Corrales, Jr. SBN 117647
Attorney at Law
11939 Rancho Bernardo Road, Suite 170
San Diego, CA 92128
Tel: (858) 521-0634/Fax: (858) 521-0633
Email:  mannycorrales@yahoo.com

Attorney for Plaintiff
CORRALES LAW PC, and In Pro Per

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CORRALES LAW PC, a California Professional Corporation; MANUEL CORRALES, JR., a California Resident,<br><br>　　Plaintiffs,<br><br>　　vs.<br><br>EQUAL ACCESS JUSTICE FUND LP, a Delaware Limited Partnership; B.E. BLANK COMPANY LP, a Delaware Limited; BEB PARTNERS LLC, a limited liability corporation; BENJAMIN E. BLANK, a Florida Resident,<br><br>　　Defendants. | Case No.  '25CV1834 JLS  MMP<br><br>**COMPLAINT**<br><br>1. **Declaratory Relief [CCP § 1060]**<br>2. **Violation of Cal. Bus. Code § 17200, et. Seq [Unlawful, unfair and fraudulent business practices]** |

Plaintiffs CORRALES LAW PC, a California Professional Corporation, ("CLPC") and MANUEL CORRALES, JR., a California resident, ("Corrales") allege the following Claims against the Defendants:

**I.**

**JURISDICTION AND VENUE**

1.　　This Court has jurisdiction over the claims asserted in this civil lawsuit pursuant to 28 U.S.C. §1332 based on diversity jurisdiction, because Plaintiffs are citizens of the State of California and Defendants are citizens of Delaware, Florida and New Jersey. Declaratory relief is authorized pursuant to the Declaratory Judgments Act, 28 U.S.C. §52201-2202, and the All Writs Act, 28 U.S.C. § 1651

2.      Venue is proper in this Court pursuant to 42 U.S.C. §1392(b)(2), because San Diego, California is where the subject Loan Agreement was purportedly negotiated, executed, and the place of performance and alleged breach, the place where the fraud occurred, the place where the property is located that is subject to the Loan Agreement seeking an attorney fee share of cases Corrales filed and litigated lawsuits, the place of Plaintiffs' business and client trust accounts where Defendants sought access and control for purposes of sharing fees with Plaintiffs, and the State where Defendants filed a UCC lien over Plaintiffs' property to secure an unlawful fee sharing agreement with Plaintiffs.

**II.**

**PARTIES**

3.      Plaintiff CLPC is a professional law corporation located in San Diego, California.

4.      Plaintiff Corrales is a resident of San Diego, California.

5.      Defendant EQUAL ACCESS JUSTICE FUND LP ("EAJF") is a Delaware Limited Partnership with its principal place of business at 105 S. Narcissus Avenue, Suite 800, West Palm Beach, Florida 33401, and 308 Harrington Avenue, Closter, New Jersey 07624.  EAJF is also registered with the California Secretary of State to do business in California at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California.

6.      Defendant B.E. BLANK & COMPANY LP ("BEBC") is a Delaware Limited Partnership with its principal place of business at 105 South Narcissus Avenue, Suite 800, West Palm Beach, Florida 33401.  It is a General Partner of Defendant EAJF.

7.      Defendant BEB PARTNERS LLC ("BEBP") is a limited liability corporation that is in partnership with the other named Defendants and whose principal place of business is at 105 S. Narcissus Avenue, Suite 800, West Palm Beach, Florida 33401.

8.      Defendant BENJAMIN E. BLANK ("Blank") is a Florida resident and is the managing agent for EAJF, BEBC, and BEBP.

9.      At all times herein mentioned, all of the Defendants were the agents, employees, partners, joint venturers, or co-conspirators of the other Defendants and when doing the acts alleged in this Complaint they acted within the course and scope of

COMPLAINT                                                                                                         2

such agency.  At all material times, all of the Defendants named in this Complaint aided and abetted, authorized, and ratified all of the acts of the other Defendants.

10.    At all times herein mentioned, the Defendants were non-lawyers and not licensed to practice law, were part of a joint enterprise whose purpose was to engage in the unlawful collection of a debt in violation of California and federal law, and whose further purpose was to engage in the unlawful sharing of attorney's fees and the unlawful collection of high interest rates in violation of California usury laws.

**III.**

**GENERAL ALLEGATIONS**

11.    In August of 2021, Corrales, a San Diego lawyer, sought funding for his law practice from Defendant Benjamin Blank, the owner of Defendant B.E. Blank & Company, based on a referral from another company.  Mr. Blank was drawn by the fact that Corrales had a claim for recovery of his fees in excess of $5.9 million from an Indian tribe he had represented for almost 13 years.  However, Mr. Blank and his company stated that they could not loan money directly to Corrales, but that the loan would need to be made to a professional corporation that they directed he set up for the loan.  This was Plaintiff CLPC, which Corrales set up at Defendant Blank and his company's direction. direction.

12.    In addition, Blank and his company required that Corrales' law corporation, CLPC, agree to share 50% of CLPC's attorney's fees on other cases Corrales was handling which was to be used to pay down the loan, in addition to a high interest rate.  Plaintiffs signed a Loan Agreement with Bank and his companies on August 16, 2021.  (Ex. "1" to Complaint – "Loan Agreement").  The Loan Agreement contains a confidential clause designed to hide Defendants' illegal fee sharing arrangement. In addition, a subsequent amendment to the Loan Agreement to construe the Loan Agreement as not a fee sharing agreement so as to avoid violating California State Bar Rule violates public policy and is therefore void.

13.    Corrales requested funding for $200,000, but Blank and his company told Corrales that the previous funding company, U.S. Claims, also out of Florida, had filed a U.C.C. lien with the California Secretary of State on <u>non-recourse</u> funding U.S. Claims had purportedly advanced to Corrales showing accrued amount of $518,650.

Unbeknownst to Corrales, the U.C.C lien was illegal or improper, because U.C.C. lien filings only apply to <u>loan</u> debts, and the U.S. Claims' non-recourse funding agreement states that its funding to Corrales was <u>not</u> a loan. Moreover, U.S. Claims had no lien, because the funding U.S. Claims advanced to Corrales was for his Tribal lawsuit and was non-recourse in nature. (Ex. "4" to Complaint – U.S. Claims' payoff letter referencing the lien pertained only to the California Valley Miwok Tribe case). The U.S. Claims funding lien applied only to this Tribal case as shown in its Disclosure Statement. (Ex. "2," page 3 of Disclosure Statement). If Corrales did not prevail on that Tribal lawsuit, he would owe U.S. Claims nothing. In fact, Corrales lost that case in December 2018 (Ex."2" to Complaint) and therefore owed U.S. Claims nothing on the $200,000.00 it advanced in May 2018, which U.S. Claims asserts grew to $518,650.00 by August 2021. U.S. Claims advanced $200,350.00 to Corrales on May 17, 2018, on a case in which he was seeking recovery of money for the California Valley Miwok Tribe ("Miwok Tribe"). The Miwok Tribe case was the only case identified in the U.S. Claims May 17, 2018, non-recourse funding agreement. Under the non-recourse funding agreement with U.S. Claims, the amount owed would increase approximately $100,000 per year. Thus, at the time Plaintiffs entered into the Loan Agreement with Defendants, the amount of the U.S. Claims' purported lien would have been around $518,650.00. However, Corrales lost the case involving the Miwok Tribe, and pursuant to his nonrecourse funding agreement with U.S. Claims, he had no obligation to reimburse U.S. Claims for the advance. The May 17, 2018, U.S. Claims funding agreement, which specifically states is <u>not</u> a loan, provides in part:

> "[Corrales] agrees and sells and assigns to USC and USC hereby agrees to purchase [Corrales'] entire right, title and interest in, to and under a portion of the Proceeds as described in the Disclosure Statement **at the instant such Proceeds come into being by virtue of a judgment, settlement, verdict or other disposition** of the Litigation or when the proceeds are paid to [Corrales]." (Emphasis added).

(Ex. "2" to Complaint, page 1, Section 1.b. of U.S. Claims "purchase, Sale, Assignment & Equitable Lien Agreement"). Since Corrales lost the case, he had no obligation to reimburse U.S. Claims. Despite this, U.S. Claims refused to remove its UCC lien it had filed on May 17, 2018. Both U.S. Claims and the Defendants knew that the UCC lien

was invalid, yet the Defendants claimed they paid it anyway and that the Plaintiffs owed them for this purported pay off.  Defendants essentially resurrected the invalid and unenforceable U.S. Claims lien and created an obligation where none existed.  By Defendants' own negligence and mistake, they paid off the non-collectable U.S. Claims' lien and made it a new loan with Corrales.  No consideration existed for this obligation.

14.    In addition, the $518,650.00 U.S. Claims U.C.C. lien Defendant Blank paid was a personal non-recourse obligation of Corrales personally.  It was not an obligation of Plaintiff CLPC.  As a result, Plaintiff CLPC received no benefit from such payment.

15.    Prior to signing the August 16, 2025, Loan Agreement, CLPC and Defendant BEBC (Blank Company) signed a "Term Sheet" summarizing the basic core terms of the Loan Agreement.  Defendant Blank and his company, BEBC, for the first time disclosed that Defendant "EAJF" would be the "financier" of the loan.  The Term Sheet specifically provided that:

> "The law firm [CLPC] will pay the Financier [EAJF] a minimum of 50% of the attorney's fees and reimbursed expenses received on encumbered legal matters until the principal and interest of the credit facility [$700,000 loan] are fully repaid."

(Ex. "3" to Complaint, page 2 of "Term Sheet," dated August 10, 2021).  This provision was directly and indirectly incorporated into the Loan Agreement.  For example, the Loan Agreement states:

> "The Borrower [CLPC] unconditionally agrees to repay to the Lender [EAJF] on the tenth (10th) day after the end of each calendar month … an amount on each such date equal to fifty percent (50%) … of the Law Firm Proceeds …."

(Page 11 of Loan Agreement).  The term "Law Firm Proceeds" in the Loan Agreement "means all funds and other property or value received directly or indirectly by or on behalf of the Borrower or an Affiliate (and not the client's share) on account of … any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) the client on account or as a result or by virtue (directly or indirectly) of a Case, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement or otherwise … , and any and all other gross revenues received by Borrower in connection

with its provision of legal services, including but not limited to services rendered in connection with litigation, transactional or consulting services and regardless of whether any such revenues were pursuant to a contingency, hourly, flat-fee, or other payment agreement … " (Page 5 of Loan Agreement).  In other words, the Loan Agreement required Plaintiffs to <u>share</u> attorney's fees with Defendants in violation of California State Bar rules.

16.    The term "Case" in the Loan Agreement means:

"…legal matters in which the Borrower [CLPC] or the Borrower's successor in interest is an attorney of record or co-counsel or from which the Borrower or the Borrower's successor in interest otherwise receives fees in exchange for services rendered …"

(Page 2 of Loan Agreement).

17.    In addition, the Loan Agreement provides that Defendant EAJF shall have access to CLPC client trust account maintained in a California bank account and CLPC agreed to allow Defendant EAJF to withdraw CLPC's attorney's fees from CLPC's client trust account. (Page 35 of Loan Agreement).  The purpose of this provision was to allow Defendants to collect Plaintiffs' legal fees from their clients' trust account – a clear violation of California State Bar rules.

18.    On August 13, 2021, the parties amended the Loan Agreement to exclude hourly fees from CLPC obligation to share its legal fees with Defendants.  Otherwise, CLPC was still obligated to share its legal fees with Defendants.

19.    Accordingly, the purpose of the Loan Agreement was to require CLPC to share its legal fees with Defendants in violation of Cal. Rule Prof. Conduct 5.4(a) and thus violated public policy.  In addition, at no time did Plaintiffs' clients agree in writing to any fee sharing agreement between Plaintiffs and Defendants with respect to their respective cases.  As a result, the Loan Agreement is void and unenforceable.

## **FIRST CLAIM**

### **(Declaratory Relief—CC Section 1060 and 28 U.S.C. § 2201-2202, and 28 U.S.C. §1651)**

(As Against Defendants Equal Access Justice Fund LP, B.E. Blank & Company LP, and BEB Partners LLC)

20.    The allegations in Paragraphs 1 through 19 are re-alleged and incorporated herein by reference.

21.    CCP §1060 provides in pertinent part:

"Any person interested … under a contract … who desires a declaration of his or her rights or duties with respect to another … may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action … for a declaration of his or her rights and duties … including a determination   of any question of … validity arising under the … contract."

At all times herein mentioned, Plaintiffs are "interested persons" under CCP §1060 who are entitled to declaratory relief with respect to the validity and enforcement of the subject Loan Agreement.

22.    An actual controversy has arisen and now exists between Plaintiffs and Defendants Equal Access Justice Fund LP, B.E. Blank & Company LP, and BEB Partners LLC (Defendant Loan Parties) concerning the validity and enforcement of the subject Loan Agreement, and whether it is void as against public policy as an agreement to share legal fees in violation of Cal. Rule of Prof. Conduct 5.4(a).  Plaintiffs contend that the Loan Agreement requires CLPC to share its legal fees with Defendant Loan Parties.  Defendant Loan parties deny the Loan Agreement is a legal fee sharing agreement.

23.    Defendant Loan parties have commenced arbitration against Plaintiffs with Judicial Arbitration and Mediation Services, Inc., ("JAMS") pursuant to an arbitration clause in the subject Loan Agreement.  Plaintiffs dispute the Defendant Loan Parties' right to commence arbitration because the Loan Agreement is void and unenforceable as against public policy and therefore the Defendant Loan Parties' right to demand arbitration is likewise unenforceable.  Defendant Loan parties dispute this contention.

24.    Plaintiffs contend that the California Rules of Professional Conduct of the State Bar prohibiting legal fee sharing with non-lawyers is not limited to ethical standards to guide conduct of members of the State Bar but also serve as an expression of public policy to protect the public and thus serves as a basis to declare the subject Loan Agreement void and unenforceable as against public policy. Defendant Loan Parties deny this contention.

25.     Plaintiffs also contend that the subject Loan Agreement is also void against public policy, because none of the Plaintiffs' clients gave their written consent to the fee sharing arrangement manifested in the subject Loan Agreement, which violates California Rules of Professional Conduct of the State Bar.  Defendants deny these allegations.

26.     Plaintiffs also contend that the subject Loan Agreement is against public policy and therefore void, because it charges excessive interest rates in violation of California usury laws, and is further void because it fails to disclose these high interest rates in a conspicuous place on the loan document as required by the Truth in Lending Act ("TILA"), 15 U.S.C. §1693, et seq., and §1632 ("The terms 'annual percentage rate' and 'finance charge' shall be disclosed *more conspicuously* than other terms, data, or information provided in connection with a transaction, except information relating to the identity of the creditor").  Plaintiffs contend that the Loan Agreement contains 45 pages of detailed information and conditions that are burdensome, confusing and unintelligible and verbose.  Yet, nowhere in these pages is the interest rate or finance charges set forth in any conspicuous manner that can be easily understood.  Defendants dispute these contentions.

27.     Plaintiffs contend that the Loan Agreement is further void and invalid for lack of consideration, and because the U.S. Claims' lien Defendants purportedly paid off was unenforceable.  The U.S. Claims' lien was to secure a non-recourse funding advance to Corrales on a Tribal case.  Since the case was lost, Corrales had no obligation to repay or reimburse the advance of $200,350.00, which grew with accrued interest to $518,650 in August of 2021.  Defendants mistakenly paid this amount, believing U.S. Claims had a valid lien.  It did not.  Defendants effectively resurrected this dead lien and converted it into a loan as part of the $700,000 it loaned to Plaintiff CLPC in August 2021.  On the balance of $200,000 from this loan to CLPC, the Defendants gave CLPC $77,000, and yet charged CLPC interest on the entire $700,000.  In addition, the U.S. Claims' pay off for the invalid $518,650 lien was for Corrales personally and not for CLPC.  For these additional reasons, the Loan Agreement is void and unenforceable for lack of consideration.  Defendants dispute these contentions.

28.     Accordingly, these disputes require resolution under CCP §1060 for a declaration of those rights pursuant to CCP §1060.

## SECOND CLAIM

### (Injunctive Relief Relief—Violation of Cal. Bus. Prof. Code §17200, et seq.— California Unfair Competition Law)

(As Against All Defendants)

29.     The allegations in Paragraphs 1 through 28 are re-alleged and incorporated herein by reference.

30.     California's Unfair Competition Law ("UCL") "prohibits any unfair competition, which means 'any unlawful, unfair or fraudulent business act or practice.'" Cal. Bus. & Prof. Code §17200, et seq. Cal. Bus. & Prof. Code §17200 provides:

"… [U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising …"

Cal. Bus. & Prof. Code §17201 provides:

"[T]he term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."

Cal. Bus. & Prof. Code §17203 further provides:

"Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."

The UCL coverage is "sweeping" and its standard for wrongful business conduct is "intentionally broad." In re First Alliance Mortg. Co. (9th Cir. 2006) 471 F.3d 977, 995. Each prong—fraudulent, unfair, and unlawful—is independently actionable. Lozano v. AT & T Wireless Servs., Inc. (9th Cir. 2007) 504 F.3d 718, 731.

31.     At all times herein-mentioned each of the Defendants was a person within the meaning of Cal. Bus. & Prof. Code §17203, and each was engaged in an unlawful and/or unfair business practice of requiring that Plaintiffs share their legal fees with them under the Loan Agreement in violation of California State Bar rules, as herein

alleged.  Defendants are not lawyers and are prohibited from sharing legal fees with Plaintiffs or any licensed attorney.

31.    To have standing to sue for relief under the UCL, the Plaintiff must be a "person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code §17204.  The UCL incorporates the established meaning of "injury in fact" from the Article III federal standing requirements. Under federal law, an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) 'actual or **imminent**, not "conjecture" or "hypothetical." <u>Kwikset Corp. v. Superior court</u> (2011) 51 Cal.4th 310, 322.

32.    Plaintiffs have standing under California's Unfair Competition Law, because they suffered an "injury in fact" that is **imminent** and "lost money or property as a result of such unfair competition."  For example, Defendant EAJF has commenced an arbitration at JAMS against Plaintiffs for the recovery of Plaintiffs' attorney's fees under the Loan Agreement which is an unlawful legal fee sharing agreement in violation of the California State Bar.  The total Defendant EAJF is claiming in its arbitration claim is over $1 million, which it claims represents added interest.  Defendants only gave Plaintiff CLPC $77,000.00 under the Loan Agreement (after paying itself $23,000 for a loan fee) and falsely claims it loaned Plaintiff CLPC $700,000.00.  Plaintiff Corrales is personally liable under the Loan Agreement as a guarantor.  Plaintiffs are barred from sharing their legal fees collected from their clients to pay Defendants.  If they did make those payments, Corrales would be disciplined by the State bar.  Should Defendant EAJF prevail in its arbitration claims against Plaintiffs, Defendants will then obtain an order from the Delaware state court affirming the award and then seek to enforce the judgment in California against Plaintiffs.  Thus, Plaintiff have suffered an injury in fact caused by Defendants' unlawful and unfair business practices, because the invasion of their legally protected interests in the form of their assets, money and property is **imminent** and subject to garnishment.  In addition, Plaintiffs suffered actual injury in the form of being charged high monthly interest rates in violation of California's usury laws, and actual injury in the form of a claim, now in arbitration, that will result in Plaintiffs becoming judgment debtors which will force them into bankruptcy.  In addition, Plaintiffs have been required to pay the JAM arbitrator $4,500.00 in fees and will continue to be

billed for the JAMS arbitration proceeding.  Should Defendant EAJF prevail in the
arbitration proceeding, they will be entitled to an award for attorney's fees and costs per
the Loan Agreement.

33.    Accordingly, Plaintiffs have suffered an injury in fact that is proximately
caused by Defendants' unlawful and unfair business practices under the UCL.

34.    Defendants' conduct is a pattern and practice in California and elsewhere.
They have entered into other loan agreements with other lawyers requiring that these
other lawyers share their legal fees collected from their clients to pay similar loans.
Attached are various ads Defendant BEBC posts on social media for state-wide
solicitation for attorney fee sharing loan agreements.  (Ex. "5" to Complaint).  The Court
should therefore enjoin Defendants from engaging in such practices, enjoin Defendants
from enforcing the subject Loan Agreement, and enjoin Defendant EAJF from pursuing
arbitration under the Loan Agreement on the grounds that the Loan Agreement is void
as against public policy and an unlawful and unfair business practice. Cal. Bus. Code
§17203 ("Any person who engages, has engaged, or proposes to engage in unfair
competition may be enjoined in any court of competent jurisdiction).

35.    In addition, Defendants have commenced binding arbitration in New York
with JAMS based upon this invalid and void Loan Agreement. The Arbitration provision
in the Loan Agreement provides that the arbitration take place at the JAMS office in
Delaware. However, JAMS does not have a JAMS office in Delaware. Over Plaintiffs'
objections and at Defendants' urging, JAMS refused to change the location to San
Diego, and instead stated it will conduct arbitration with a New York or Pennsylvania
arbitrator and export the non-Delaware arbitrator to a rented office somewhere in
Delaware. Based upon this invalid arbitration venue provision, Plaintiff will be required
to travel to Delaware to defend themselves against Defendants unlawful arbitration. If
Defendants prevail at the arbitration hearing, Plaintiff will be forced to hire a Delaware
lawyer at great expense to oppose Defendants' petition in Delaware Court to affirm the
arbitration award, since Corrales is not license in Delaware and he represents
Defendant CLPC. Defendants will then file the Delaware judgment in California and
attempt to collect the over $1 million judgment against Corrales personally, forcing him
into bankruptcy. In order to prevent Defendants from pursuing their invalid claims in

arbitration, the Court should enjoin the arbitration proceeding resolution of this action in federal court.

## **PRAYER FOR RELIEF**

Therefore, Plaintiffs request a judgment against Defendants as follows:

1. Declaratory relief declaring that the subject Loan Agreement is void and unenforceable in its entirety as against public policy, because its purpose is to share legal fees with a non-lawyer.

2. Declaratory relief declaring that since the subject Loan Agreement is void and unenforceable as against public policy, the arbitration provisions in the Loan Agreement are likewise void and unenforceable.

3. Declaratory relief declaring that the Loan Agreement is void and unenforceable as against public policy, because Plaintiffs' clients did not consent in writing to the fee sharing agreement.

4. Declaratory relief declaring that the Loan Agreement is void and unenforceable as against public policy, because it charges excessive and illegal interest and violates 15 U.S.C. §§1693, et seq., and 1634.

5. Declaratory relief declaring that the subject Loan Agreement is void and unenforceable for lack of consideration, because the Defendants paid an unenforceable lien from U.S. Claims that became unenforceable when Corrales lost the case upon which the lien was based, and because the payoff was for an obligation of Corrales personally and not an obligation of CLPC.

6. Injunctive relief under Cal. Bus. Code §17200, et seq., the California Unfair Competition Law, enjoining Defendants from enforcing the subject Loan Agreement and pursuing arbitration under the subject Loan Agreement. (Cal. Bus. Code §17203).

7. Granting such other equitable and legal relief as the Court deems just and proper.

Dated: July 18, 2025

_____
Manuel Corrales, Jr., Esq.,
Attorney for Plaintiff
CORRALES LAW PC, and In Pro Per

# EXHIBIT "1"

**IN THE MATTER OF**

| | |
|---|---|
| **EQUAL ACCESS JUSTICE FUND LP**<br>**c/o Delaware Trust Company**<br>**251 Little Falls Drive**<br>**Wilmington, Delaware 19808** | )<br>)<br>)<br>) **CLAIM NO.**_____<br>)<br>**Claimant,**    )<br>) **ARBITRATOR** _____<br>-v-    )<br>)<br>**CORRALES LAW PC**    )<br>**17140 Bernardo Center Drive, Suite 358**    )<br>**San Diego, CA 92128**    )<br>)<br>**and**    )<br>)<br>**MANUEL CORRALES, JR.**    )<br>**17140 Bernardo Center Drive, Suite 358**    )<br>**San Diego, CA 92128**    )<br>**Respondents.**    )<br>)<br>) |

Claimant Equal Access Justice Fund LP ("Claimant"), for its demand for arbitration and statement of claim against Respondents Corrales Law PC ("Law Firm") and Manuel Corrales, Jr. (individually "Guarantor" and collectively with Law Firm, "Respondents") states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.    Claimant is a Delaware limited partnership with its principal place of business located in West Palm Beach, Florida.

2.    Upon information and belief, Respondent Law Firm is a California professional corporation with its principal place of business located in San Diego, California.

3.    Upon information and belief, Respondent Guarantor is a resident of California, is an attorney licensed to practice law, and is the managing partner of Law Firm.

4.      Arbitration is appropriate pursuant to § 11.15 of the Loan Agreement signed by the parties on or around August 16, 2021, which provides that "any and all Claims arising out of or relating any way to this agreement or any other Loan Document or the breach, termination, enforcement, interpretation or validity thereof . . . shall be submitted to final and binding arbitration before Judicial Arbitration and Mediation Services, Inc. ("JAMS")."

## FACTUAL ALLEGATIONS

5.      On or around August 16, 2021, the parties entered into a Loan Agreement (the "Original Loan Agreement").  Subsequently, on or about November 8, 2021, the parties entered into an Amendment to Loan Agreement ("Amendment" or collectively, the "Loan Agreement"), providing for a loan to Law Firm as the Borrower in the original principal amount of $700,000 with Guarantor, individually, as Guarantor.  A true and correct copy of the Original Loan Agreement and Amendment is attached hereto as Exhibit A.

6.      Pursuant to the Loan Agreement, the maturity date for the Loan was August 16, 2024 (the "Maturity Date").

7.      Pursuant to Section 2.3 of the Loan Agreement, "Maturity of Loan," Law Firm was required to make a payment of all principal and interest not sooner paid on the loans due and payable on the Maturity Date.

8.      Pursuant to Section 2.4(b) of the Loan Agreement as amended by the Amendment Section 2, Law Firm was – on the tenth (10th) day after the end of each calendar month – obligated to make mandatory monthly prepayments to Claimant equal to an amount of 25% of the Law Firm Proceeds (as that term is defined in the Original Loan Agreement), for such calendar month (subject to a discretionary increase as outlined in the Original Loan Agreement sections i-iii) (the "Mandatory Prepayments").

- 2

9.      Pursuant to Section 7.3 of the Loan Agreement, "Reports," Law Firm was required to furnish Claimant copies of Law Firm's tax returns and bank statements, as well as other financial information at intervals proscribed by the Loan Agreement (collectively, "Reports").

10.      Pursuant to Section 9 of the Loan Agreement, "The Guarantees," the Guarantor unconditionally and irrevocably guaranteed jointly and severally to the Claimant, the due and punctual payment of Obligations (as that term is defined in the Loan Agreement) due to the Claimant. Guarantor executed the Loan Agreement and acknowledged Guarantor's liability under the Loan Agreement.

11.      On or around August 16, 2021, Law Firm executed a Note in favor of the Claimant in the principal amount of $700,000. A true and correct copy of the Note is attached hereto as Exhibit B.

12.      On or around August 16, 2021, Law Firm executed a Direction of Proceeds, in which Respondents agreed that the proceeds of the Note should be paid by Claimant as follows:

1. **To the account of Corrales Law PC, the amount of Seventy-Seven Thousand and No/100 Dollars ($77,000.00) paid as follows:**

   Account Name: Corrales Law PC Operating Account
   Account Number: 737013976
   Name of Bank: JP Morgan Chase Bank
   Bank Routing Number: 322-271-627
   Reference Information: Equal Access Justice Fund Loan Proceeds

2. **To the account of Collectio I Lockbox SPV, LLC, the amount of Five Hundred and Five Thousand and No/100 Dollars ($505,000.00) paid as follows:**

   Account Name: Collectio I Lockbox SPV, LLC
   Account Number: 4298292491
   Name of Bank: Wells Fargo Bank
   Bank Routing Number: 121-000-248
   Reference Information: Corrales Law PC Payoff

A true and correct copy of the Direction of Proceeds is attached hereto as Exhibit C. As reflected

on the Direction of Proceeds, Claimant ultimately only ended up distributing gross loan proceeds of $600,000 as follows:

**EXHIBIT 1**
Loan Proceeds Distribution

| | |
|---|---|
| Gross Loan Proceeds: | $600,000.00 |
| Loan Advance Fee: | ($12,000.00) |
| Servicing Fee: | ($6,000.00) |
| USClaims Payoff: | ($505,000.00) |
| Net Loan Proceeds<br>(to Borrower account per letter to which this exhibit is attached). | $77,000.00 |

13.     The $505,000 payment to Collection I Lockbox SPV, LLC was made to satisfy a previous loan that Respondents owed to US Claims, as reflected by the Payoff Letter attached hereto as Exhibit D.

14.     On or around August 16, 2021, the Law Firm and Claimant entered into a Security Agreement.  A true and correct copy of the Security Agreement is attached hereto as Exhibit E.

15.     Under the Security Agreement, Law Firm granted to Claimant a security interest in all of the "Collateral" and the proceeds thereof to secure payment and performance of the Indebtedness.  Pursuant to Section 2 of the Security Agreement, "Collateral" is defined to include all of the following ": (a) Accounts…; (b) Chattel Paper; (c) Instruments…; (d) Documents; (e) General Intangibles…; (f) Letters of Credit Rights; (g) Supporting Obligations; (h) Deposit Accounts; (i) Investment Property…; (j) Inventory; (k) Equipment; (l) Fixtures; (m) Commercial Tort Claims…; (n) Rights to merchandise and other Goods…; (o) Monies, personal property, and interests in personal property...; (p) Charging Liens …; (q) Supporting evidence and other

- 4

documents relating to the above described property…; (r) Accessions…; and (s) Proceeds and products of the foregoing...;" (collectively, the "Collateral").

16.    Claimant has properly perfected its security interest in the Collateral created by the Security Agreement by filing a UCC-1 Financing Statement with the Secretary of State for the State of California. A true and correct copy of the UCC-1 Financing Statement is attached hereto as <u>Exhibit F</u>.

17.    Claimant has a perfected, first-priority, security interest in all of the Collateral acquired or owned by Law Firm.

18.    Pursuant to Section 8.1, "Events of Default," a failure to make payment at the time it is due (whether at the Maturity Date or any other time provided for in the Loan Agreement), is a default of Law Firm's Obligation.

19.    Section 8.2, "Non-Bankruptcy Defaults," expressly authorizes Claimant to declare the full amount of principal and interest due and payable due and owing, and to exercise all of Claimant's rights and remedies as a secured party, including the right to take possession of and dispose of the Collateral.

20.    Despite notice and repeated demands, the Respondents have failed to, *inter alia*, pay all principal and interest due to Claimant on and after the Maturity Date ("Maturity Default").

21.    Due to Respondents' Default under the Loan Agreement including the Maturity Default, all amounts under the Loan Agreement are immediately due and payable. Claimant has sent several letters communicating this to Respondent, reserving its rights, and demanding payment and compliance with the Loan Documents, including letters dated December 9, 2024, and December 18, 2024. (A true and accurate copy of the demand letters are attached hereto as <u>Exhibit G).</u>

22.     To date, Respondent has refused to pay or comply with the Loan Documents.  The outstanding amount due as of March 3, 2025 totaled $1,273,224.82, inclusive of principal and interest, as well as late fees and other charges, all of which have continued to accrue at the Default Rate since that date.

23.     Pursuant to the Loan Agreement, Guarantor is jointly and severally liable for all amounts due to Claimant.

**COUNT I**
**(DEFAULT UNDER LOAN AGREEMENT)**

24.     Claimant incorporates the allegations contained in Paragraphs 1 through 24, above, as if fully rewritten herein.

25.     Respondent Law Firm is in default under the Loan Agreement by reason of its Maturity Default and failure to make required payments of principal and interest to Claimant. Claimant has declared all sums due under the Loan Agreement to be immediately due and payable.

26.     As of March 3, 2025, the outstanding amount due totaled $1,273,224.82, inclusive of principal and interest, as well as late fees and other charges, all of which have continued to accrue at the Default Rate since that date, and will continue to accrue until the balance is paid in full.

**COUNT II**
**(BREACH OF GUARANTEE)**

27.     Claimant incorporates the allegations contained in Paragraphs 1 through 27, above, as if fully rewritten herein.

28.     Respondent Guarantor absolutely, unconditionally, jointly and severally guaranteed the prompt payment when due of all Obligations of Law Firm under the Loan

Agreement. The Guarantee is contained in the Original Loan Agreement, which is attached hereto as <u>Exhibit A</u>.

29.    Claimant is entitled to and seeks enforcement of the Guarantee of Guarantor with respect to the indebtedness, obligations and liabilities of Law Firm under the Loan Agreement.

## COUNT III
### (DECLARATION)

30.    Claimant incorporates the allegations contained in Paragraphs 1 through 30, above, as if fully rewritten herein.

31.    The security interest in the Collateral granted by Law Firm to Claimant pursuant to the Security Agreement is superior and prior in law to any interest that Law Firm or any other creditor may have in the Collateral, and Claimant has the statutory right to take possession of the Collateral.

32.    To the best knowledge, information and belief of Claimant, the Collateral is located at 17140 Bernardo Center Drive, Suite 358, San Diego, CA 92128. There is probable cause to believe that the Collateral is located there because such location is the principal place of business of Law Firm.

33.    The Collateral has not been taken for a tax assessment, or fine, pursuant to a statute; or seized under an execution against the property, and is not statutorily exempt from such seizure.

34.    Claimant is entitled to a declaration that it holds a first priority lien against the Collateral and an order that Law Firm turnover all Collateral to Claimant.

## PRAYER FOR RELIEF

WHEREFORE, Claimant, Equal Access Justice Fund LP, respectfully requests that the following relief:

a. On Count One, money damages against Respondent Law Firm in the amount of

$1,273,224.82, inclusive of principal and interest, late fees and other charges that have accrued since then and that will continue to accrue until the balance is paid in full;

b. On Count Two, money damages against Respondent Guarantor, jointly and severally, for all indebtedness, obligations and liabilities of Law Firm under the Loan Agreement;

c. On Count Three, issuance of an order of possession with respect to the Collateral;

d. On all Counts, prejudgment and post-judgment interest, attorneys' fees and costs, and such further relief that the Panel deems just and proper.

Respectfully submitted,

*/s/ Joseph Lehnert*
Joseph Lehnert
Stephanie Scott
Keating Muething & Klekamp PLL
One East Fourth St., Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 639-3964
Fax: (513) 579-6457
sscott@kmklaw.com
jlehnert@kmklaw.com
*Attorneys for Claimant,*
*Equal Access Justice Fund LP*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of March, 2025, a copy of the foregoing was served by regular U.S. Mail and email upon:

**CORRALES LAW PC**
**17140 Bernardo Center Drive, Suite 358**
**San Diego, CA 92128**

**and**

**MANUEL CORRALES, JR.**
**17140 Bernardo Center Drive, Suite 358**
**San Diego, CA 92128**

*/s/ Stephanie M. Scott*
Stephanie M. Scott

14289056.1

- 8

# EXHIBIT A

LOAN AGREEMENT

DATED AS OF AUGUST 16, 2021

AMONG

CORRALES LAW PC

THE GUARANTORS AND EQUITY PARTNERS FROM TIME TO TIME PARTY HERETO

AND

EQUAL ACCESS JUSTICE FUND LP

Lender Reference:  Loan Number 102

## TABLE OF CONTENTS

SECTION                                    HEADING                                                    PAGE

SECTION 1. DEFINITIONS; INTERPRETATION...............................................................1
    *Section 1.1.*    Definitions...........................................................................1
    *Section 1.2.*    Interpretation........................................................................9
    *Section 1.3.*    Accounting Terms................................................................10
    *Section 1.4.*    References to Documents. ...................................................10

SECTION 2. THE FACILITY.......................................................................................10
    *Section 2.1.*    The Facility..........................................................................10
    *Section 2.2.*    Calculation of Interest.........................................................11
    *Section 2.3.*    Maturity of Loan. ................................................................11
    *Section 2.4.*    Payments.............................................................................11
    *Section 2.5.*    Recourse..............................................................................12
    *Section 2.6.*    Default Rate.........................................................................12
    *Section 2.7.*    Evidence of Indebtedness. ...................................................12
    *Section 2.8.*    Agreements Regarding Loan. ...............................................13
    *Section 2.9.*    Joint and Several Obligations. .............................................13

SECTION 3. FEES.
    *Section 3.1.*    Fees. ....................................................................................14

SECTION 4. PLACE AND APPLICATION OF PAYMENTS. ....................................16
    *Section 4.1.*    Place and Application of Payments. .....................................16
    *Section 4.2.*    Non-Business Days...............................................................16
    *Section 4.3.*    Payments Set Aside..............................................................17

SECTION 5. REPRESENTATIONS AND WARRANTIES.........................................17
    *Section 5.1.*    Organization and Qualification.............................................17
    *Section 5.2.*    Authority and Validity of Obligations. .................................17
    *Section 5.3.*    Use of Proceeds; Business Purpose. .....................................18
    *Section 5.4.*    Financial Reports and Accounts. ..........................................18
    *Section 5.5.*    No Material Adverse Change.................................................19
    *Section 5.6.*    Full Disclosure.....................................................................19
    *Section 5.7.*    Governmental Authority and Licensing.................................19
    *Section 5.8.*    Legal Interest; Liens. ...........................................................19
    *Section 5.9.*    Litigation and Other Controversies.......................................19
    *Section 5.10.*    Taxes...................................................................................19
    *Section 5.11.*    Approvals.............................................................................20
    *Section 5.12.*    Compliance with Laws and Ethics........................................20
    *Section 5.13.*    Good Standing. ....................................................................20

Lender Reference: Loan Number 103

| Section 5.14. | Other Agreements. | 21 |
| Section 5.15. | Solvency and Fraudulent Conveyance. | 21 |
| Section 5.16. | No Default. | 21 |
| Section 5.17. | Notification of Clients. | 21 |
| Section 5.18. | OFAC. | 21 |
| Section 5.19. | Reliance Representation. | 21 |

**SECTION 6. CONDITIONS PRECEDENT.** ... 21

| Section 6.1. | All Loans. | 21 |
| Section 6.2. | Closing Date Loan. | 22 |

**SECTION 7. COVENANTS.** ... 23

| Section 7.1. | Maintenance of Business; Retention of Rights in Law Firm Proceeds. | 24 |
| Section 7.2. | Taxes and Assessments. | 24 |
| Section 7.3. | Reports. | 24 |
| Section 7.4. | Inspection. | 26 |
| Section 7.5. | Borrowings and Guaranties. | 26 |
| Section 7.6. | Liens. | 27 |
| Section 7.7. | Mergers, Consolidations and Sales. | 27 |
| Section 7.8. | Loans or Advances to Employees. | 27 |
| Section 7.9. | Compliance with Laws. | 27 |
| Section 7.10. | Use of Proceeds. | 28 |
| Section 7.11. | Maintenance of Malpractice Insurance. | 28 |
| Section 7.12. | Minimum Collateral Coverage. | 28 |
| Section 7.13. | Fee Sharing and Referral Agreements. | 28 |
| Section 7.14. | Affiliate Transactions Limitation. | 28 |
| Section 7.15. | Rent Increase Limitation. | 28 |

**SECTION 8. EVENTS OF DEFAULT AND REMEDIES.** ... 28

| Section 8.1. | Events of Default. | 28 |
| Section 8.2. | Non-Bankruptcy Defaults. | 30 |
| Section 8.3. | Bankruptcy Defaults. | 30 |

**SECTION 9. THE GUARANTEES.** ... 31

| Section 9.1. | The Guarantees. | 31 |
| Section 9.2. | Guarantee Unconditional. | 31 |
| Section 9.3. | Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances. | 32 |
| Section 9.4. | Subrogation. | 32 |
| Section 9.5. | Subordination. | 32 |
| Section 9.6. | Waivers. | 33 |
| Section 9.7. | Stay of Acceleration. | 33 |
| Section 9.8. | Benefit to Guarantors. | 33 |

Lender Reference: Loan Number 103

Section 9.9.          Transfers of Guarantor Property. .........................................................33
Section 9.10.         Assignment of Life Insurance Policy and Reporting Requirements....33
Section 9.11.         Personal Assets Lien. ...........................................................................34

SECTION 10. COLLATERAL. .................................................................................34

Section 10.1.         Collateral. .............................................................................................34
Section 10.2.         Direction of Proceeds; Depository Banks..........................................34
Section 10.3.         Additional Lender Protections. ...........................................................35
Section 10.4.         Further Assurances. ..............................................................................36

SECTION 11. MISCELLANEOUS. ...........................................................................36

Section 11.1.         Notices. ................................................................................................36
Section 11.2.         Amendments. .......................................................................................37
Section 11.3.         Costs and Expenses; Indemnification. ................................................37
Section 11.4.         No Waiver, Cumulative Remedies. .....................................................38
Section 11.5.         Survival of Representations. ................................................................38
Section 11.6.         Survival of Indemnities.......................................................................38
Section 11.7.         Counterparts; Integration; Effectiveness.............................................38
Section 11.8.         Headings. .............................................................................................39
Section 11.9.         Severability of Provisions. ..................................................................39
Section 11.10.        Construction.........................................................................................39
Section 11.11.        Excess Interest. ....................................................................................39
Section 11.12.        Independent Evaluation of Loan Parties; No Advisory or Fiduciary Responsibility of Lender.......................................................................40
Section 11.13.        Binding Nature. ...................................................................................41
Section 11.14.        Governing Law. ...................................................................................41
SECTION 11.15.       Waiver of Jury Trial; Binding Arbitration. .........................................41
Section 11.16.        Future Financing. ................................................................................44
Section 11.17.        USA Patriot Act. ..................................................................................44
Section 11.18.        Confidentiality. ....................................................................................45

EXHIBIT A        —    Notice of Borrowing
EXHIBIT B        —    Note
EXHIBIT C        —    Additional Guarantor Supplement
EXHIBIT D        —    Direction of Proceeds
EXHIBIT D-1      —    Loan Proceeds Distribution
EXHIBIT E        —    Compliance Certificate
EXHIBIT F        —    Letter of Authorization
EXHIBIT G        —    Monthly Compliance Certificate
EXHIBIT H        —    Closing Collateral Certification

SCHEDULE 10.2    —    Deposit Accounts

Lender Reference: Loan Number 103

# LOAN AGREEMENT

This Loan Agreement is entered into as of August 16, 2021 , among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Equity Partners party to this Agreement as Guarantors, and Equal Access Justice Fund LP, a Delaware limited partnership (the *"Lender"*), as the lender as provided herein, having an address of Equal Access Justice Fund LP c/o Delaware Trust Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## PRELIMINARY STATEMENT

The Borrower has requested, and the Lender has agreed to extend, a credit facility on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  DEFINITIONS; INTERPRETATION.

*Section 1.1.*    Definitions
The following terms when used herein shall have the following meanings:

*"Adverse Case Resolution"* means, with respect to any Case, a Case Resolution that results in no Law Firm Proceeds. However, Adverse Case Resolution does not include: (i) a voluntary dismissal; (ii) entry of judgment or dismissal resulting from a motion to dismiss, summary judgment, or otherwise, wherein the court allows for an amended or refiled pleading to correct an alleged failure to adhere to procedural or substantive prerequisites to maintaining such legal matter; (iii) entry of judgment or dismissal resulting from a motion to dismiss, summary judgment, or otherwise, wherein the court disallows an amended or refiled pleading to cure an alleged failure to adhere to procedural or substantive prerequisites to properly filing or maintaining such legal matter or (iv) dismissal or entry of judgment based upon actions and omissions that establish the basis of a legal malpractice claim or allegation.

*"Affiliate"* means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided that*, in any event for purposes of this definition, any Person that owns, directly or indirectly, 5% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 5% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to Control such corporation or other Person.

*"Agreement"* means this Loan Agreement, as the same may be amended, modified, restated or supplemented from time to time pursuant to the terms hereof.

-1-

Borrower Initials: _____
Lender Reference: Loan Number 103

"*Borrower*" is defined in the introductory paragraph of this Agreement.

"*Business Day*" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Wilmington, Delaware.

"*Case*" or "*Cases*" mean legal matters in which the Borrower or the Borrower's successor in interest is an attorney of record or co-counsel or from which the Borrower or the Borrower's successor in interest otherwise receives fees in exchange for services rendered or referrals and includes, but is not limited to, all trial court proceedings, appellate proceedings, proceedings on remand, enforcement, ancillary, parallel or alternate dispute resolution proceedings and processes arising out of or related to a legal matter, such as if a matter must be refiled due to a procedural or pleading deficiency, Commercial Tort Claims, and all other proceedings founded on the underlying facts giving rise to a legal matter.

"*Case Resolution*" means, with respect to any Case, either full and final settlement of the Case or the entry of a final, non-appealable and enforceable judgment, in either case, resolving with prejudice all aspects and elements of such Case.

"*Change of Control*" means any Guarantor ceases to be an Equity Partner in the Borrower for any reason, including, without limitation, death, incapacity or termination.

"*Closing Date*" means the date of this Agreement or such later Business Day upon which each condition described in Section 6 shall be satisfied or waived in a manner acceptable to the Lender in its discretion.

"*Code*" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"*Collateral*" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to the Lender by the Collateral Documents or which are intended to be subject to the Liens granted to the Lender, *provided* that Collateral shall not included any Excluded Property. Collateral includes, but is not limited to, all charging liens or charging lien rights Borrower has.

"*Collateral Documents*" means the Security Agreement, each Control Agreement and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements, control agreements, and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

"*Commercial Tort Claims*" are claims arising in tort with respect to which: (A) the claimant is an organization; or (B) the claimant is an individual and the claim: (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual.

-2-

Borrower Initials:_____

Lender Reference:  Loan Number 103

"*Compliance Certificate*" means the certificate in the form of Exhibit E, or in such other form acceptable to the Lender, to be delivered to the Lender pursuant to Section 7.3.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"*Control Agreement*" is defined in Section 10.2(a).

"*Custodian*" means Delaware Trust Company, having an address of 251 Little Falls Drive, Wilmington, Delaware 19808, in its capacity as the custodian hereunder, and any successor in such capacity.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Default*" means any event or condition which constitutes an Event of Default or any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"*Default Rate*" is defined in Section 2.6.

"*Designated Disbursement Account*" means the Operating Account designated in writing to the Lender as the Borrower's Designated Disbursement Account (or such other account as the Borrower and the Lender may otherwise agree) pursuant to Exhibit D.

"*Disciplinary Action*" means (i) any motion or action by or before any Governmental Authority (including, without limitation, any court, arbitrator, arbitration panel in any domestic or foreign jurisdiction), which alleges that the Borrower or any of its Equity Partners or employees committed any professional misconduct (including, without limitation, any violation of the Disciplinary Rules) and for which a penalty is sought (whether such penalty is money damages or restitution, the referral of the Borrower or one of its Equity Partners or employees to any state bar association or other disciplinary authority related to the professional responsibility of attorneys); or (ii) any denial or revocation of any pro hac application or admission in any jurisdiction.

"*Disciplinary Rules*" is defined in Section 5.12.

"*Effective Date*" shall mean the date first set forth above.

Borrower Initials: _____

Lender Reference: Loan Number 103

*"Equity Partner"* means a Person directly or indirectly owning an equity interest in the Borrower (including, but not limited to, a partner, member, shareholder, sole proprietor or other designation as applicable to the organizational form of the Borrower).

*"Event of Default"* means any event or condition identified as such in Section 8.1.

*"Expense"* or *"Expenses"* means costs and expenses of litigation, including, without limitation, court filing fees, deposition costs, expert fees and expenses, investigation costs, long-distance telephone charges, messenger service fees, photocopying expenses, process server fees, case development costs, and medical expenses, and, in addition, marketing and case acquisition costs; *provided, however*, that "Expenses" shall not include attorney fees of the Loan Parties, salaries or other overhead of the Loan Parties. The Borrower agrees not to pass through any expenses to its client which are not permitted in the written contract between the Borrower and its client.

*"Facility"* means the credit facility for making Loans described in Section 2.1.

*"Fees"* means the Late Advance Fees, Late Fees and Late Reporting Fees, Services Fees provided in Section 3.1 and other fees charged by Lender.

*"GAAP"* means generally accepted accounting principles in the U.S. set out in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and and the Financial Accounting Standards Board as in effect from time to time and applied in accordance with Section 1.3 hereof.

*"Governmental Authority"* means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

*"Guarantee"* of or by any Person (the *"guarantor"*) means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the *"primary obligor"*) in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; *provided,* that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

-4-

Borrower Initials: _____
Lender Reference: Loan Number 103

*"Guaranty Agreements"* means and includes the Guarantee of the Guarantors provided for in Section 9, and any other guaranty agreement executed and delivered in order to guarantee the Obligations or any part thereof in form and substance acceptable to the Lender.

*"Guarantor"* or *"Guarantors"* means and includes each Person that signs a Guaranty Agreement.

*"Indebtedness"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business), (c) all indebtedness secured by any Lien upon property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all capitalized lease obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (g) all other obligations required by GAAP to be classified upon such Person's balance sheet as liabilities and (h) all Guarantees of such Person in respect of any of the foregoing.

*"Interest Rate"* means twenty-two percent (22%) per annum, compounded on an annual basis; unless pursuant to Section 11.11 the Maximum Rate will apply.

*"IOLTA Account"* is defined in Section 10.2(b).

*"IRS"* means the United States Internal Revenue Service.

*"Late Fees"* is defined in Section 3.1 (b).

*"Late Reporting Fees"* is defined in Section 3.1 (b).

*"Law Firm Proceeds"* means all funds and other property or value received directly or indirectly by or on behalf of the Borrower or an Affiliate (and not the client's share) on account of (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) the client on account or as a result or by virtue (directly or indirectly) of a Case, whether by negotiation, arbitration, mediation, diplomatic efforts, Lawsuit, settlement or otherwise, and includes all of the Borrower's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; (ii) any consequential, rescissionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, attorneys' and other fees and costs

-5-

Borrower Initials: _____
Lender Reference: Loan Number 103

awarded or recovered on account thereof, and reimbursed expenses; (iii) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of the Case and amounts received on account of fees and expenses in connection with any of the forgoing, in each case, whether in the form of cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds, and any other rights to payment of cash and/or transfer(s) of things of value or other property (including property substituted therefor), whether delivered or to be delivered in a lump sum or in installments, in relation to any Case or negotiation with any Person in relation to the Case, and only to the extent such value is actually received by the Borrower or such Affiliate; (iv) any and all other gross revenues received by Borrower in connection with its provision of legal services, including but not limited to services rendered in connection with litigation, transactional or consulting services and regardless of whether any such revenues were pursuant to a contingency, hourly, flat-fee, or other payment agreement; *provided, however*, that "Law Firm Proceeds" shall not include (a) the amount of the recovery actually due and payable to the client, and (b) any amounts actually due and payable to a referral or handling Law firm or attorney that is not employed by or on retainer with Borrower, an Affiliate of Borrower or otherwise related (including by marriage) to Borrower, any Guarantor or any employee of Borrower or Guarantor.

*"Laws"* means, collectively, all international, foreign, federal, State and local statutes, treaties, rules (including those governing the professional conduct of attorneys), guidelines, regulations, ordinances, codes, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority (whether or not such orders, requests, licenses, authorizations, permits or agreements have the force of Law).

*"Lender"* means Equal Access Justice Fund LP, in its capacity as the lender hereunder, and any successor in such capacity.

*"Lender Parties"* is defined in Section 11.3(b).

*"Legal Requirement"* means any treaty, convention, statute, Law, common Law, rule, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any governmental authority, whether federal, state, or local.

*"Lien"* means any lien (statutory or other), mortgage, security interest, financing statement, collateral assignment, pledge, assignment, charge, hypothecation, deposit arrangement, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing), or encumbrance of any kind, and any other right of or arrangement with any creditor (whether based on common Law, constitutional provision, statute or contract) to have its claim satisfied out of any property or assets, or their Proceeds, before the claims of the general creditors of the owner of the property or assets.

-6-

*"Litigation"* means any action by or before any Governmental Authority, arbitrator or arbitration panel.

*"Loan"* is defined in Section 2.1.

*"Loan Advance Fees"* is defined in Section 3.1(a).

*"Loan Availability Period"* means the period in which credit facility will be available, commencing on the Effective Date and ending on Maturity Date.

*"Loan Documents"* means this Agreement, the Note, the Collateral Documents, the Guaranty Agreements, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith.

*"Loan Extension Fees"* is defined in Section 3.1(a).

*"Loan Party"* means the Borrower and each of the Guarantors.

*"Material Adverse Effect"* means (a) a material adverse change in, or material adverse effect upon, the operations, business, property, condition (financial or otherwise) or prospects of the Borrower, (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document or the rights and remedies of the Lender thereunder or (ii) the perfection or priority of any Lien granted under any Collateral Document.

*"Mandatory Payment"* is defined in Section 2.4(b).

*"Maturity Date"* means the earliest of (i) August 16, 2024, or (ii) the date upon which the Loan is accelerated in accordance with Sections 8.2 or 8.3. The Facility may be renewed annually following the Maturity Date on Lender's discretion.

*"Malpractice Insurance Policies"* is defined in Section 7.11.

*"Maximum Rate"* means the maximum non-usurious amount and the maximum non-usurious rate of interest that the Lender is permitted to contract for, charge, take, reserve or receive on the Obligations under 6 Del. C. § 2301(c) and successor statutes. In the unlikely event that a court, arbitrator, or other tribunal were to disregard the Lender and Borrower's choice of Delaware Law and apply the Laws of some other jurisdiction to determine maximum rate, and such determination were to be upheld in a final and non-appealable order, award, or judgment, then the Maximum Rate would mean the maximum non-usurious amount and the maximum non-usurious rate of interest that the Lender is permitted to contract for, charge, take, reserve or receive on the Obligations under the applicable Laws of such other jurisdiction, and any additional interest or charges treated as interest over the Maximum Rate shall be deemed to have been a mistake and

-7-

Borrower Initials: _____

Lender Reference:  Loan Number 103

automatically cancelled. For the avoidance of doubt, if a change of Laws shall occur and the Maximum Rate under applicable Laws shall change, for purposes of this Agreement and the other Loan Documents, the Maximum Rate shall only be applied retroactively if retroactive application is so required by Law and if not, the Maximum Rate shall only be applicable pursuant to the terms of this Agreement and the Loan Documents as of the effective date of such change.

"*NDA Signing Date*" means May 11, 2021, the date the Borrower signed a non-disclosure agreement with Lender.

"*Note*" is defined in Section 2.7(d).

"*Obligations*" means all obligations of the Borrower to pay principal and interest on the Loan, all fees and charges payable hereunder, and all other payment obligations of the Borrower or any other Loan Parties arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

"*Operating Account*" is defined in Section 10.2(a).

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Responsible Officer*" of any Person means any executive officer of such Person and any other officer, Equity Partner or managing member or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"*Revenues*" means, with reference to any period, the gross consolidated revenues of the Borrower.

"*Security Agreement*" means that certain Security Agreement dated the date hereof between the Borrower and the Lender, as the same may be amended, modified, supplemented or restated from time to time.

"*Solvent*" means a condition of a Person on a particular date, whereby on such date (a) the fair value of the assets of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is generally paying such Person's debts as and when they come due. In computing the amount of contingent liabilities at any time, it is intended that such liabilities will be computed at the amount that, in light of all the facts and circumstances

-8-

Borrower Initials:_____

Lender Reference:  Loan Number 103

existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"*Term Sheet*" means the term sheet executed by Borrower and Lender on August 12, 2021.

"*UCC*" means the State of Delaware Uniform Commercial Code, as amended from time to time; *provided* that if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"*U.S. Dollars*" and "*$*" each means the Lawful currency of the United States of America.

*Section 1.2.*    Interpretation.

(a)    The meanings of words and defined terms are equally applicable to the singular and plural forms of the defined terms and words.  Defined terms in respect of one gender include each other gender where appropriate.  Derivatives of defined terms have corresponding meanings.

(b)    Any conflict or ambiguity between this Agreement and any other Loan Document is controlled by the terms and provisions of this Agreement.

(c)    The headings and captions used in this Agreement and the other Loan Documents are for convenience only and will not be deemed to limit, amplify or modify the terms of this Agreement or the Loan Documents.

(d)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears, unless otherwise indicated.

(e)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(f)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision of such Loan Document.

(g)    The term "including" is by way of example and not limitation.

(h)    Any reference herein to any Person shall be construed to include such Person's successors and assigns.

(i)    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, but not limited to, cash, securities, accounts, choses in action, and contract rights.

-9-

Borrower Initials:_____

Lender Reference:  Loan Number 103

(j)     All references to time of day herein (e.g., 11:00 a.m.) are to the time recognized in Wilmington, Delaware (daylight or standard, as applicable), unless otherwise specifically provided.

Section 1.3.     Accounting Terms.  All accounting terms not specifically or completely defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, with all accounting principles being consistently applied from period to period and on a basis consistent with the most recent financial statements of the Borrower.

Section 1.4.     References to Documents.  Unless otherwise expressly provided in this Agreement, (a) references to corporate formation or governance documents, contractual agreements (including this Agreement and the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document, and (b) references to any Law shall include all statutory and regulatory provisions, or rules, consolidating, amending, replacing, supplementing or interpreting such Law.

## SECTION 2.  THE FACILITY.

Section 2.1.     The Facility.  Subject to the terms and conditions hereof, the Lender agrees to make a loan (individually a *"Loan"* and collectively, the *"Loans"*) in U.S. Dollars to the Borrower on the Closing Date in an amount not to exceed seven hundred thousand and No/100 Dollars ($700,000.00) on a cumulative basis during the Loan Availability Period (the "*Maximum Facility Amount*").  The Loans shall be advanced in one or more borrowings during the Loan Availability Period, commencing with an initial advance of $600,000.00 to be transferred by Lender to Borrower on the Closing Date (the *"Initial Advance"*).  Subsequent to the transfer of the Initial Advance, the Borrower may request additional advances of funding in increments of at least $100,000.00, until the maximum value of the facility is reached (the *"Additional Advances"*), the approval of which shall be in the sole discretion of the Lender based on Borrower's performance of its obligations pursuant to the Loans and growth of projected Law Firm Proceeds. The Borrower may only request the Additional Advances on a once-per-month basis. No amount repaid or prepaid on any Loan may be borrowed again (such re-borrowed Loan, a "*Reborrowed Loan*") other than as consented to by the Lender in writing, such consent not to be unreasonably withheld and on a best efforts basis; *provided* that, notwithstanding the foregoing, (i) no Reborrowed Loan may be borrowed again after the first anniversary of the Closing Date unless approved by Lender, in its sole discretion, based on its review of Borrower's performance and credit history, (ii) the Borrower may not request more than one Reborrowed Loan per month may be borrowed again, (iii) any such Reborrowed Laon must be in a minimum amount of $100,000.00 and (iv) any such Reborrowed Loan must not increase a debt owed by Borrower to Lender in an amount that exceeds *Maximum Facility Amount*.  The proceeds of the Loans will be sent via wire or other electronic funds transfer to the Designated Disbursement Account following the Lender's receipt of the Borrower's written direction and funds transfer information and satisfaction of the conditions precedent in this

-10-

Borrower Initials:_____

Lender Reference:  Loan Number 103

Agreement. The principal will be decreased by the amount of any payments applied to principal and increased by the amount of any unpaid interest that accrues on the Loans and is added to the principal balance as set forth in Section 2.2. The Borrower shall give a notice to the Lender requesting the advance of a Loan to the Lender by telephone or other telecommunication device acceptable to the Lender (which notice shall be irrevocable once given and, if by telephone, shall be promptly confirmed in writing in a manner acceptable to the Lender), substantially in the form attached hereto as Exhibit A (Notice of Borrowing), or in such other form acceptable to the Lender. The Borrower agrees that the Lender may rely on any such telephonic or other telecommunication notice given by any person the Lender in good faith believes is a Responsible Officer without the necessity of independent investigation, and in the event any such notice by telephone conflicts with any written confirmation such telephonic notice shall govern if the Lender has acted in reliance thereon.

Section 2.2.    Calculation of Interest. Each Loan shall bear interest at a rate per annum equal to the Interest Rate from the Closing Date until the entire unpaid balance of the principal including unpaid accrued interest has been paid in full. Interest shall be computed based on a 360-day year and the actual number of days elapsed. On an annual basis, unpaid accrued interest as of the day prior to the anniversary date of the Loan agreement will compound (be added to the unpaid principal balance) on the anniversary date of the Loan Agreement. Interest will be charged on the new principal balance until it is repaid.

Section 2.3.    Maturity of Loan. The Borrower shall make a payment of all principal and interest not sooner paid on the Loans due and payable on the Maturity Date, subject to the provisions of Section 2.4.

Section 2.4.    Payments.

(a)    *Optional Payments*. The Borrower may prepay in whole or in part (without penalty or premium) upon notice delivered by the Borrower to the Lender no later than 5:00 p.m. on the date of payment (Wilmington, Delaware time).

(b)    *Mandatory Payments*. The Borrower unconditionally agrees to prepay to the Lender on the tenth (10th) day after the end of each calendar month in each fiscal year, commencing with the first calendar month after the Closing Date and continuing each calendar month thereafter, in an amount on each such date equal to fifty percent (50%) (the *"Mandatory Payment Percentage"*) of Law Firm Proceeds for such calendar month, *provided that* the Mandatory Payment Percentage shall be increased as set forth below, in the Lender's sole discretion, in each of the following cases (the *"Mandatory Payment"*):

(i)    if the amount of interest due on the Loan is equal to or greater than fifty percent (50%) of the current principal balance of the Loan, then the Borrower shall pay an amount equal to one hundred percent (100%) of Law Firm Proceeds for such calendar month; or

Borrower Initials:_____
Lender Reference:  Loan Number 103

(ii)     if the amount of the Obligations is equal to or greater than one hundred fifty percent (150%) of the original principal amount of the Loan, then the Borrower shall pay an amount equal to one hundred percent (100%) of Law Firm Proceeds for such calendar month; or

(iii)     if the Borrower fails to provide the information required by Section 7.3 or, if the Lender believes, in its good faith judgment, that the information provided by the Borrower is inaccurate, then the Borrower shall pay an amount equal to one hundred percent (100%) of Revenues for such calendar month.

(c)     The Borrower acknowledges, understands and agrees that any optional payments or other amount repaid in addition to the Mandatory Payments required above (whether intentional or inadvertent, made by the Borrower or a third party on the Borrower's behalf) does not reduce the amount or percentage of any subsequent Mandatory Payment required under the terms of this Agreement.  The Borrower agrees that the Lender is not required to credit or apply any optional payment amounts to the next Mandatory Payment amount, and any Mandatory Payments must be made in the full amount as set forth in this Section 2.4, without deduction or offset by the Borrower or otherwise.

(d)     All payments shall be applied according to Section 4.1.

*Section 2.5.*     Recourse.  The Obligations shall be full recourse to the Loan Parties.

*Section 2.6.*     Default Rate.  Notwithstanding anything to the contrary contained herein, while any Event of Default exists or after acceleration, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by Law) on the principal amount of the Loans and other amounts at a rate per annum equal to the sum of 5.00% *plus* the Interest Rate (the "*Default Rate*"); *provided, however,* that in the absence of acceleration pursuant to Sections 8.2 or 8.3, any adjustments pursuant to this Section shall be made at the election of the Lender, with written notice to the Borrower (which election may be retroactively effective to the date of such Event of Default).  While any Event of Default exists or after acceleration, interest shall be paid on demand of the Lender. If the Default Rate should ever exceed the Maximum Rate, then the Maximum Rate shall apply instead.

*Section 2.7.*     Evidence of Indebtedness.

(a)     The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower resulting from the Loans made by the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(b)     The Lender shall also maintain accounts in which it will record (i) the amount of the Loans made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder, and (iii) the amount of any sum received by the Lender hereunder from the Borrower.

-12-

Borrower Initials: _____
Lender Reference:  Loan Number 103

(c)     The entries in the accounts maintained pursuant to subsections (a) and (b) above shall be *prima facie* evidence of the existence and amounts of the Obligations therein recorded; *provided, however,* that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Obligations in accordance with their terms.

(d)     The Borrower shall prepare, execute and deliver to the Lender a promissory note payable to the Lender or its registered assigns in the forms of Exhibit B (the *"Note"*).

Section 2.8.     Agreements Regarding Loan.

(a)     The Borrower and the Lender hereby agree that this Agreement and all the Loan Documents evidence a loan and financing agreement wherein at the Borrower's request the Lender is providing financing to the Borrower, and the Borrower represents to the Lender that the contemplated transactions do not constitute in any manner a fee sharing agreement between the Lender and the Borrower with respect to any specific individual Case. It is the intent of both the Borrower and Lender to strictly comply with all Laws and all relevant ethical obligations.

(b)     The Borrower and the Lender hereby agree that the Lender will not exercise influence or control over the strategy with respect to any Case, which is within the purview of the attorney of record and his or her client, and Lender shall not have direct contact with the Borrower's clients prior to an Event of Default.  As such, the Borrower shall not, without the consent of the relevant client, disclose to the Lender any attorney-client privileged or confidential information of its clients relating to the Cases or otherwise.  The Lender shall not interfere, and the Borrower shall not allow any interference by the Lender, with the attorney-client relationship, Borrower's handling of its clients' cases, Borrower's decisions regarding its clients' cases, or maintaining client confidences in connection with any Cases or otherwise, the Lender's interest being solely the collection of the Obligations.

(c)     The Borrower and the Lender hereby agree that the Lender, in its sole discretion in each instance, may extend the Maturity Date by successive twelve-month periods (each twelve-month period an *"Extension Period"*).  The Lender will provide Borrower with notice (the *"Application Notice"*) of the Borrower's opportunity to apply for such an extension ninety (90) days prior to (i) the Maturity Date or (ii) the end of the currently applicable Extension Period.  The Borrower must submit its application for extension to the Lender, in the form specified by the Lender in the Application Notice, no later than sixty (60) days prior to (i) the Maturity Date or (ii) the end of the currently applicable Extension Period.  The Lender will evaluate the Borrower's application and determine, in Lender's sole discretion, whether to grant an extension of the Maturity Date or, if applicable, a successive Extension Period.  Borrower must pay an extension fee as provided in Section 3.1(c) below for each such extension, if any.

Section 2.9.     Joint and Several Obligations. Each party constituting the Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Lender for the payment and performance of the Obligations. Each party constituting the Borrower acknowledges

-13-

Borrower Initials: _____

Lender Reference: Loan Number 103

and agrees that its joint and several liability on the Obligations owed by any party or parties constituting the Borrower under this Agreement is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Lender, and without limiting the generality of the foregoing, each party constituting the Borrower's joint and several liability on the Obligations shall not be impaired by any acceptance by the Lender of any other security for or Guarantors upon the Obligations or by any failure, neglect or omission on the Lender's part to resort to any one or all of the parties constituting the Borrower for payment of the Obligations or to realize upon or protect any collateral security therefor. Each party constituting the Borrower's joint and several liability on the Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the Loans or for what purposes such credits and financial accommodations are used, and each party constituting the Borrower waives notice of borrowing requests issued by, and Loans made to, the other parties constituting the Borrower. Such joint and several liability of each party constituting the Borrower shall also not be impaired or affected by (and the Lender, without notice to anyone, is hereby authorized to make from time to time) any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or disposition of any collateral security for the Obligations or of any guaranty thereof. In order to enforce payment of the Obligations, foreclose or otherwise realize on any Collateral, or exercise any other rights granted hereunder or under any other Loan Document or under applicable Law (all in accordance with the terms of the Loan Documents), the Lender shall be under no obligation at any time to first resort to any Collateral, property, Liens, or any other rights or remedies whatsoever, and the Lender shall have the right to enforce the Obligations irrespective of whether or not other proceedings or steps are pending seeking resort to or realization upon or from any of the foregoing. Each party constituting the Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse, or subrogation available to such party against any other party constituting the Borrower liable for payment of any Obligations, or as to any security therefor, unless and until the Obligations have been paid in full. By its acceptance below, each party constituting the Borrower hereby expressly waives and surrenders any defense to its joint and several liability on the Obligations based upon any of the foregoing. In furtherance thereof, each party constituting the Borrower agrees that wherever in this Agreement it is provided that the Borrower is liable for a payment or performance of an obligation, such obligation is the joint and several obligation of each party constituting the Borrower. Notwithstanding anything herein to the contrary, the right of recovery against each party constituting the Borrower under this Agreement shall not exceed $1.00 less than the lowest amount which would render such amount constituting the Borrower's obligation under this Agreement void or voidable under applicable Law, including, without limitation, fraudulent conveyance Law.

SECTION 3.    FEES.

    *Section 3.1.*    Fees.

      (a)    *Loan Advance Fees and Loan Extension Fees.*    The Borrower shall pay to the Lender, on the date of each advance of a Loan, a non-refundable advance fee in an amount equal to 2.00% of the principal amount of the Loan advanced on such date (including, for the sake of

-14-

clarity, any Loan advanced as a reborrowing after a principal payment) (the "*Loan Advance Fees*"). The Borrower shall pay to the Lender, on the date of each extension of a Loan, a non-refundable extension fee in an amount equal to 1.00% of the outstanding principal amount of the Loan extended on such date (the "*Loan Extension Fees*"). The Lender is hereby authorized to deduct such amounts from the disbursement of such Loan. Borrower acknowledges and agrees that this fee approximates the overhead and direct costs of Lender associated with loan setup, documentation, and initial administrative work and merely compensates Lender for those expenses.

(b)    *Late Fees and Late Reporting Fees.*   In addition to any other amounts due hereunder, if any payment due hereunder is not received by the Lender on or before 1:00 p.m. (Wilmington, Delaware time) of the fifth (5th) Business Day after such payment is due, the Borrower shall pay to the Lender on demand a late fee of (i) $1,000.00 per occurrence for the first three occurrences, (ii) $2,000.00 per occurence for the fourth, fifth and sixth occurrences, and (iii) $3,000.00 per occurrence for the seventh occurrences and any occurrence thereafter (the "*Late Fees*"). Borrower acknowledges and agrees that this late fee approximates the overhead and direct costs of Lender associated with Borrower being late on any payment and merely compensates Lender for those expenses. Additionally, if any document or information required to be provided to Lender under this Loan Agreement is not delivered when due or within ten (10) business days following request from Lender, Borrower shall pay a Late Reporting Fee of (i) $250.00 upon Borrower's failure to timely provide any such document or information; (ii) $500.00 for every additional month in which Borrower fails to timely provide any such document or information up to six additional months; and (iii) $1,000.00 for every additional month after six months from the date that Borrower failed to timely provide any such document or information (the "*Late Reporting Fees*"). The Lender may draw the Late Fees and Late Reporting Fees from the Borrower's Operating Account through an ACH transaction, pursuant to the terms of the ACH Authorization form.

(c)    *Servicing Fees.* The Borrower shall pay to the Lender, on the date of each advance of a Loan, a non-refundable servicing fee in an amount equal to 1.00% of the principal amount of the Loan advanced on such date (including, for the sake of clarity, any Loan advanced as a reborrowing after a principal payment). The Lender is hereby authorized to deduct such amount from the disbursement of such Loan. In addition, the Borrower shall pay to the Lender, on the date that is the fifth (5th) Business Day after each anniversary of the Closing Date, a non-refundable servicing fee in an amount equal to 1.00% of the aggregate outstanding principal balance (including interest compounded on the anniversary date pursuant to Section 2.2) of the Loans as of such anniversary. Borrower acknowledges and agrees that the servicing fees approximate the overhead and direct costs of servicing by Lender and merely compensates Lender for those expenses. The Lender may draw the annual Servicing Fee from the Borrower's Operating Account through an ACH transaction, pursuant to the terms of the ACH Authorization form.

(d)    *Borrower's Acknowledgement that the Fees are Reasonable.*   The Borrower represents and warrants that the Fees are standard in the industry of lending to Law firms for the type of services provided in respect of the Cases and that in no manner does it constitute an

-15-

Borrower Initials: _____

Lender Reference: Loan Number 103

"unconscionable fee" as used in Rule 1.5 of the Disciplinary Rules or pursuant to relevant Law, and that a competent Lawyer would form a reasonable belief that the Fees are reasonable, especially in light of the Borrower's request for funding for its litigation practice and its agreement and understanding of the terms and conditions of this Agreement and other Loan Documents, the complicated nature of the borrowing arrangements, and the potential risks associated with the related transactions.

SECTION 4.    PLACE AND APPLICATION OF PAYMENTS.

*Section 4.1.*    Place and Application of Payments.    All payments of principal of and interest on the Loans, and all other Obligations payable by the Borrower under this Agreement and the other Loan Documents, shall be made by the Borrower to the Lender prior to 5:00 p.m. (Wilmington, Delaware time) on the due date thereof at the place designated for payment by the Lender in Wilmington, Delaware. Any payments received after such time shall be deemed to have been received by the Lender on the next Business Day. All such payments shall be made in U.S. Dollars, either by wire or automated clearinghouse (ACH) transfer, at the place of payment as set forth below:

| | |
|---|---|
| ABA Routing Number: | 061-100-606 |
| Bank Name: | Synovus Bank |
| Address: | 1148 Broadway, Columbus, GA 31901 |
| Account Number: | 1015563776 |
| Account Name: | Equal Access Justice Fund LP |

If payments are not received by the applicable due date and past the applicable grace period, the Lender may draw the Mandatory Payments (as calculated in the Lender's reasonable judgment and on a best-efforts basis) from the Borrower's Operating Account pursuant to the terms in the ACH Authorization. If the Lender must initiate monthly payment transactions, it may in its sole discretion, also determine whether a Late Fee is required, pursuant to Section 3.1(b) and include such amount in the transaction.

All such payments are to be applied by Lender, a Delaware limited partnership, in Delaware to the Obligations of Borrower determined by Lender in its discretion, in each case without set-off or counterclaim. The Borrower agrees that payments shall not be made by check or cash and that the Lender has no obligation to accept such payments. All payments shall first be applied to indemnities, expenses and fees (including but not limited to those fees due under Section 3 of this Agreement) payable to the Lender or any other indemnified Person under this Agreement or the Loan Documents, then to all outstanding fees and charges, then to all accrued but unpaid interest on the Loans, and then to the outstanding principal balance of the Loans.

*Section 4.2.*    Non-Business Days.    If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable. In the case of any payment of principal falling due on a day which is not a Business Day, interest on such

-16-

principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

Section 4.3.    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to the Lender and is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver, creditor or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

## SECTION 5.    REPRESENTATIONS AND WARRANTIES.

Section 5.1.    Organization and Qualification.  The Borrower is duly organized, validly existing, and in good standing as a limited liability company, limited partnership, corporation, or other appropriate entity, as applicable, under the Laws of the jurisdiction in which it is organized, has full and adequate power to conduct its business as now conducted, and is duly licensed or qualified in all states in which it provides legal services.  No Loan Party is the subject of any order of relief under any Debtor Relief Law.

Section 5.2.    Authority and Validity of Obligations.  Each Loan Party has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for (in the case of the Borrower), to guarantee the Obligations (in the case of each Guarantor), to grant to the Lender the Liens described in the Collateral Documents executed by the Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it.  The Loan Documents delivered by the Loan Parties have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of such Loan Parties enforceable against each of them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar Laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at Law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by any Loan Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of Law or any judgment, injunction, order or decree binding upon any Loan Party or any provision of the organizational documents (*e.g.,* charter, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of any Loan Party, (b) contravene or constitute a default under any covenant, indenture or agreement of or affecting any Loan Party or any of their respective property or (c) result in the creation or imposition of any Lien on any property of any Loan Party other than the Liens granted in favor of the Lender pursuant to the Collateral Documents.

-17-

Borrower Initials: _____

Lender Reference:  Loan Number 103

*Section 5.3.*    Use of Proceeds; Business Purpose.

(a)    The Borrower shall use the proceeds of the Loans only for the commercial purpose of funding Borrower's law firm expenses, repaying any portion of the Facility, and repaying any existing indebtedness the repayment of the Borrower or any Guarantor which is agreed to by the Lender in the Term Sheet, and not for any other purpose (including for personal, household or family purposes).

(b)    Borrower shall not use any Loan proceeds (i) to fund any commercial or business activities (including litigation funding of third parties) other than Borrower's Law firm expenses, (ii) to pay bonuses or other incentive payments to Borrower's attorneys or make distributions to Borrower's equity owners, or (iii) to pay any amount to brokers and/or consultants used by any Loan Party to obtain the litigation financing contemplated by this Loan Agreement (other than amounts disclosed to Lender and paid directly by Lender on Borrower's behalf). Despite anything to the contrary in this Loan Agreement, nothing in this Loan Agreement is intended (and must not be construed) to limit Borrower's ability to advise its clients or prospective clients with respect to non-Lender independent financing for the client's or prospective client's businesses, pending litigation, or contemplated litigation.

(c)    All Loan proceeds received by Borrower are subject to an express trust in favor of Lender. Borrower and each Guarantor hold all Loan proceeds as a fiduciary for the benefit of Lender and any use of any Loan proceeds that is not authorized by Lender is a defalcation by Borrower and any such Guarantor so acting on Borrower's behalf.

(d)    Law Firm Proceeds received by Borrower are subject to an express trust in favor of Lender in the amount of Mandatory Payments due or becoming due to Lender. Borrower and each Guarantor hold such Law Firm Proceeds as a fiduciary for the benefit of Lender and any use of any Law Firm Proceeds that is not permitted under this Agreement or authorized by Lender is a defalcation by Borrower and any Guarantor or other Loan Party utilizing those trust funds. Likewise, Borrower acknowledges that the information provided to Lender by Borrower and Borrower's representations are to obtain money, or an extension, renewal, or refinancing of credit, that Lender is relying upon all of the information and representations, that Lender's reliance is reasonable, and that falsity, fraud, or misapplication of proceeds by Borrower will render Borrower's Obligations to Lender non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2) and (4).

*Section 5.4.*    Financial Reports and Accounts.    All financial statements of the Loan Parties heretofore submitted to the Lender are true and correct in all material respects, have been prepared in accordance with GAAP, on a basis consistent with the most recent accounting periods, certified as true and correct by a Responsible Officer of the Borrower, and truly and accurately reflect in all material respects the financial condition of the relevant Loan Party and, with respect to the Borrower, the results of the operations and cash flows for the Borrower as of the dates thereof and for the periods covered thereby. The Borrower has no contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods,

-18-

Borrower Initials: _____

Lender Reference: Loan Number 103

on the financial statements furnished pursuant to Section 7.3. The bank accounts set forth on Schedule 10.2 are all the Borrower's accounts and Borrower has no direct or indirect interest in any other accounts. No Material Adverse Change. Since the NDA Signing Date, (a) there has been no change in the condition (financial or otherwise) or business prospects of any Loan Party which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect nor (b) has there been a material adverse change in the value of the Collateral or the Borrower's interest in the same taken as a whole. Since the NDA Signing Date, no Equity Partner has terminated its ownership in the Borrower for any reason. No Equity Partner who previously had an ownership interest in the Borrower has given notice that such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower nor, to the knowledge of the Borrower, is any such transfer of a Case threatened.

Section 5.6.    Full Disclosure. The statements and information furnished to the Lender in connection with the negotiation of this Agreement and the other Loan Documents as required to obtain the commitment by the Lender to provide all or part of the financing contemplated hereby or subsequently provided to the Lender as required under the terms of this Agreement (including, but not limited to, the information provided by the Borrower with respect to the Cases from time to time as required by Section 7.3) do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading, the Lender acknowledging that as to any projections furnished to the Lender, the Loan Parties only represent that the same were prepared on the basis of information and estimates the Loan Parties believed to be reasonable.

Section 5.7.    Governmental Authority and Licensing. The Borrower has received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct its businesses. No investigation or proceeding which, if adversely determined, could reasonably be expected to result in revocation or denial of any material license, permit or approval is pending or, to the knowledge of the Borrower, threatened.

Section 5.8.    Legal Interest; Liens. The Borrower has good and defensible legal interest to its assets as reflected on the most recent consolidated balance sheet of the Borrower furnished to the Lender. The Borrower's assets are subject to no Liens other than such thereof as are permitted by Section 7.6.

Section 5.9.    Litigation and Other Controversies. There is no Litigation or Disciplinary Action or other governmental or arbitration proceeding pending, nor to the knowledge of any Loan Party threatened, against any Loan Party. The Borrower shall notify the Lender in writing upon learning of any pending or threatened Litigation or Disciplinary Action or proceeding that could reasonably be expected, in the aggregate, to have a Material Adverse Effect; provided that the Borrower shall not disclose to the Lender any such information that would violate any duties to any of the Borrower's clients.

Section 5.10.    Taxes. All federal and state tax returns required to be filed by any Loan Party in any jurisdiction have, in fact, been filed, and all taxes upon any Loan Party or upon any

Borrower Initials: _____

Lender Reference:  Loan Number 103

of their respective property, income or franchises, which are shown to be due and payable in such returns, have been paid, except such taxes, if any, as are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in accordance with GAAP have been provided.

*Section 5.11.*    Approvals. No authorization, consent, license or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by any Loan Party of any Loan Document, except for (i) such approvals which have been obtained prior to the Closing Date and remain in full force and effect and (ii) filings which are necessary to perfect the security interests under the Collateral Documents.

*Section 5.12.*    Compliance with Laws and Ethics. The Borrower represents and warrants that it is in compliance with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing. The Borrower shall notify the Lender immediately upon its receipt of any written or oral communication from a third party challenging the legality or validity of any Loan Document.

(a)    The Borrower specifically acknowledges, represents and warrants that the provisions of this Agreement, and all of the Loan Documents, comply with all applicable Disciplinary Rules, including, without limitation, the American Bar Association Model Rules of Professional Conduct ("*ABA Model Rules*"), any and all other applicable rules of professional responsibility governing attorney conduct in each of the States and federal districts or circuits where Borrower is licensed or practices and any other analogous rules of ethics or disciplinary rules of any other applicable jurisdiction (the "*Disciplinary Rules*").

(b)    The Borrower waives any right to bring any private cause of action or any suit of any nature against the Lender in connection with any alleged violation of any Disciplinary Rules and hereby acknowledges that the ABA Model Rules specifically state that "*[v]iolation of a Rule should not give rise to a cause of action* (emphasis added) nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to Lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability."

(c)    The Borrower acknowledges that it has entered into this Agreement and all Loan Documents with the Lender as applicable, and that to seek to avoid the provisions hereof or of the Loan Documents based on any violation of any Disciplinary Rule(s) would be, in itself, an abuse of the applicable Disciplinary Rules.

*Section 5.13.*    Good Standing. The Borrower specifically acknowledges, represents and warrants that it is in good standing with the Secretary of State for the State of California.

-20-

Borrower Initials:_____

Lender Reference:  Loan Number 103

Section 5.14.   Other Agreements.   No Loan Party is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

Section 5.15.   Solvency and Fraudulent Conveyance.   The Borrower is Solvent, is able to pay its debts as they become due, has sufficient capital to carry on its business and will be Solvent after giving effect to the transactions contemplated by this Agreement. The Borrower is not transferring any Collateral with any intent to hinder, delay or defraud any of its creditors or equity holders. The Borrower will not use the proceeds from the transactions contemplated by this Agreement to give preference to any class of creditors.

Section 5.16.   No Default.   No Default has occurred or is continuing.

Section 5.17.   Notification of Clients.   Borrower has, or will within thirty (30) days of executing this Agreement, notified each of its clients in writing of the existence of Lender's lien. After the execution of this Agreement, Borrower will disclose in its client fee agreement contracts the existence of Lender's lien.

Section 5.18.   OFAC.   The Borrower (i) is not a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) does not engage in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner that violates Section 2 of such executive order, and (iii) is not a person on the list of "Specially Designated Nationals and Blocked Persons" or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.Reliance Representation. Borrower is making all of the foregoing representations in order to obtain money, or an extension, renewal, or refinancing of credit, Lender is relying upon all of the representations and information provided by Borrower, Lender's reliance is reasonable, and falsity, fraud, or misapplication of proceeds by Borrower will render Borrower's Obligations to Lender non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2) and (4).

SECTION 6.   CONDITIONS PRECEDENT.

Section 6.1.   All Loans.   At the time of the making of each Loan hereunder:

(a)    each of the representations and warranties set forth herein and in the other Loan Documents shall be true and correct as of said time, except to the extent the same expressly relate to an earlier date, in which case they shall be true and correct as of such earlier date;

(b)    no Default shall have occurred and be continuing or would occur as a result of such Loan; and

Borrower Initials: _____

Lender Reference:  Loan Number 103

(c)    such Loan shall not violate any order, judgment or decree of any court or other authority or any provision of Law or regulation applicable to the Lender as then in effect.

Each request for a Loan hereunder shall be deemed to be a representation and warranty by the Borrower on the date of such Loan as to the facts specified in subsections (a) through (c), both inclusive, of this section; *provided, however,* that the Lender may continue to make advances under the Facility, in the sole discretion of the Lender, notwithstanding the failure of the Borrower to satisfy one or more of the conditions set forth above and any such advances so made shall not be deemed a waiver of any Default or other condition set forth above that may then exist. NOTWITHSTANDING THE FOREGOING, THE LENDER MAY REFUSE TO EXTEND LOANS AT ANY TIME IT DEEMS FIT.

Section 6.2.    Closing Date Loan.  Prior to making the Loan on the Closing Date the following conditions precedent shall have been satisfied:

(a)    the Lender shall have received this Agreement duly executed by the Borrower and the Guarantors;

(b)    the Lender shall have received the duly executed Note of the Borrower dated the date hereof and otherwise in compliance with the provisions of Section 2.7;

(c)    Lender shall have received the Security Agreement duly executed by the Borrower, together with a UCC financing statement to be filed against the Borrower, as debtor, in favor of the Lender, as secured party, which financing statement shall include among the listed Collateral all Commercial Tort Claims that the Borrower is handling with the style of the cases, names of the parties, cause numbers, and location and court in which pending;

(d)    the Lender shall have received copies of the Borrower's (i) certificate of partnership and partnership agreement (or comparable organizational documents) and any amendments thereto, (ii) resolutions authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, and (iii) specimen signatures of the persons authorized to execute such Loan Documents, all certified in each instance by its Responsible Officer and notarized;

(e)    the Lender shall have received the initial fees called for by Section 3.1;

(f)    the capital and organizational structure of the Borrower shall be satisfactory to the Lender;

(g)    the Lender shall have received financing statement, tax, and judgment lien search results against the Collateral evidencing the absence of Liens thereon except as permitted by Section 7.6;

-22-

Borrower Initials: _____
Lender Reference: Loan Number 103

(h)    the Lender shall have received pay-off and lien release letters from secured creditors of the Borrower (other than secured parties intended to remain outstanding after the Closing Date with Indebtedness and Liens permitted by Sections 7.5 and 7.6) setting forth, among other things, the total amount of indebtedness outstanding and owing to them and containing an undertaking to cause to be delivered to the Lender UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of the Borrower, which pay-off and lien release letters shall be in form and substance acceptable to the Lender;

(i)    the Lender shall have received a fully executed Internal Revenue Service Form W-9 (or its equivalent) for the Borrower and each Guarantor;

(j)    the Lender shall have received a current updated personal financial statement for each Guarantor to be delivered on or before April 15th of each year in the form completed by such Guarantor and delivered to Lender on or before the execution of this Loan Agreement;

(k)    If required in the Term Sheet, each Guarantor shall have covenanted to assign to Lender ownership of one or more life insurance policies covering his or her life for 125% of the full amount of the Note no later than 30 days subsequent to the Closing Date, at which time each Guarantor shall provide original documentation of such assignment to the satisfaction of Lender including, but not limited to, (i) providing the original copy of the insurance policy; (ii) providing a letter from the applicable insurance company stating that there is no other claim against the insurance policy; and (iii) proof that each Guarantor filed a copy of the assignment at the office of the applicable insurance company with acknowledgment of receipt by the insurance company;

(l)    the Borrower and each Guarantor shall have covenanted to produce to Borrower an operative Certificate of Good Standing;

(m)    the Borrower shall have covenanted to provide to the Lender, no later than 15 days subsequent to the Closing Date, proof that its operative legal entity, Corrales Law PC: (a) has been registered as an operative law firm with The State Bar of California; and (b) that all of the Borrower's Cases, and any projected Law Firm Proceeds attributable to the Borrower's Cases are assigned and shall pass through it.

(n)    the Lender shall have received from the Borrower a Closing Collateral Certification in the form of Exhibit H; and

(o)    the Lender shall have received such other agreements, instruments, documents, certificates, and opinions as the Lender may reasonably request.

SECTION 7.  COVENANTS.

The Borrower agrees to the following, so long as any credit is available to or in use by the Borrower hereunder, except to the extent compliance in any case or cases is waived in writing by the Lender:

-23-

Borrower Initials: _____

Lender Reference:  Loan Number 103

*Section 7.1.*    Maintenance of Business; Retention of Rights in Law Firm Proceeds.  The Borrower shall preserve and maintain its existence.  Borrower and each Guarantor shall not own or hereafter acquire, without the prior written consent of Lender, an ownership, profit or revenue interest, either direct or indirect, in any entity engaged in the practice of law other than Borrower.  The Borrower shall preserve and keep in force and effect all licenses, permits, and approvals necessary to the proper conduct of its business.  Neither the Borrower nor any Guarantor shall assign or reassign any of such Borrower's or Guarantor's rights to the Law Firm Proceeds in any of the Cases unless and until the Obligations have been paid in full.  The Borrower shall handle the Cases with best efforts in order to receive compensation for each of the Borrower's clients, all within the applicable rules of professional responsibility, until the Borrower has satisfied its Obligations under this Agreement.

*Section 7.2.*    Taxes and Assessments.  The Borrower shall (a) duly pay and discharge all federal, state, and local taxes, rates, assessments, fees, and governmental charges upon or against it, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor; and (b) shall use the proceeds of the Loans to immediately payoff any and all back taxes owed to the IRS or any other taxing authority immediately subsequent to the Closing Date, and shall furnish proof of payment and final resolution of all back taxes to Lender no later than 15 days subsequent to the Closing Date.

*Section 7.3.*    Reports.  The Borrower shall furnish to the Lender:

(a)    as soon as available, and in any event no later than five (5) days after the filing thereof with the IRS, a copy of the federal tax returns of the Borrower;

(b)    as soon as available, and in any event no later than five (5) days after the filing thereof with the IRS, a copy of the federal tax returns of each Guarantor;

(c)    as soon as available, and in any event no later than ten (10) days after the last day of each fiscal month of each fiscal year of the Borrower, a completed monthly repayment report on Lender's form (through Lender's online reporting portal) detailing Law Firm Proceeds received for the month, a copy of all pages of the bank account statements (unredacted and unaltered in any way) for each Operating Account, IOLTA Account, all other deposit accounts, and all the bank accounts to which the Borrower has directed any revenues, if requested, other documentation (for example, cleared check copies or a general ledger report) that would allow Lender to verify the amounts documented or that should have been documented in the repayment report, and a Monthly Compliance Certificate (Exhibit G) certifying that all Law Firm Proceeds have been reported in compliance with this Loan Agreement;

(d)    as soon as available, and in any event no later than fifteen (15) days after the last day of each quarter of each fiscal year of the Borrower, a Compliance Certificate (Exhibit E) signed by a Responsible Officer of the Borrower which certifies (i) that to the best of such officer's

-24-

Borrower Initials: _____

Lender Reference:  Loan Number 103

knowledge and belief no Default has occurred during the period (including, for the sake of clarity, a Default arising from a breach of Section 7.4 or 7.6) or, if any such Default has occurred during such period, setting forth a description of such Default and specifying the action, if any, taken by the Borrower to remedy the same, (ii) that attached thereto is a true, correct and complete status report of all Cases pending or closed during the applicable reporting period (which status report shall include, at a minimum, (a) each case being handled by Borrower, (b) type of case, (c) current case status, (d) fee amounts received by Borrower to date, (e) high and low estimated fee amounts expected to be received, and (f) estimated timeframe to receipt of payments);

(e)      promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of any Loan Party or of notice of any material noncompliance with any applicable Law, regulation or guideline relating to any Loan Party;

(f)      notice of any Change of Control;

(g)      promptly after knowledge thereof shall have come to the attention of any Responsible Officer of the Borrower or any Loan Party, written notice of (i) any threatened or pending Litigation, Disciplinary Action, or any other governmental or arbitration proceeding or labor controversy against any Loan Party or any of their property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, (ii) the occurrence of any Material Adverse Effect, (iii) the occurrence of any Default, or (iv) any material deterioration in the value of the Collateral or the Borrower's interest therein;

(h)      notice of the Borrower's representation being terminated by any client or of a dual representation claim being asserted as to any client within 7 days of such termination or assertion;

(i)      notice of any Equity Partner terminating its ownership in the Borrower for any reason;

(j)      notice within ten (10) days of each new Case involving Commercial Tort Claims, and as soon as available, and in any event no later than thirty (30) days after the last day of each fiscal quarter of each fiscal year of the Borrower, a complete list of all Cases being handled by Borrower, including style of the cases, names of the parties, cause numbers, locations and the courts in which pending, and notification of which Cases contain Commercial Tort Claims.

(k)      copies of Borrower's and Guarantors' applications for malpractice insurance and certificates showing such coverage as well as Guarantor's applications for life insurance and certificates showing such coverage as required by Section 9.10;

(l)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Loan Party, or compliance with the terms of any Loan Document, as the Lender may reasonably request, subject to the terms of Section 2.8;

-25-

Borrower Initials:_____

Lender Reference:  Loan Number 103

(m)    as soon as available, and in any event no later than thirty (30) days after the last day of each fiscal quarter of each fiscal year of the Borrower, a copy of the financial statements of the Borrower, include but not limited to copies of the Borrower's balance sheet, income statement, and cash flow statement. The Borrower's financial statements shall be true and correct in all material respects, prepared in accordance with generally accepted accounting principles consistently applied, and truly and accurately reflect in all material respects the financial condition of the Borrower; and

(n)    as stated in Section 3.1(b), if any document or information required to be provided to Lender under this Loan Agreement is not delivered when due or within ten (10) business days following request from Lender, Borrower shall pay a late charge of (i) $250.00 upon Borrower's failure to timely provide any such document or information; (ii) $500.00 for every additional month in which Borrower fails to timely provide any such document or information up to six additional months; and (iii) $1,000.00 for every additional month after six months from the date that Borrower failed to timely provide any such document or information.

Section 7.4.    Inspection. The Borrower shall permit the Lender and each of its duly authorized representatives and agents to request electronically or to visit and inspect any of its property, corporate books, and financial records (including documentation necessary to support the character and quality of the Collateral), to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision the Borrower hereby authorizes such accountants to discuss with the Lender the finances and affairs of the Borrower) at such reasonable times and intervals as the Lender may designate and, so long as no Default exists, with reasonable prior notice to the Borrower, subject at all times to all Legal Requirements and Section 2.8.Borrowings and Guaranties. The Borrower shall not issue, incur, assume, create or have outstanding any Indebtedness, or be or become liable as endorser, guarantor, surety or otherwise for any Indebtedness or undertaking of any Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any Person; provided, however, that the foregoing shall not restrict nor operate to prevent:

(a)    the Obligations of the Borrower owing to the Lender and any other indebtedness, liabilities and obligations of the Borrower owing to the Lender;

(b)    purchase money indebtedness and capitalized lease obligations of the Borrower in an amount not to exceed $50,000 in the aggregate at any one time outstanding; and

(c)    unsecured indebtedness of the Borrower not otherwise permitted by this section in an amount not to exceed $50,000 in the aggregate at any one time outstanding.

-26-

Borrower Initials: _____

Lender Reference:  Loan Number 103

Section 7.6.    Liens. The Borrower shall pay off the existing indebtnesses the Borrower agreed to pay in the Term Sheet, and have any liens securing such indebtnesses released in writing within 30 days after the Closing. The Borrower shall not create, incur or permit to exist any Lien of any kind on any of its property (including the Collateral); provided, however, that the foregoing shall not apply to nor operate to prevent:

(a)    Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations, the MSPA or other similar charges, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(b)    Liens on equipment of the Borrower created solely for the purpose of securing indebtedness permitted by Section 7.5(b), representing or incurred to finance the purchase price of such property, provided that no such Lien shall extend to or cover other property of the Borrower other than the respective property so acquired, and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such property, as reduced by repayments of principal thereon;

(c)    any interest or title of a lessor under any operating lease, including the filing of UCC financing statements solely as a precautionary measure in connection with operating leases entered into by the Borrower in the ordinary course of its business;

(d)    other encumbrances not materially affecting the conduct of the Borrower's business and not securing Indebtedness; and

(e)    Liens granted in favor of the Lender pursuant to the Collateral Documents.

Section 7.7.    Mergers, Consolidations and Sales. The Borrower shall not be a party to any merger or consolidation or amalgamation, or sell, transfer, lease or otherwise dispose of all or substantially all of its assets. The Borrower shall not sell, transfer, refer, encumber or otherwise dispose of its legal interest in any Cases or enter into any agreement for the same or similar purpose without the written consent of the Lender; provided that the foregoing restrictions shall not apply to any Case Resolution in the ordinary course of business.

Section 7.8.    Loans or Advances to Employees. The Borrower shall not make, retain or have outstanding any loans or advances to (other than for travel advances and other similar cash advances made to employees in the ordinary course of business) any other Person.

Section 7.9.    Compliance with Laws. The Borrower shall comply in all respects with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing.

-27-

*Section 7.10.*   Use of Proceeds.  The Borrower shall use the proceeds of the Loans solely for the purposes set forth in, or otherwise permitted by, Section 5.3.

*Section 7.11.*   Maintenance of Malpractice Insurance.  During the term of this Agreement, the Borrower and Guarantors shall maintain, at their sole cost and expense, legal malpractice insurance policies issued by an insurance carrier with an A.M. Best rating of "A" or better (the "Malpractice Insurance Policies"). The Borrower and Guarantors represent and warrant that the Malpractice Insurance Policies are in full force and effect, that the amount of coverage is sufficient to cover all matters being handled by Borrower and Guarantors including the Collateral, that the Borrower and Guarantors are not in default under any of the Malpractice Insurance Policies, and that no claim for coverage thereunder has been denied under any such current Malpractice Insurance Policies with respect to any matter. At the request of the Lender, the Borrower and Guarantors shall furnish the Lender with a copy of the certificate of insurance evidencing the coverage under such Malpractice Insurance Policies and the Borrower and Guarantors agree that no such Malpractice Insurance Policies may be cancelled or the amount of coverage under such Malpractice Insurance Policies reduced without thirty (30) days prior written notice to the Lender.

*Section 7.12.*   Minimum Collateral Coverage.  Borrower shall not permit the value of the Collateral, as estimated by Lender, at any time to be less than FOUR TIMES the outstanding Indebtedness.

*Section 7.13.*   Fee Sharing and Referral Agreements.  Without the prior written approval of Lender, Borrower shall not enter into a fee sharing or referral agreement unless such agreement is entered into in the ordinary course of business and on an arms-length basis and shall not modify any fee sharing or referral agreements in any way that would reduce the fees or other amounts payable to Borrower thereunder or that would otherwise prejudice Lender.

*Section 7.14.*   Affiliate Transactions Limitation.  Without the prior written approval of Lender, Borrower shall not enter into a  transaction with or make payments to its Affiliate or any Equity Partner's Affiliate.

*Section 7.15.*   Rent Increase Limitation.  If Borrower rents any real properties owned by Equity Partner, Affiliate, or Equity Partner's Affiliate, Borrower shall not increase or accept the increase of its annual rent by more than ten percent (10%) within one calender year without the prior written approval of Lender.

## SECTION 8.  EVENTS OF DEFAULT AND REMEDIES.

*Section 8.1.*   Events of Default.  Any one or more of the following shall constitute an "Event of Default" hereunder:

(a)   default in the payment when due of all or any part of the principal of or interest on the Loans (whether at the stated maturity thereof or at any other time provided for in this

-28-

Borrower Initials:_____
Lender Reference:  Loan Number 103

Agreement) or of any fee or other Obligation payable hereunder or under any other Loan Document or any default has occurred under any other agreement with the Lender;

(b)    default in the observance or performance of any covenant set forth in Sections 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, 7.8, 7.9, 7.10, 7.11., 7.12, 7.13 or 10.2 of this Agreement;

(c)    any representation or warranty made herein or in any other Loan Document or in any certificate furnished to the Lender pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby is determined in the sole discretion of the Lender to be untrue in any material respect as of the date of the issuance or making or deemed making thereof;

(d)    Either (i) any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or (ii) any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or (iii) any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the Lender in any Collateral purported to be covered thereby except as expressly permitted by the terms hereof, or (iv) any Loan Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder;

(e)    default shall occur under any Indebtedness issued, assumed or guaranteed by any Loan Party in an amount in excess of $25,000, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness (whether or not such maturity is in fact accelerated), or any such Indebtedness shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

(f)    (i) any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against any Loan Party, or against any of their respective property, in an aggregate amount for all such Persons in excess of $25,000 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days, or any action shall be legally taken by a judgment creditor to attach or levy upon any property of any Loan Party to enforce any such judgment, or (ii) any Loan Party shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(g)    any Change of Control shall occur; or the death or legal incompetence of any Guarantor shall occur;

(h)    any Loan Party shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability

-29-

to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any Law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate or similar action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 8.1(j);

(i)     a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for any Loan Party, or any substantial part of any of its property, or a proceeding described in Section 8.1(i)(v) shall be instituted against any Loan Party, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of thirty (30) days;

(j)     the Borrower's engagement with the client is terminated for any reason (whether initiated by the Borrower, the client or legal process other than Adverse Case Resolution) with respect to more than 5% of Cases (a *"Client Termination"*); or

(k)     any Equity Partner's ownership in the Borrower is terminated for any reason.

*Section 8.2.*     Non-Bankruptcy Defaults.     When any Event of Default (other than those described in subsections (i) or (j) of Section 8.1 with respect to the Borrower) has occurred and is continuing, the Lender may, by written notice to the Borrower, declare the principal of and the accrued interest on the Loans to be forthwith due and payable and thereupon the Loans, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under the Loan Documents without further demand, presentment, protest or notice of any kind. In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable Law or equity when any such Event of Default has occurred and is continuing. Without limiting the foregoing, the Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of the Collateral and to enforce any of the Lender's remedies, without prior notice or hearing as to such appointment. If Borrower is in default, Lender, among other rights, has the right to place Borrower in involuntary bankruptcy.

*Section 8.3.*     Bankruptcy Defaults.     When any Event of Default described in subsections (i) or (j) of Section 8.1 with respect to the Borrower has occurred and is continuing, then the Loans shall immediately become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or notice of any kind. In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable Law or equity when any such Event of Default has occurred and is continuing, subject to the United States Bankruptcy Code where applicable and subject to Section 9.7.

-30-

Borrower Initials:_____

Lender Reference: Loan Number 103

## SECTION 9.  THE GUARANTEES.

*Section 9.1.*    The Guarantees.  To induce the Lender to provide the Loans described herein and in consideration of benefits expected to accrue to the Borrower by reason of the Loans and for other good and valuable consideration, receipt of which is hereby acknowledged, each Equity Partner of the Borrower party hereto (including any Equity Partner executing an Additional Guarantor Supplement in the form attached hereto as Exhibit C or such other form acceptable to the Lender) hereby unconditionally and irrevocably guarantees jointly and severally to the Lender, the due and punctual payment of all present and future Obligations, including, but not limited to, the due and punctual payment of principal of and interest on the Loans, and the due and punctual payment of all other Obligations now or hereafter owed by the Borrower under the Loan Documents, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges after the entry of an order for relief against the Borrower or such other obligor in a case under the United States Bankruptcy Code or any similar proceeding, whether or not such interest, costs, fees and charges would be an allowed claim against the Borrower or any such obligor in any such proceeding).

*Section 9.2.*    Guarantee Unconditional.  The obligations of each Guarantor under this Section 9 shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(a)    any full or limited extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of any Loan Party or other obligor or of any other guarantor under this Agreement or any other Loan Document or by operation of Law or otherwise;

(b)    any modification or amendment of or supplement to this Agreement or any other Loan Document;

(c)    any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, any Loan Party or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of any Loan Party or other obligor or of any other guarantor contained in any Loan Document;

(d)    the existence of any claim, set-off, or other rights which any Loan Party or other obligor or any other guarantor may have at any time against the Lender or any other Person, whether or not arising in connection herewith;

(e)    any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against any Loan Party or other obligor, any other guarantor, or any other Person or property;

-31-

Borrower Initials: _____

Lender Reference:  Loan Number 103

(f)     any application of any sums by whomsoever paid or howsoever realized to any obligation of any Loan Party or other obligor, regardless of what obligations of any Loan Party or other obligor remain unpaid;

(g)     any invalidity or unenforceability relating to or against any Loan Party or other obligor or any other guarantor for any reason of this Agreement or of any other Loan Document or any provision of applicable Law or regulation purporting to prohibit the payment by any Loan Party or other obligor or any other guarantor of the principal of or interest on any Loan or any other amount payable under the Loan Documents; or

(h)     any other act or omission to act or delay of any kind by the Lender or any other Person or any other circumstance whatsoever that might, but for the provisions of this subsection, constitute a legal or equitable discharge of the obligations of any Guarantor.

*Section 9.3.*     Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances. Each Guarantor's obligations under this Section 9 shall remain in full force and effect until the principal of and interest on the Loans and all other amounts payable by the Borrower and the other Loan Parties under this Agreement and all other Loan Documents shall have been paid in full. If at any time any payment of the principal of or interest on any Loan or any other amount payable by any Loan Party or other obligor or any guarantor under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of such Loan Party or other obligor or of any guarantor, or otherwise, each Guarantor's obligations under this Section 9 with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

*Section 9.4.*     Subrogation. Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations shall have been paid in full. If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the payment in full of the Obligations and all other amounts payable by the Loan Parties hereunder and the other Loan Documents, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender or be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

*Section 9.5.*     Subordination. Each Guarantor (each referred to herein as a "Subordinated Creditor") hereby subordinates the payment of all indebtedness, obligations, and liabilities of the Borrower or other Loan Party owing to such Subordinated Creditor, whether now existing or hereafter arising, to the indefeasible payment in full in cash of all Obligations. During the existence of any Event of Default, subject to Section 9.4, any such indebtedness, obligation, or liability of the Borrower or other Loan Party owing to such Subordinated Creditor shall be enforced and performance received by such Subordinated Creditor as trustee for the benefit of the holders of the Obligations and the proceeds thereof shall be paid over to the Lender for application to the Obligations (whether or not then due), but without reducing or affecting in any manner the liability of such Guarantor under this Section 9.

-32-

Borrower Initials:_____

Lender Reference:  Loan Number 103

Section 9.6.     Waivers.   Each Guarantor agrees that each guaranty being given is a continuing, absolute, and unconditional guaranty and may be enforced without first resorting to collection from the Borrower or resorting to any security or other property or invoking other rights or remedies. Each Guarantor irrevocably waives acceptance hereof, presentment, demand, notice of non-payment, protest, notice of protest, impairment of collateral, release of collateral, notice of acceleration, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Lender or any other Person against the Borrower or any other Loan Party or other obligor, another guarantor, or any other Person. For the avoidance of doubt, each Guarantor agrees and understands that Lender may enforce any or all of the Guarantees without first attempting any notice of default or collection efforts against Borrower. Borrower understands and agrees that Lender proceeding against any Guarantor will never be a waiver of any of Lender's rights against Borrower.

Section 9.7.     Stay of Acceleration.  If acceleration of the time for payment of any amount payable by the Borrower or other Loan Party or other obligor under this Agreement or any other Loan Document is stayed upon the insolvency, bankruptcy or reorganization of the Borrower or such other Loan Party or obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement or the other Loan Documents shall nonetheless be payable by the Guarantors hereunder forthwith on demand by the Lender.

Section 9.8.     Benefit to Guarantors.  Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder, and each Guarantor acknowledges that this guarantee is necessary or convenient to the conduct, promotion and attainment of its business. In consideration of the benefits accruing to each Guarantor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor shall execute a Security Agreement granting Lender a lien on and security interest in all right, title, and interest of the Guarantor, whether now owned or existing or hereafter created, acquired, or arising, in and to the collateral described therein.

Section 9.9.     Transfers of Guarantor Property.  Each Guarantor agrees that it will not transfer any asset worth more than $10,000.00 while any Indebtedness remains outstanding under the Loan Agreement, and will not transfer any asset of any value if there is an existing Event of Default under the Loan Agreement.

Section 9.10.   Assignment of Life Insurance Policy and Reporting Requirements.   If required in the Term Sheet, each Guarantor shall deliver to Lender the assignment of ownership of one or more life insurance policies covering each Guarantor in at least 125% of the outstanding principal balance of the Note, no later than 30 days after the receipt of Lender's request.  Each Guarantor shall provide or cause to be provided to Lender evidence from the insurance company of continuing coverage under each life insurance policy that Guarantor has assigned to Lender on each anniversary date of coverage and that Lender is the payee under such life insurance policies. Each Guarantor shall provide to Lender any notice of cancellation, revocation, or non-renewal of any malpractice insurance and each life insurance policy within five (5) business days after receipt thereof by Borrower or any Guarantor.

-33-

Section 9.11.  Personal Assets Lien.   If the value of Borrower's real property, personal property, and fixtures, including all of the projected Law Firm Proceeds of all Cases and all proceeds thereof, but excluding any Excluded Property, at any time is less than FOUR TIMES the outstanding Indebtedness, the Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of the Equity Partners in all of their personal assets, whether now owned or hereafter acquired, and all proceeds thereof. The Equity Partners acknowledges and agrees that the Liens on their personal assets shall be granted to the Lender and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Lender; provided that until a Default has occurred and the Lender shall have requested, the Equity Partners shall not be required to deliver a mortgage with respect to any of their real property. When, if ever, Lender requests that Equity Partners deliver a mortgage with respect to any of its real property, Equity Partners will deliver such fully-executed mortgage to Lender within five (5) days of Lender's request. Lender has the right to file UCC-1 financing statements to perfect liens on all Equity Partners' personal assets.

SECTION 10.  COLLATERAL.

Section 10.1.  Collateral.  The Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of the Borrower in all of its real property, personal property, and fixtures, including all of the Law Firm Proceeds of all Cases, whether now owned or hereafter acquired, and all proceeds thereof, but excluding any Excluded Property. The Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to the Lender and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Lender; provided that until a Default has occurred and the Lender shall have requested, the Borrower shall not be required to deliver a mortgage with respect to any of its real property. When, if ever, Borrower is requested by Lender to deliver a mortgage with respect to any of its real property, Borrower will deliver such fully-executed mortgage to Lender within five (5) days of Lender's request. Borrower authorizes Lender to file UCC-1 financing statements to set up liens on all Borrower's real property, personal property, and fixtures, including all of the Law Firm Proceeds of all Cases.

Section 10.2.  Direction of Proceeds; Depository Banks.

(a)     Operating Accounts.  All deposit accounts of the Borrower on the date hereof are listed and identified (by account number, account type and depository institution) on Schedule 10.2.  The Borrower shall promptly notify the Lender of any other deposit account opened or maintained by the Borrower after the date hereof, and shall submit to the Lender a supplement to Schedule 10.2 to reflect such additional accounts (provided the Borrower's failure to do so shall not impair the Lender's security interest therein).  With respect to each deposit account (defined as the "Operating Accounts" whether or not Borrower uses such deposit accounts to operate its business) and as a condition to the establishment and maintenance of any such Operating Account, the Borrower, the depository institution, and the Lender shall execute and deliver an account control agreement (a "Control Agreement") in form and substance satisfactory to the Lender which provides, among other things, for the depository institution's agreement that it will comply

-34-

with instructions originated by the Lender directing the disposition of the funds in such Operating Account without further consent by the Borrower; *provided* that with respect to any Operating Accounts in existence on the Closing Date, the Borrower shall deliver such Control Agreements within thirty (30) Business Days (or such longer time period as determined by the Lender in its sole discretion) of the Closing Date. Borrower shall maintain an authorization for electronic funds transfer by Lender from the Operating Accounts. Lender may authorize an electronic funds transfer of any funds for any Obligations that are not paid to Lender when such Obligations are due and payable. Any funds in which the Borrower somehow has no interest that are transferred from the Operating Account by Lender shall be promptly refunded to the Operating Account by Lender upon notice and proof that Borrower had no interest in the transferred funds. Borrower hereby gives Lender permission to contact and obtain information from all banks where Borrower maintains accounts.

(b)     *IOLTA Account.*     If directed by Lender, within five (5) Business Days of the Closing Date and at Borrower's sole expense, the Borrower (i) shall direct the bank or other financial institution where the Borrower maintains its Interest on Lawyer's Trust Account (*"IOLTA Account"*) to permit Lender to have electronic viewing access to the IOLTA Account by using the financial institution's online system and (ii) shall maintain an authorization for electronic funds transfer by Lender from the IOLTA Account. Lender may authorize an electronic funds transfer of any funds in which Borrower has an interest for any Obligations that are not paid to Lender when such Obligations are due and payable. The Borrower agrees to undertake all necessary actions as may be required and provide all necessary authorizations in order to allow and permit Lender to have such access to the IOLTA Account. As part of Borrower's foregoing obligation, Borrower shall send a written authorization (*"Letter of Authorization"*) to the appropriate financial institution to permit such access until further notice. A form of this Letter of Authorization is attached hereto as Exhibit F. The Borrower shall not revoke the Letter of Authorization until the Obligations have been paid in full or by prior written agreement with the Lender. The Borrower agrees to undertake any additional actions as required by the holder of the IOLTA Account to permit such access and authorization, including entering into additional agreements with such financial institution. Any funds in which the Borrower has no interest that are transferred from the IOLTA Account by Lender shall be promptly refunded to the IOLTA Account by Lender upon notice and proof that Borrower had no interest in the transferred funds.

(c)     *After an Event of Default.*     Borrower hereby grants Lender a power of attorney to, after an Event of Default, direct the banks on the Borrower's behalf transfer all the monies in the Operating Accounts and IOLTA Account to accounts at different banks of Lender's choosing and to execute any and all documents on behalf of the Borrower to accomplish these transfers.

**Section 10.3.**     Additional Lender Protections. Upon request by Lender, Borrower shall, within ten (10) days, notify in writing the clients, the opposing parties' attorneys, the opposing parties' insurers, and also, if requested by Lender, the courts with respect to each of the Cases Borrower is handling that Lender has a lien on and right to direct payment of Borrower's account receivable/contingency interest in any and all recoveries or settlement proceeds received or to be received by the clients. Lender shall also have the right, as attorney in fact for the Borrower, to

-35-

Borrower Initials: _____

Lender Reference:  Loan Number 103

give any or all of the foregoing notices on any or all Cases of the Borrower, and Lender shall also have the right to intervene in any Cases if Borrower is in Default soly to protect Lender's lien upon Borrower's interest in the lawsuit, subject to the terms of Section 2.8. Borrower further conveys and assigns to Lender all contractual, statutory, and common law rights to charging liens against Cases or proceeds of Cases.

*Section 10.4.* Further Assurances. The Borrower agrees that it shall, from time to time at the request of the Lender, execute and deliver such documents and do such acts and things as the Lender may reasonably request in order to provide for or perfect or protect such Liens on the Collateral or otherwise carry out the terms of this Agreement. Upon the Borrower making a new Equity Partner, the Borrower shall promptly thereafter cause such new Equity Partner to execute a Guaranty Agreement, and the Loan Parties shall also deliver to the Lender, or cause such Equity Partner to deliver to the Lender, at the Borrower's cost and expense, such other instruments, documents, certificates, and opinions reasonably required by the Lender in connection therewith.

## SECTION 11. MISCELLANEOUS.

*Section 11.1.* Notices.

(a) *Notices Generally.* Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail as follows:

(i) if to the Borrower or any other Loan Party, Corrales Law PC, 17140 Bernardo Center Drive, Suite 358, San Diego, CA 92128; or

(ii) if to the Lender, to Equal Access Justice Fund LP, Attention of Benjamin E. Blank, c/o Delaware Trust Company, 251, Little Falls Drive, Wilmington, Delaware 19808.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through electronic communications, to the extent provided in subsection (b) below, shall be effective as provided in said subsection (b).

(b) *Electronic Communications.* The Lender or the Borrower may, in its discretion, by notice to the other party, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website

-36-

Borrower Initials: _____

Lender Reference: Loan Number 103

shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    *Change of Address.* Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

Section 11.2.    Amendments.  No amendment, modification, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 11.3.    Costs and Expenses; Indemnification.

(a)    The costs and expenses of the Lender in connection with the negotiation, preparation, execution and delivery of this Agreement and other Loan Documents are covered by the fee set forth in Section 3.1(a).  The Borrower agrees to pay on demand the costs and expenses of the Lender in connection with (a) establishing and maintaining access to the IOLTA (including, but not limited to, set-up, documentation, or other bank charges, or attorneys' fees and expenses), and

(b)    any subsequent consents hereunder or waivers or amendments hereto or thereto, including the reasonable fees and expenses of counsel for the Lender with respect to all of the foregoing (whether or not the transactions contemplated by any such waiver or amendment are consummated).  The Borrower further agrees to pay to the Lender or any other holder of the Obligations all costs and expenses (including court costs and reasonable attorneys' fees), if any, incurred or paid by the Lender or any other holder of the Obligations in connection with any Default or Event of Default or in connection with the enforcement of this Agreement or any of the other Loan Documents or any other instrument or document delivered hereunder or thereunder (including, without limitation, all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving the Borrower or any guarantor). THE BORROWER FURTHER AGREES TO INDEMNIFY THE LENDER, LENDER'S COUNSEL, AND ANY SECURITY TRUSTEE, AND THEIR RESPECTIVE DIRECTORS, LAWYERS, OFFICERS AND EMPLOYEES (COLLECTIVELY "LENDER PARTIES"), AGAINST ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, JUDGMENTS, LIABILITIES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR, WHETHER OR NOT THE INDEMNIFIED PERSON IS A PARTY THERETO) WHICH ANY OF THEM MAY PAY OR INCUR ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY OR THE DIRECT OR INDIRECT APPLICATION OR PROPOSED APPLICATION OF THE PROCEEDS OF ANY EXTENSION OF CREDIT MADE AVAILABLE HEREUNDER, INCLUDING, WITHOUT LIMITATION, FOR

-37-

Borrower Initials: _____

Lender Reference:  Loan Number 103

ANY LENDER PARTY'S OR LENDER PARTIES' OWN NEGLIGENCE OR STRICT LIABILITY, OTHER THAN THOSE WHICH ARISE FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY CLAIMING INDEMNIFICATION. The Borrower, upon demand by the Lender at any time, shall reimburse the Lender for any legal or other expenses incurred in connection with investigating or defending against any of the foregoing except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified. The obligations of the Borrower under this section shall survive the termination of this Agreement.

(c)     All amounts due under this section shall be payable within five (5) Business Days after demand therefor.

(d)     Each party's obligations under this section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

*Section 11.4.*  No Waiver, Cumulative Remedies.  No delay or failure on the part of the Lender or on the part of the holder or holders of any of the Obligations in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right.  The rights and remedies hereunder of the Lender and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 11.5.*  Survival of Representations.  All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

*Section 11.6.*  Survival of Indemnities.  All indemnities and other provisions relative to reimbursement to the Lender of amounts sufficient to protect the yield of the Lender with respect to the Loans, including, but not limited to, Section 11.3, shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligations.

*Section 11.7.*  Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Lender, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf", "jpg" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement,

-38-

Borrower Initials:_____
Lender Reference:  Loan Number 103

and Borrower shall also send the blue ink original signatures to Lender and its counsel, as directed. All Loan Documents shall be deemed executed in the State of Delaware and be delivered to and held in trust by Custodian.

Section 11.8.  Headings.  Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 11.9.  Severability of Provisions.  Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.  All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of Law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of Law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

Section 11.10.  Construction.  The parties acknowledge and agree that the Loan Documents shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of the Loan Documents.  Each Loan Party acknowledges that it has had access to counsel and advisors of its own choice in negotiations leading up to execution of this Agreement.  **Each Loan Party acknowledges that (a) it has conducted such investigation and inquiry that it, in its sole discretion, deems necessary and in executing this Agreement, (b) no Loan Party is relying or acting upon any statement, advice, representation, act or omission of the Lender or Lender Parties and (c) no Loan Party has been influenced to any extent in entering in this Agreement by any statements made by any other party**.  Each Loan Party has read this Agreement and has had the Agreement fully explained to it by its counsel or has waived its right to do so.  Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

Section 11.11.  Excess Interest.  Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable Law in the State of Borrower's principal place of business as set forth in the preamble (after giving effect to any separate usury waiver that the Borrower may have delivered to the Lender and only if Delaware law is determined not to be applicable) to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loans or other obligations outstanding under this Agreement or any other Loan Document (*"Excess Interest"*).  If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither the Borrower nor any guarantor or endorser shall be obligated to pay any Excess Interest, (c) any

-39-

Borrower Initials: _____
Lender Reference:  Loan Number 103

Excess Interest that the Lender may have received hereunder shall, at the option of the Lender, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable Law), (ii) refunded to the Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum Lawful contract rate allowed under applicable usury Laws (the *"Maximum Rate"*), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither the Borrower nor any guarantor or endorser shall have any action against the Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any of the Borrower's Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Borrower's Obligations shall remain at the Maximum Rate until the Lender has received the amount of interest which the Lender would have received during such period on the Borrower's Obligations had the rate of interest not been limited to the Maximum Rate during such period.

Section 11.12. Independent Evaluation of Loan Parties; No Advisory or Fiduciary Responsibility of Lender.

(a)    The Loan Parties acknowledge and agree that: (i) the Borrower is a law firm and each of its attorneys, including each of the Guarantors, is both sophisticated in the practice of law and also experienced in borrowing funds to finance litigation expenses; (ii) in reaching their decision to enter into this Agreement and the other Loan Documents, they completed an independent evaluation of both this Agreement and the other Loan Documents, and as such, they understand, acknowledge and accept their respective terms and conditions, as well as any potential risks associated with the transactions contemplated hereby; and (iii) they are relying on their own independent evaluation or the evaluation of their independent advisors and not on or on the advice of the Lender, or its respective affiliates, partners, members, officers, equity owners, agents, employees or other representatives, as the basis to inform their decision to enter into this Agreement and the transactions contemplated herein.

(b)    In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges its understanding that: (i) other than the express trusts created herein, no fiduciary, advisory or agency relationship between any Loan Party and the Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Lender has advised or is advising any Loan Party on other matters; (ii) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between such Loan Parties, on the one hand, and the Lender, on the other hand; and (iii) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate to the best of its legal and business judgment.

-40-

Borrower Initials:_____
Lender Reference:  Loan Number 103

(c)    In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party further acknowledges its understanding that: (i) the Lender has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates, or any other Person; (ii) the Lender has no obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Lender and its respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of any Loan Party, and the Lender has no obligation to disclose any of such interests to any Loan Party or its Affiliates; and (iv) the Lender has not solicited any clients for the Borrower and has not recommended any clients to the Borrower.  To the fullest extent permitted by Law, each Loan Party hereby waives and releases any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.13. Binding Nature.

This Agreement shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Lender and the benefit of its successors and assigns, including any subsequent holder of the Obligations.  The Borrower may not assign its rights hereunder without the written consent of the Lender.  This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 11.14. Governing Law.

THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS, AND THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THERETO, AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER ARISING HEREUNDER OR THEREUNDER, SHALL BE CONSTRUED AND DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THAT WOULD OR COULD REQUIRE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. THE LOAN PARTIES ARE SOPHISTICATED ATTORNEYS, AND THEY ACKNOWLEDGE AND AGREE THAT DELAWARE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THIS LOAN AGREEMENT TRANSACTION.

Section 11.15. Waiver of Jury Trial; Binding Arbitration.

(a)    This section concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort, by statute, or otherwise, including but not limited to controversies or claims that arise out of or relate to (i) this Agreement, (ii) any Loan Document, or (iii) the transactions contemplated hereby or thereby (collectively a *"Claim"*).  THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A

-41-

Borrower Initials:_____
Lender Reference: Loan Number 103

TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL
INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

(b)     Any and all Claims arising out of or relating in any way to this Agreement or any
other Loan Document or the breach, termination, enforcement, interpretation or validity thereof,
including the determination of the scope or applicability of this Agreement or any other Loan
Document shall be submitted to final and binding arbitration before Judicial Arbitration and
Mediation Services, Inc. ("JAMS"). The arbitration shall take place in Wilmington, Delaware
and shall be conducted in accordance with the provisions of JAMS Comprehensive Arbitration
Rules and Procedures ("JAMS Rules"), or any similar successor, in effect at the time of the filing
of the demand for arbitration.

(c)     The arbitration shall be held before and decided by one neutral arbitrator (the
"Arbitrator"). Within fifteen (15) days after the commencement of arbitration, the Arbitrator shall
be selected by agreement of both sides. In the event there are more than two (2) parties to the
arbitration, the Lender shall collectively be considered one side (the "Lender Side, and any other
parties to the arbitration shall collectively be considered the other side (the "Borrower Side"). If
the Lender is not a party to the arbitration, the claimant(s) shall collectively be considered one
side, and the respondent(s) shall collectively be considered one side. In the event the sides are
unable to agree upon the Arbitrator, then the Arbitrator shall be selected by the sides in accordance
with the procedure set forth in Rule 15 of the JAMS Rules. The Arbitrator shall serve as neutral,
independent and impartial arbitrator and shall agree to use commercially reasonable efforts to
cause the issuance of a ruling in respect of such arbitration within sixty (60) days of appointment
of the Arbitrator. The Arbitrator shall not be told whether he or she was selected by a particular
side. Where a demand for arbitration is submitted between the Lender Side and the Borrower Side,
and the Lender Side and the Borrower Side are already involved in other arbitral proceedings
pending under the JAMS Rules, (i) JAMS shall refer that new case to the Arbitrator already
selected for the existing proceedings, or (ii) if the Arbitrator has not yet been selected for the
existing proceedings then a single Arbitrator shall be selected for all arbitral proceedings pending
under the JAMS Rules between any parties hereto as set forth herein. JAMS and the parties hereto
shall proceed in the same way when a demand for arbitration is submitted between the Lender Side
and the Borrower Side even if the parties hereto are not identical to the parties in the existing
arbitral proceedings. Where JAMS refers the new case to an existing arbitrator, the parties to the
new case will be deemed to have waived their right to designate an arbitrator. The parties hereto
agree to participate in the arbitration in good faith and use commercially reasonable efforts to cause
the Arbitrator to issue his or her ruling within sixty (60) days of the appointment of the
Arbitrator. The Arbitrator shall have the power to award any appropriate remedy allowed by
applicable Law, but shall not have power to modify the provisions of this Section 11.15 to make
an award or impose a remedy that is not available to a court of general jurisdiction sitting in
Wilmington, Delaware, and the jurisdiction of the Arbitrator is limited accordingly. The Arbitrator
may issue preliminary injunctive relief, permanent injunctive relief, or other equitable relief, and
may specifically enforce this Agreement or any other Loan Document. In deciding any motion for
injunctive relief, the Arbitrator shall apply general federal standards for issuing injunctive relief
rather than the standards applicable to Delaware courts. The Arbitrator may proceed with default

-42-

Borrower Initials:_____
Lender Reference: Loan Number 103

judgment against a side that fails to comply with JAMS rules or fails to appear. Unless otherwise determined by the Arbitrator, the fees and costs of the Arbitrator and arbitration (but not the parties' individual costs of conducting the arbitration) shall be borne equally by the parties involved in the arbitration. In any arbitration arising out of or related to this Agreement or any other Loan Document, the Arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. If the Arbitrator determines a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the Arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. Adequate discovery shall be permitted by the Arbitrator consistent with applicable Law and the objectives of arbitration. The award of the Arbitrator, which shall be in writing summarizing the basis for the decision, shall be final and binding upon the parties (subject only to limited review as required by Law) and may be entered as a judgment in any court having competent jurisdiction, and the parties hereto hereby submit to the jurisdiction of the courts of the State of Delaware for that purpose. The details, existence and outcome of any such arbitration and any information obtained in connection with any such arbitration (including any discovery taken in connection with such arbitration) shall be kept strictly confidential and shall not be disclosed or discussed with any person not a party to, or witness in, the arbitration; *provided* that a party may make such disclosures as are required by applicable Law or legal process; *provided further* that a party may make such disclosures to it or its attorneys, accountants, investors or other agents and representatives who reasonably need to know the disclosed information in connection with any arbitration pursuant to this Section 11 and who are obligated to keep such information confidential to the same extent as such party; and *provided further* that a party may make such disclosures to the extent necessary to enforce any arbitration award. If any party hereto receives a subpoena or other request for information from a third party that seeks disclosure of any information that is required to be kept confidential pursuant to the immediately preceding sentence, or otherwise believes that it may be required to disclose any such information, such party shall (i) promptly notify the other parties to the arbitration and (ii) reasonably cooperate with such other parties in taking any legal or otherwise appropriate actions, including the seeking of a protective order, to prevent the disclosure or otherwise protect the confidentiality, of such information.

(d)     Notwithstanding the foregoing, a party may seek an order from a state or federal court sitting in New Castle County, Delaware for preliminary injunctive relief or a temporary restraining order to the extent necessary pending the appointment of an arbitrator. Any injunction issued by such court shall expire upon the earlier of (i) an order of the arbitrator terminating such injunction, or (ii) thirty (30) days after the arbitrator is appointed (subject to the arbitrator's discretion to extend the duration of any such injunction). Seeking a preliminary injunction or temporary restraining order pending the arbitrator's appointment shall not be deemed a waiver of the right to arbitrate or to compel arbitration. The parties hereto hereby submit to the exclusive jurisdiction of the courts sitting in New Castle County, Delaware and agree that venue is proper therein (and waive any objection to such venue) for the purpose of compelling arbitration, seeking preliminary relief as expressly set forth herein, and enforcing any arbitration award entered

-43-

Borrower Initials: _____

pursuant hereto. The Lender may seek relief in any other court prior to or pending arbitration if reasonably necessary to protect or preserve Collateral or Lender's lien on Collateral.

(e)     The Borrower irrevocably consents to the service of process for arbitration or other legal proceedings in the manner provided for Notices pursuant to Section 11.1 of this Agreement and agrees that nothing in this Agreement or any other Loan Document will affect the right of the Lender to serve process in any other manner permitted by Law.

(f)     The Borrower understands and irrevocably agrees that nothing in this section shall be construed to preclude the Lender from enforcing against the Collateral, with or without judicial process, any remedy provided under any credit document or any right, remedy or power of a secured party under Article 9 of the UCC, including, without limitation, taking possession of, disposing of or otherwise foreclosing on any Collateral.

(g)     Each Loan Party hereby knowingly, irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in Delaware. Each party hereto hereby knowingly and irrevocably waives, to the fullest extent permitted by applicable Legal Requirements, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court or arbitral body.

*Section 11.16.* Future Financing.  It is the intent of the Borrower and Lender to have an ongoing borrowing and lending relationship and, therefore, the Borrower agrees that if it intends to obtain financing in the future that is similar in nature to the Loans contemplated by this Agreement, then Lender shall have the right to provide such future financing on equal or better terms than those the Borrower has obtained in good faith.  In the event that the Borrower obtains from a third party (or multiple third parties) in good faith a term sheet, commitment letter or other document reflecting transaction terms that the Borrower desires to accept, the Borrower shall first provide such document to the Lender and the Lender shall evaluate the collateral for such proposed financing and the terms thereof and, within fourteen (14) Business Days of receipt thereof, advise the Borrower if the Lender is amenable to granting a loan upon substantially the same or better terms.  In the event the Lender agrees to provide such new financing in writing, the Borrower and the Lender shall enter into such financing on substantially the same terms and conditions.  Nothing in this Section 11.16 shall obligate the Lender to make additional loans or provide any additional financing to the Borrower.

*Section 11.17.* USA Patriot Act.  The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into Law October 26, 2001)) (the "Act"), it is required to obtain, verify, and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.

-44-

Borrower Initials:_____
Lender Reference:  Loan Number 103

*Section 11.18*. Confidentiality.  The Loan Parties acknowledge that this Agreement and the other Loan Documents are for the Loan Parties' confidential use only and may not, without the written consent of the Lender, be disclosed by any Loan Party to any other Person other than Representatives of the Loan Parties having a need to know the same, except where such disclosure is required by Law or legal process (in which case the Loan Parties agree to notify the Lender promptly thereof).  As used above, "Representatives" of a Loan Party means such Loan Party or its employees, directors, officers attorneys and agents (but not commercial lenders).

[SIGNATURE PAGES TO FOLLOW]

-45-

Borrower Initials:_____
Lender Reference:  Loan Number 103

This Loan Agreement is entered into among us for the uses and purposes hereinabove set forth as of the date first above written.

*"Borrower"*

Corrales Law PC

By _____

Name:   Manuel Corrales, Jr.

Title:    Director

*"Guarantors / Equity partners"*

Each Guarantor/equity partner acknowledges receipt of a completed copy of this Loan Agreement (which includes the Guarantee) as of the time of execution.

By _____

Manuel Corrales, Jr., Individually

*"Lender"*

Equal Access Justice Fund LP

By:    BEB Partners LLC

Its:    General Partner

By: _____

Name:   Benjamin E. Blank

Title:    Manager

[Signature Page to Loan Agreement]

**EXHIBIT A**

**NOTICE OF BORROWING**

Date: _____, ____

To:    EQUAL ACCESS JUSTICE FUND LP

Ladies and Gentlemen:

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. The Borrower hereby gives you notice irrevocably, pursuant to Section 2.1 of the Loan Agreement, of the borrowing specified below:

1.    The Business Day of the proposed borrowing is _____, ____.

2.    The aggregate amount of the proposed borrowing is $_____.

The Borrower hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed borrowing, before and after giving effect thereto and to the application of the proceeds therefrom:

(a)    the representations and warranties contained in Section 5 of the Loan Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such earlier date); and

(b)    no Default has occurred and is continuing or would result from such proposed Borrowing.

Corrales Law PC

*[Exhibit – Please Do Not Execute]*

By _____
Name:    Manuel Corrales, Jr.
Title:    Director

Lender Reference: Loan Number 103

**EXHIBIT B**

**NOTE**

U.S. $700,000.00                                                    August 16, 2021

FOR VALUE RECEIVED, the undersigned, Corrales Law PC, a California professional corporation (the *"Borrower"*), hereby promises to pay to Equal Access Justice Fund LP (the *"Lender"*) or its registered assigns at the principal office of the Lender in Wilmington, Delaware (or such other location as the Lender may designate to the Borrower), in immediately available funds, the principal sum of seven hundred thousand and No/100 Dollars ($700,000.00), together with any accrued interest added to the principal balance in accordance with Section 2.2 of the Loan Agreement, or, if less, the aggregate unpaid principal amount of the Loans made or maintained by the Lender to the Borrower pursuant to the Loan Agreement, in the manner and subject to the terms of Section 2 of the Loan Agreement, together with interest on the principal amount of such Loans from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Loan Agreement.

This Note is the Note referred to in the Loan Agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among the Borrower, the Guarantors party thereto, and the Lender, and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Loan Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Loan Agreement. This Note shall be governed by and construed in accordance with the internal Laws of the State of Delaware.

Reference is hereby made to Section 11.14 of the Loan Agreement. This Note must be construed, and its performance enforced, under the laws of the State of Delaware. Pursuant to Section 11.15 of the Loan Agreement, the parties have agreed to submit all disputes, if any, to final and binding arbitration before Judicial Arbitration and Mediation Services, Inc. ("JAMS") in Wilmington, Delaware. If legal action is necessary outside of arbitration, then BORROWER AND THE LOAN PARTIES HEREBY CONSENT AND AGREE THAT ANY FEDERAL OR STATE COURT LOCATED IN DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS AND DISPUTES BETWEEN BORROWER, ANY GUARANTOR AND LENDER PERTAINING TO THIS NOTE, THE LOAN DOCUMENTS, ANY ARBITRAL PROCEEDING, OR ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE. Further, Borrower and the Loan Parties hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or relating to this Note, any Loan Document, any arbitral proceeding, or any matter arising out of or related to this Note shall be brought in the United States District Court for the District of Delaware or any Delaware State court in New Castle County sitting in Wilmington, Delaware, and any appellate court from any thereof, and Borrower hereby waives any right to object to jurisdiction within either of the foregoing forums by the Lender. Nothing contained herein shall prevent the Lender from bringing any suit, action, counterclaim or proceeding or exercising any rights against any security and against any Loan Party and against any property of any Loan Party, within any other jurisdiction, and the initiation

Lender Reference: Loan Number 103



of such suit, action or proceeding or taking of such action in any other such jurisdiction shall in no event constitute a waiver of the agreements contained herein with respect to the laws of the State of Delaware governing the rights and obligations of the parties hereto. This paragraph is in addition to and not in lieu of Sections 11.14 and 11.15 of the Loan Agreement, and Sections 11.14 and 11.15 of the Loan Agreement shall apply to this Note.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, all in the events, on the terms and in the manner as provided for in the Loan Agreement. Further, this Note may be declared due prior to the expressed maturity hereof in the Event of Default as that term is defined in the Loan Agreement.

The Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

Corrales Law PC

*[Exhibit – Please Do Not Execute]*

By _____

Name:    Manuel Corrales, Jr.
Title:    Director

Lender Reference:  Loan Number 103



**EXHIBIT C**

**ADDITIONAL GUARANTOR SUPPLEMENT**

Date: August 16, 2021

To:     EQUAL ACCESS JUSTICE FUND LP

Ladies and Gentlemen:

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. The undersigned, [**name of new Guarantor**], an Equity Partner in the Borrower, hereby elects to be a *"Guarantor"* for all purposes of the Loan Agreement, effective from the date hereof. The undersigned confirms that the representations and warranties set forth in Section 5 of the Loan Agreement are true and correct as to the undersigned as of the date hereof (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such earlier date) and the undersigned shall comply with each of the covenants set forth in Section 7 of the Loan Agreement applicable to it.

Without limiting the generality of the foregoing, the undersigned hereby agrees to perform all the obligations of a Guarantor under, and to be bound in all respects by the terms of, the Loan Agreement, including without limitation Section 9 thereof, to the same extent and with the same force and effect as if the undersigned were a signatory party thereto.

The undersigned acknowledges that this Agreement shall be effective upon its execution and delivery by the undersigned to the Lender, and it shall not be necessary for the Lender to execute this Agreement or any other acceptance hereof. This Agreement shall be construed in accordance with and governed by the internal Laws of the State of Delaware.

Very truly yours

*[Exhibit – Please Do Not Execute]*
_____
[INSERT NAME OF NEW GUARANTOR], individually

Lender Reference: Loan Number 103



**EXHIBIT D**
**DIRECTION OF PROCEEDS**

Date: August 16, 2021

To:    EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. The Borrower hereby agrees that the proceeds of the Note shall be paid by the Lender as follows:

1. To the account of, the amount of [_____] Dollars ($[_____]) paid as follows:

   Account Name:
   Account Number:
   Name of Bank:
   Bank Routing Number:
   Reference Information:  Equal Access Justice Fund Loan Proceeds

The Borrower acknowledges and agrees that the proceeds from payment number 1 above are net of the payment of the applicable fees set forth in Section 3.1 of the Loan Agreement. The distribution of the Loan proceeds is set forth on Exhibit 1 hereto.

This Direction of Proceeds is hereby executed as of the date first set forth above.

Corrales Law PC

*[Exhibit – Please Do Not Execute]*

By _____
   Name:    Manuel Corrales, Jr.
   Title:    Director

Lender Reference:  Loan Number 103

**EXHIBIT 1**
Loan Proceeds Distribution

Gross Loan Proceeds:                    $[_____]

Fees                                    $[_____]

Net Loan Proceeds                       $[_____]
(to Borrower account per letter to which this exhibit is attached)

Lender Reference:  Loan Number 103

**EXHIBIT E**
**COMPLIANCE CERTIFICATE**

Date: _____, _____

To:    EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among Corrales Law PC, a California professional corporation  (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*).  Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement.  This Compliance Certificate is furnished to the Lender pursuant to the Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES ON BEHALF OF BORROWER THAT:

1.    I am a Responsible Officer of the Borrower.

2.    I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the accounting period covered by this Compliance Certificate, except as set forth below.

3.    The representations and warranties contained in Section 5 of the Loan Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct  as of such earlier date).

4.    Described below are the exceptions, if any, to paragraph 2 above by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____
_____
_____
_____

5.    Described below is an update on each of the following items for such period covered by this Compliance Certificate:

Pro Bono:
Community Service:
Charity:

6.    No Equity Partner has terminated its ownership in the Borrower for any reason.  No Equity Partner who previously had an ownership interest in the Borrower has given notice that

Lender Reference:  Loan Number 103

such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower, nor to the knowledge of the Borrower, is any such transfer of a Case threatened.

7.    Attached hereto as Schedule I is a true, correct and complete list of all Cases pending as of the date hereof or closed during the accounting period covered by this Compliance Certificate, including, for each Case, style of the cases, names of the parties, cause numbers, locations and the courts in which pending, and notification of which Cases contain Commercial Tort Claims.

8.    Borrower acknowledges that this Certification is made to obtain money, or an extension, renewal, or refinancing of credit, that Lender is relying upon all of the information contained in and attached to this Certification, that Lender's reliance is reasonable, and that falsity, fraud, or misapplication of proceeds by Borrower will render Borrower's Obligations to Lender non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2) and (4).

The foregoing certifications are made and delivered as of the date first above written.

Corrales Law PC

*[Exhibit – Please Do Not Execute]*

By  _____
        Name:    Manuel Corrales, Jr.
        Title:    Director

Lender Reference:  Loan Number 103

**SCHEDULE I**
**TO COMPLIANCE CERTIFICATE**

CORRALES LAW PC

**CASES**

| | CLIENT NAME(S) | TYPE OF CASE | CURRENT CASE STATUS | AMOUNT RECEIVED TO DATE | LOW ESTIMATE OF FUTURE FEE* AMOUNTS | HIGH ESTIMATE OF FUTURE FEE* AMOUNTS | ESTIMATED TIMEFRAME TO RECEIPT OF PAYMENTS | WHETHER INCLUED COMERCIAL TORT CLAIM |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| ... | | | | | | | | |

*Net fees to the firm after any co-counsel arrangements.

Lender Reference:  Loan Number 103

**EXHIBIT F**
**Letter of Authorization - on Borrower Letterhead**

August 16, 2021 [Bank & Address]

Attention:

Re:                     Letter of Authorization for Corrales Law PC
                        Loan Agreement with Equal Access Justice Fund LP

Dear [_____],

We are writing in regard to the that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021 among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. As part of its obligations under the Loan Agreement, the Borrower is required to permit the Lender to have electronic viewing access into the Borrower's IOLTA Account number _____ (the *"IOLTA Account"*) maintained with _____ Bank (*"you"*).

        This letter shall serve as an irrevocable instruction to you from the the Borrower to establish and allow such access to information in the IOLTA Account.

        You agree to continue to allow such access to the IOLTA Account until receipt of notice from Lender to discontinue such access. The Borrower acknowledges that the Lender is relying on this Letter of Authorization in extending credit to the Borrower under the Loan Agreement. Further, the Borrower and each Guarantor under the Loan Agreement agree not to sue and to hold you harmless from and against any claims and causes of action from complying with the terms of this Letter of Authorization, including allowing access to information in the IOLTA Account.

Lender Reference:  Loan Number 103

This Letter of Authorization is executed by the Borrower and each Guarantor as of the date first set forth above.

Sincerely,

Corrales Law PC

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   Manuel Corrales, Jr.
    Title:    Director

*[Exhibit – Please Do Not Execute]*

_____
    Manuel Corrales, Jr., individually

cc:    Benjamin E. Blank, Manager of Equal Access Justice Fund LP

Lender Reference: Loan Number 103

**EXHIBIT G**
**MONTHLY COMPLIANCE CERTIFICATE**

Date: _____, _____

To:    EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain loan agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP, a Delaware limited partnership (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. This Compliance Certificate is furnished to the Lender pursuant to the Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES ON BEHALF OF BORROWER THAT:

1.    I am a Responsible Officer of the Borrower.

2.    I have reviewed the terms of the Loan Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Borrower during the "Compliance Period," which is the period from (a) the later of (i) the initial funding of the loan and (ii) the end of the period covered by the most recent Compliance Certificate, through (b) the date hereof.

3.    The examinations described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any noncompliance with the reporting required in Section 7.3(b) of the Loan agreement, or with the Mandatory Payments (all revenue has been reported to Lender and I have made, or will be making, payment as required by Section 2.4 of the Loan Agreement), except as set forth below in paragraph 8.

4.    The examinations described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the Compliance Period as of the date of this Compliance Certificate, except as set forth below in paragraph 8.

5.    The financial information required by Section 7.3 of the Loan Agreement submitted for this Compliance Period present fairly in all material respects the financial condition of the Borrower.

6.    The representations and warranties contained in Section 5 of the Loan Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such earlier date).

Lender Reference: Loan Number 103

8.    Described below are the exceptions, if any, to paragraphs 3 and 4 above by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____

_____

_____

_____

_____

9.    No Equity Partner has terminated its ownership in the Borrower for any reason. No Equity Partner who previously had an ownership interest in the Borrower has given notice that such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower nor, to the knowledge of the Borrower, is any such transfer of a Case threatened.

The foregoing certifications are made and delivered as of the date first above written.

Corrales Law PC

By  *[Exhibit – Please Do Not Execute]*
    _____
    Name:    Manuel Corrales, Jr.
    Title:    Director

**EXHIBIT H**
**CLOSING COLLATERAL CERTIFICATION**

Date: August 16, 2021

To:     EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. This Closing Collateral Certification is furnished to the Lender pursuant to the Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES ON BEHALF OF BORROWER THAT:

1.     I am a Responsible Officer of the Borrower.

2.     I have reviewed the terms of the Loan Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Borrower during the "Underwriting Period," which is the period from (a) the NDA Signing Date, through (b) the Closing Date.

3.     The examinations described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any material adverse changes to the financial condition of the Borrower or the Borrower's docket of Cases during the Underwriting Period, except as set forth below in paragraph 4.

4.     Described below are the exceptions, if any, to paragraphs 3 above by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____
_____
_____
_____
_____

5.     No Equity Partner has terminated its ownership in the Borrower for any reason. No Equity Partner who previously had an ownership interest in the Borrower has given notice that such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower nor, to the knowledge of the Borrower, is any such transfer of a Case threatened.

Lender Reference:  Loan Number 103



6.      The following (or listing attached hereto) is a correct and complete list of all active cases of borrower as of the Closing Date:

| | CLIENT NAME(S) | TYPE OF CASE | CURRENT CASE STATUS | AMOUNT RECEIVED TO DATE | LOW ESTIMATE OF FUTURE FEE* AMOUNTS | HIGH ESTIMATE OF FUTURE FEE* AMOUNTS | ESTIMATED TIMEFRAME TO RECEIPT OF PAYMENTS |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| ... | | | | | | | |

*Net fees to the firm after any co-counsel arrangements.

The foregoing certifications are made and delivered as of the date first above written.

Corrales Law PC

By _____
Name:    Manuel Corrales, Jr.
Title:    Director

Lender Reference:  Loan Number 103

# CASE LIST

1. **Abdullah v. Cheesecake Factory**
   37-2020-00015773 (SD-Central)

2. **Alaedini v. Jones**

3. **Anderson v. Granberry**
   21TRCV00408 (LA – Inglewood)

4. **Castro (John Doe) v. Royal Emerald**
   37-2021-00022284 (SD-Central)

5. **Clark v. Bainbridge**
   37-2020-00008514 (SD-Central)

6. **Corona v. Waste Management**
   30-2021-01212511 (Orange-Santa Ana)

7. **Corrales v. CGCC**
   37-2019-00019079 (SD-Central)

8. **Cowan v. Platinum Security**
   34-2019-00270003 (Sacramento)

9. **CPH v. Pacific Steel**
   37-2020-00031027 (SD Central)

10. **Craig v. FirstService Residential**
    RIC 2001189 (Riverside - Main)

11. **Donius v. Mazzetti (Federal)**
    09-cv-02330 (USDC – SDCA)

12. **Donius v. County of San Diego**
    19-cv-01898 (USDC – SDCA)

13. **Donius v. NCTD & County of SD**
    37-2020-00015528 (SD-Central)

14. **Farr v. Wells Fargo**
    37-2020-00026833 (SD – North)

15. **Garcia v. El Pollo Loco**

16. **Harvey v. Emerald Health**
    37-2019-00064216 (SD – Central)

17. **Healy v. Vigil**
    CVV-2020-0010 (Viejas of Kumeyaay)

18. **Lang v. Il Fornaio**
    37-2020-00017408 (SD-HOJ)

19. **LoDolce v. Amazon**

20. **Lopez v. San Miguel Fire**
    37-2020-00033387 (SD-Central)

21. **Miranda v. Albertsons**
    30-2020-01147331 (Orange – Central)

22. **Navarrete v. Fleer**

23. **Ramah Navajo Class Action**

24. **Riley v. Welk Resort Group**
    37-2019-00066178 (SD – North)

25. **Sandhovel**

26. **Sandoval v. Cigar Cartel**
    20BBCV00099 (LA – Burbank)

27. **Serrano v. CORE**

28. **Suzy Cleaners**
    20-CV-00234 (USDC-SDCA)

29. **Torrecillas v. DUSD**
    19STCV40416 (LA-Stanley Mosk)

30. **Torres v.**

31. **Webb v. T.E.R.I., Inc.**
    37-2019-00025349 (SD – North)



**SCHEDULE 10.2**

**DEPOSIT ACCOUNTS**

| DEPOSITORY | ACCOUNT NAME | ACCOUNT NUMBER | ACCOUNT TYPE |
|---|---|---|---|
| JP Morgan Chase | Corrales Law PC | 322271627 | Operating |
| JP Morgan Chase | Corrales Law PC | 3162853721 | IOLTA |

## AMENDMENT TO LOAN AGREEMENT

### CONTRACTUAL LIEN ON LITIGATION PROCEEDS
### (California Civil Code §2883(a))

The parties to the Loan Agreement dated August 13, 2021 ("Loan Agreement"), hereby amend and modify the original Loan Agreement, dated August 13, 2021, as follows:

1.       The definition of "Law Firm Proceeds" in Section 1.1 of the Loan Agreement is modified to <u>exclude</u> proceeds from cases taken on a pure hourly fee agreement, but include contingency fees and referral fees received by Guarantor.

2.       The amount of repayment percentage set forth in Section 2.4(b) of the Loan Agreement entitled "Mandatory Payments," shall be modified to provide as follows:

      a.       The Borrower unconditionally agrees to repay to the Lender on the tenth (10th) day after the end of each calendar month twenty-five percent (25%) of the Law Firm Proceeds for such calendar month.

      b.       The repayment obligations of the Loan from Law Firm Proceeds is meant to be construed as payments equal to fees collected on applicable cases, and not actual fees, so as not to violate ethical rules prohibiting a fee split/sharing agreement with a non-lawyer under California State Bar Rules.  The repayment obligations of the Loan are only measured by a formula relating to the dollar amounts of Law Firm Proceeds.

      c.       In all other respects, Section 2.4 of the Loan Agreement remains in full force and effect.

3.       The parties acknowledge that the case listed as <u>Corrales v. CGCC</u>, 37-2019-0019079 (San Diego Superior Court) is a case wherein Guarantor, Manuel Corrales, Jr., individually, and not the entity Borrower, is the <u>client</u>, and that Guarantor has retained an attorney to represent him in that case.  Neither the Borrower nor the Guarantor has any right to assign or encumber the attorney's fees payable to Guarantor's attorney in that case, per Section 1.1 of the Loan Agreement.  The Collateral in that case is Guarantor's individual recovery as a party plaintiff, not the fees recovered by his attorney.  In consideration of the modification of this "Amendment to Loan Agreement," Guarantor therefore gives Lender a contractual lien in that case

pursuant to California Civil Code §2883 for the payment of the Loan, and authorizes Lender to add the Corrales v. CGCC case to any UCC filing Lender may file to perfect its lien rights. Guarantor grants Lender a security interest and a lien in the proceeds Guarantor will receive personally as a party plaintiff in the Corrales v. CGCC case to secure repayment of the subject Loan obligations, pursuant to California Civil Code §§2881(1) and 2883(a). Guarantor will notify Guarantor's attorney of record in Corrales v. CGGG of this lien with instructions to him to withhold $700,000, plus accrued interest, less payments made on the loan (an exact amount of which to be determined at the successful conclusion of the case) to pay Lender from the proceeds of Guarantor's recovery to satisfy Lender's lien for repayment of the Loan, and will provide written confirmation to Lender that such notice was provided. Guarantor represents to Lender that Guarantor's claim for past legal fees owed by the California Valley Miwok Tribe in the Corrales v. CGCC case exceed $9 million, that the California Gambling Control Commission ("CGCC") is presently withholding over $20 million for disbursement to the Tribe, and that the CGCC, because of Guarantor's lien for services rendered to the Tribe, will be obligated to pay Guarantor directly from those proceeds upon the successful conclusion of his case. Lender's lien, therefore, obligates Guarantor's attorney to pay Lender directly from those proceeds under California law. Guzzetta v. State Bar (1987) 43 Cal.3d 962, 979; In the Matter of Nunez (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 196, 200 (Attorney in a personal injury action representing a Medi-Cal beneficiary has fiduciary obligation to the DHS upon notice letter of Medi-Cal Lien to pay Medi-Cal lien prior to disbursement to client). Filing a Notice of Lien with the Court in the case may subject Guarantor's confidential Loan file materials to discovery and a subpoena by the other parties to the lawsuit, and cause unnecessary delay in the prosecution of his case. To avoid such interference, Guarantor will instead provide Lender with regular, monthly court docket statements on the case, so that Lender can monitor the activities in the case.

4.    The parties may consider this "Amendment to Loan Agreement" as a contractual lien pursuant to California Civil Code §2883(a).

**Amendment to Loan Agreement, November 8, 2021**

5.      In all other respects, the original Loan Agreement dated August 13, 2021, remains in full force and effect.

Dated: 11/15/2021                **CORRALES LAW PC**
                                 (Borrower)

                                 By: _____
                                     Manuel Corrales, Jr.
                                     Director


Dated: 11/16/2021                **GUARANTOR**

                                 _____
                                 Manuel Corrales, Jr., individually


Dated:                           **EQUAL ACCESS JUSTICE FUND LP**
                                 (Lender)

                                 By:    BEB Partners LLC
                                 Its:   General Partner

                                 By: _____
                                     Benjamin E. Blank, Manager

_____

**Amendment to Loan Agreement, November 8, 2021**

3

# EXHIBIT B

NOTE

U.S. $700,000.00                                                    August 16, 2021

FOR VALUE RECEIVED, the undersigned, Corrales Law PC, a California professional corporation (the *"Borrower"*), hereby promises to pay to Equal Access Justice Fund LP (the *"Lender"*) or its registered assigns at the principal office of the Lender in Wilmington, Delaware (or such other location as the Lender may designate to the Borrower), in immediately available funds, the principal sum of seven hundred thousand and No/100 Dollars ($700,000.00), together with any accrued interest added to the principal balance in accordance with Section 2.2 of the Loan Agreement, or, if less, the aggregate unpaid principal amount of the Loans made or maintained by the Lender to the Borrower pursuant to the Loan Agreement, in the manner and subject to the terms of Section 2 of the Loan Agreement, together with interest on the principal amount of such Loans from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Loan Agreement.

This Note is the Note referred to in the Loan Agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among the Borrower, the Guarantors party thereto, and the Lender, and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Loan Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Loan Agreement. This Note shall be governed by and construed in accordance with the internal Laws of the State of Delaware.

Reference is hereby made to Section 11.14 of the Loan Agreement. This Note must be construed, and its performance enforced, under the laws of the State of Delaware. Pursuant to Section 11.15 of the Loan Agreement, the parties have agreed to submit all disputes, if any, to final and binding arbitration before Judicial Arbitration and Mediation Services, Inc. ("JAMS") in Wilmington, Delaware. If legal action is necessary outside of arbitration, then BORROWER AND THE LOAN PARTIES HEREBY CONSENT AND AGREE THAT ANY FEDERAL OR STATE COURT LOCATED IN DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS AND DISPUTES BETWEEN BORROWER, ANY GUARANTOR AND LENDER PERTAINING TO THIS NOTE, THE LOAN DOCUMENTS, ANY ARBITRAL PROCEEDING, OR ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE. Further, Borrower and the Loan Parties hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or relating to this Note, any Loan Document, any arbitral proceeding, or any matter arising out of or related to this Note shall be brought in the United States District Court for the District of Delaware or any Delaware State court in New Castle County sitting in Wilmington, Delaware, and any appellate court from any thereof, and Borrower hereby waives any right to object to jurisdiction within either of the foregoing forums by the Lender. Nothing contained herein shall prevent the Lender from bringing any suit, action, counterclaim or proceeding or exercising any rights against any security and against any Loan Party and against any property of any Loan Party, within any other jurisdiction, and the initiation of such suit, action or proceeding or taking of such action in any other such jurisdiction shall in no

Lender Reference: Loan Number 103

event constitute a waiver of the agreements contained herein with respect to the laws of the State of Delaware governing the rights and obligations of the parties hereto. This paragraph is in addition to and not in lieu of Sections 11.14 and 11.15 of the Loan Agreement, and Sections 11.14 and 11.15 of the Loan Agreement shall apply to this Note.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, all in the events, on the terms and in the manner as provided for in the Loan Agreement. Further, this Note may be declared due prior to the expressed maturity hereof in the Event of Default as that term is defined in the Loan Agreement.

The Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

Corrales Law PC

By _____

Name:   Manuel Corrales, Jr.
Title:    Director

[Signature Page to Note]

Lender Reference: Loan Number 103

# EXHIBIT C

## DIRECTION OF PROCEEDS

August 16, 2021

To:  EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain Loan Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the *"Loan Agreement"*) dated as of August 16, 2021, among Corrales Law PC, a California professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP, a Delaware limited partnership (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement.  The Borrower hereby agrees that the proceeds of the Note shall be paid by the Lender as follows:

1. To the account of Corrales Law PC, the amount of Seventy-Seven Thousand and No/100 Dollars ($77,000.00) paid as follows:

   Account Name: Corrales Law PC Operating Account
   Account Number: 737013976
   Name of Bank: JP Morgan Chase Bank
   Bank Routing Number: 322-271-627
   Reference Information: Equal Access Justice Fund Loan Proceeds

2. To the account of Collectio I Lockbox SPV, LLC, the amount of Five Hundred and Five Thousand and No/100 Dollars ($505,000.00) paid as follows:

   Account Name:  Collectio I Lockbox SPV, LLC
   Account Number: 4298292491
   Name of Bank:  Wells Fargo Bank
   Bank Routing Number:  121-000-248
   Reference Information:  Corrales Law PC Payoff

The Borrower acknowledges and agrees that the proceeds from payment number 1 above are net of the payment of the applicable fees set forth in Section 3.1 of the Loan Agreement. The distribution of the Loan proceeds is set forth on Exhibit 1 hereto.

This Direction of Proceeds is hereby executed as of the date first set forth above.

Corrales Law PC

By _____
Name:    Manuel Corrales, Jr.
Title:    Director

## EXHIBIT 1
### Loan Proceeds Distribution

| | |
|---|---|
| Gross Loan Proceeds: | $600,000.00 |
| Loan Advance Fee: | ($12,000.00) |
| Servicing Fee: | ($6,000.00) |
| USClaims Payoff: | ($505,000.00) |

| | |
|---|---|
| Net Loan Proceeds | $77,000.00 |
| (to Borrower account per letter to which this exhibit is attached). | |



# EXHIBIT D



August 13, 2021

Benjamin E. Blank
**B.E. BLANK & COMPANY**
**Via Email: ben@beblankco.com**

> **Re:  Manuel Corrales Jr.**
> **Reference#:  CON00302961**

To Whom It May Concern,

This will confirm that USClaims agrees to reduce its lien in the above client's case proceeds. In an effort to work cooperatively with you and to bring this claim to its conclusion, USClaims will accept the following:

Total Amount Presently Due: $518,650.00
Less USClaims Discount: $ 13,650.00
**Discounted Amount Due USC: $505,000.00 good until August 20, 2021**

| **PAYMENT BY CHECK:** | **PAY BY WIRE TRANSFER:** |
|---|---|
| **Check Payable to:** USClaims | **Bank Name:** Wells Fargo Bank |
| **Please Include Reference#:** CON00302961 | **Bank ABA:** 121000248 |
| **USPS Mailing Address:**<br>Post Office Box 789867<br>Philadelphia, PA 19178-9867 | **Account #:** 4298292491<br>**Account Name:**<br>Collectio I Lockbox SPV, LLC |
| **Overnight Mailing Address:**<br>Lockbox Services 789867<br>MAC Y1372-045<br>401 Market Street<br>Philadelphia, PA 19106 | **Bank Address:**<br>420 Montgomery Street<br>San Francisco, CA 94104<br>**Reference#:** CON00302961 |

Please note that payments sent to our lockbox account are automatically deposited. Payments received for less than the amount due are accepted as partial payment only, even if marked "payment in full" or language of similar import, and shall not discharge the obligation to pay USClaims in full.

Do not hesitate to contact me if you have any questions or require additional information at (844) 605-8179 or payoff@usclaims.com.

Sincerely yours,

*Nandakash.S*
Payoff Analyst
payoff@usclaims.com

V10 2.3.2021



At Last! Enjoy funding with low fees, a 2x cap, and an experienced team that does all the legwork for you.

**FUNDING SIMPLIFIED**   easy@usclaims.com  |  (877) USCLAIMS

1625 S Congress Ave, Ste200B, Delray Beach, FL 33445 | Phone: (844) 605-8179 | Fax: (561) 982-3507 | Toll Free: 877 USClaims

# EXHIBIT E

## SECURITY AGREEMENT

This Security Agreement (this *"Agreement"*) is dated as of August 16, 2021, between Corrales Law PC, a California professional corporation (the *"Debtor"*), and Equal Access Justice Fund LP (the *"Secured Party"*).

## PRELIMINARY STATEMENT

A.    The Debtor and the Secured Party have entered into a Loan Agreement dated as of August 16, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the *"Loan Agreement"*), which evidences a loan or loans made by the Secured Party to the Debtor.

B.    As a condition to extending credit, continuing to extend credit or otherwise making financial accommodations available to or for the account of the Debtor under the Loan Agreement, the Secured Party requires, among other things, that the Debtor grant the Secured Party a security interest in the Debtor's personal property described herein subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the benefits accruing to the Debtor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.    *Definitions.*  All capitalized terms used in this Agreement and the recitals hereto which are defined in the Loan Agreement or in the Uniform Commercial Code as in effect from time to time in the State of Delaware (the *"UCC"*) and which are not otherwise defined herein shall have the same meanings herein as set forth therein, unless this Agreement shall otherwise specifically provide.

Section 2.    *Grant of Security Interest.*  The Debtor hereby grants to the Secured Party a lien on and security interest in, and acknowledges and agrees that the Secured Party has and shall continue to have a continuing lien on and security interest in, all right, title, and interest of the Debtor, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the following:

(a)    Accounts (including those arising out of any Case and any other property constituting Case Proceeds);

(b)    Chattel Paper;

(c)    Instruments (including Promissory Notes);

(d)    Documents;

Lender Reference:  Loan Number 103

(e)     General Intangibles (including Payment Intangibles and Software, patents, trademarks, tradestyles, copyrights, and all other intellectual property rights, including all applications, registration, and licenses therefor, and all goodwill of the business connected therewith or represented thereby), including those arising out of any Case and any other property constituting Case Proceeds;

(f)     Letter-of-Credit Rights;

(g)     Supporting Obligations;

(h)     Deposit Accounts;

(i)     Investment Property (including certificated and uncertificated Securities, Securities Accounts, Security Entitlements, Commodity Accounts, and Commodity Contracts);

(j)     Inventory;

(k)     Equipment (including all software, whether or not the same constitutes embedded software, used in the operation thereof);

(l)     Fixtures;

(m)     Commercial Tort Claims (as described on Schedule A hereto or on one or more supplements to this Agreement);

(n)     Rights to merchandise and other Goods (including rights to returned or repossessed Goods and rights of stoppage in transit) which is represented by, arises from, or relates to any of the foregoing;

(o)     Monies, personal property, and interests in personal property of such Debtor of any kind or description now held by the Secured Party or at any time hereafter transferred or delivered to, or coming into the possession, custody or control of, the Secured Party, or any agent or affiliate of any Secured Party, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property;

(p)     All charging liens or charging lien rights the Debtor has;

(q)     Supporting evidence and documents relating to any of the above-described property, including, without limitation, computer programs, disks, tapes and related electronic data processing media, and all rights of the Debtor to retrieve the same from third parties, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes and other evidences of indebtedness, insurance certificates and the like, together with all books of account, ledgers, and cabinets in which the same are reflected or maintained;

(r)     Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; and

(s)     Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof;

all of the foregoing being herein sometimes referred to as the *"Collateral."*

Section 3.     *Secured Obligations*.  The lien and security interest herein granted and provided for is made and given to secure, and shall secure, the payment and performance of  (a) all Obligations, in each case whether now existing or hereafter arising (and whether arising before or after the filing of a petition in bankruptcy and including all interest, costs, fees, and charges after the entry of an order for relief against the Debtor in a case under Title 11 of the United States Bankruptcy Code or any similar proceeding, whether or not such interest, costs, fees and charges would be an allowed claim against the Debtor in such proceeding), due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired, (b) the due performance and observance by the Debtor of all of its other obligations from time to time existing in respect of the Loan Documents, and (c) any and all expenses and charges, legal or otherwise, suffered or incurred by the Secured Party in collecting or enforcing any of such indebtedness, obligations, and liabilities or in realizing on or protecting or preserving any security therefor, including, without limitation, the lien and security interest granted hereby (all of the foregoing being hereinafter referred to as the *"Secured Obligations"*).

Section 4.     *Covenants, Agreements, Representations and Warranties*.  The Debtor hereby covenants and agrees with, and represents and warrants to, the Secured Party that:

(a)     The Debtor is duly organized and validly existing in good standing under the laws of the jurisdiction of its organization. The Debtor is the sole and lawful owner of the Collateral, and has full right, power and authority to enter into this Agreement and to perform each and all of the matters and things herein provided for.  The execution and delivery of this Agreement, and the observance and performance of each of the matters and things herein set forth, will not (i) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon the Debtor or any provision of the Debtor's organizational documents (*e.g.*, charter, articles or certificate of incorporation and by-laws, articles or certificate of formation and limited liability company operating agreement, partnership agreement, or similar organizational documents) or any covenant, indenture or agreement of or affecting the Debtor or any of its property or (ii) result in the creation or imposition of any Lien on any property of the Debtor except for the Lien granted to the Secured Party hereunder.  Schedule A hereto is true and accurate in all material respects.

(b)     The Debtor shall not move its chief executive office or maintain a place of business other than those specified on Schedule A hereto without first providing the Secured Party 30 days' prior written notice of the Debtor's intent to do so, *provided* that the Debtor shall at all times maintain its chief executive office in the United States of America and, with respect to any such new location, the Debtor shall have taken all action requested by the Secured Party to maintain the Lien of the Secured Party in the Collateral at all times fully perfected and in full force and effect.

Lender Reference:  Loan Number 103

(c)     The Debtor's legal name, jurisdiction of organization and organizational number (if any) are correctly set forth on Schedule A hereto.  The Debtor has not transacted business at any time during the immediately preceding five-year period, and does not currently transact business, under any other legal names or trade names other than the prior legal names and trade names (if any) set forth on Schedule A hereto.  The Debtor shall not change its jurisdiction of organization without the Secured Party's prior written consent.  The Debtor shall not change its legal name or transact business under any other trade name without first giving 30 days' prior written notice of its intent to do so to the Secured Party.

(d)     The Collateral and every part thereof is and shall be free and clear of all Liens of every kind, nature and description, whether voluntary or involuntary, except for the Lien of the Secured Party therein and the rights of the depository bank with respect to any Deposit Account. The Debtor shall warrant and defend the Collateral against any claims and demands of all persons at any time claiming the same or any interest in the Collateral adverse to the Secured Party.  The Debtor will promptly pay when due all taxes, assessments, and governmental charges and levies upon or against it or its Collateral, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith by appropriate proceedings which prevent attachment of any Lien resulting therefrom to, foreclosure on or other realization upon any Collateral and preclude interference with the operation of its business in the ordinary course and the Debtor shall have established adequate reserves therefor.

(e)     The Debtor shall use commercially reasonable efforts to maintain the Lien of the Secured Party hereunder in all Collateral as a valid, perfected Lien, subject only to the right of the depository bank with respect to any Deposit Account; *provided*, it is the responsibility of the Secured Party to file UCC-1 Financing and Continuation Statements.

(f)     The Debtor shall not, without the Secured Party's prior written consent, sell, assign, mortgage, lease or otherwise dispose of the Collateral or any interest therein.

(g)     The Debtor shall at all times allow the Secured Party and its representatives free access to and right of inspection of the Collateral.

(h)     The Debtor agrees to execute and deliver to the Secured Party such further agreements, assignments, instruments, and documents and to do all such other things as the Secured Party may deem necessary or appropriate to assure the Secured Party its Lien hereunder, including, without limitation, (i) such financing statements, and amendments thereof or supplements thereto, and such other instruments and documents as the Secured Party may from time to time require in order to comply with the UCC and any other applicable law, and (ii) such control agreements with respect to Deposit Accounts and to cause the relevant depository institution to execute and deliver such control agreements, as the Secured Party may from time to time require.  The Debtor hereby authorizes the Secured Party to file any and all financing statements covering the Collateral or any part thereof as the Secured Party may require.  The Secured Party may order lien searches from time to time against the Debtor and the Collateral, and the Debtor shall promptly reimburse the Secured Party for all reasonable costs and expenses incurred in connection with such lien searches.  In the event for any reason the law of any

jurisdiction other than Delaware becomes or is applicable to the Collateral or any part thereof, or to any of the Secured Obligations, the Debtor agrees to execute and deliver all such instruments and documents and to do all such other things as the Secured Party in its sole discretion deems necessary or appropriate to preserve, protect, and enforce the Lien of the Secured Party under the law of such other jurisdiction. The Debtor agrees to mark its books and records to reflect the Lien of the Secured Party in the Collateral.

(i)      On failure of the Debtor to perform any of the covenants and agreements herein contained, the Secured Party may, at its option, perform the same and in so doing may expend such sums as the Secured Party may deem advisable in the performance thereof, including, without limitation, the payment of any taxes, liens and encumbrances, expenditures made in defending against any adverse claims, and all other expenditures which the Secured Party may be compelled to make by operation of law or which the Secured Party may make by agreement or otherwise for the protection of the security hereof. The Secured Party, in making any payment hereby authorized, may do so according to any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien or title or claim. The Secured Party, in performing any act hereunder, shall be the sole judge of whether the Debtor is required to perform same under the terms of this Agreement.

Section 5.     *Certain Perfection Requirements.*

(a)      The Debtor shall use commercially reasonable efforts to receive any funds paid as Case Proceeds.

(b)      Although it is the intention of the parties that the Debtor shall receive the funds referred to in clause (a) of this Section, if, in any particular instance, the Secured Party reasonably determines that such intention may not be realized, or in any other instance in which the Secured Party determines that the establishment of a Deposit Account is required or advisable for the perfection or further perfection of the Secured Party's security interest, the Secured Party may require the Debtor to establish a Deposit Account with any commercial bank having an office in the City of Wilmington, Delaware, and to execute a control agreement, in form and substance reasonably satisfactory to the Secured Party, pursuant to which such depository bank agrees to comply with the Secured Party's delivery instructions with respect to any funds held in such account without further consent by the Debtor.

Section 6.     *Power of Attorney.*  In addition to any other powers of attorney contained herein, the Debtor hereby appoints the Secured Party, its nominee, and any other person whom the Secured Party may designate, as the Debtor's attorney-in-fact, with full power and authority upon the occurrence and during the continuation of any Event of Default (a) after receipt of any Case Proceeds has occurred, to ask for, demand, collect, sue for, recover, receive and give acquittance and receipts for monies due and to become due in respect of any of the Collateral; (b) to the extent necessary or desirable to effectuate the power set forth in clause (a), to endorse the Debtor's name on any checks, notes, acceptances, money orders, drafts and any other forms of payment or security that may come into the Secured Party's possession; and (c) notify opposing parties, their counsel, insurers, and the clients in any of the Cases of Secured Party's lien and security interest and right



Lender Reference:  Loan Number 103

to be paid from any settlement or other proceeds from the Cases. The Debtor hereby ratifies and approves all acts of any such attorney and agrees that neither the Secured Party nor any such attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction; *provided* that, in no event shall they be liable for any punitive, exemplary, indirect or consequential damages. The Secured Party may file one or more financing statements disclosing its security interest in any or all of the Collateral without the Debtor's signature appearing thereon. The Debtor also hereby grants the Secured Party a power of attorney to execute any such financing statements, or amendments and supplements to financing statements, on behalf of the Debtor without notice thereof to the Debtor. The foregoing powers of attorney, being coupled with an interest, are irrevocable until the Secured Obligations have been fully paid and satisfied.

        *Section 7.      Defaults and Remedies.*

        (a)      An "Event of Default" on the Loan Agreement shall constitute an *"Event of Default"* hereunder.

        (b)      Upon the occurrence and during the continuation of any Event of Default, the Secured Party shall have, in addition to all other rights provided herein or by law, the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights or remedies are asserted and regardless of whether the UCC applies to the affected Collateral), and further the Secured Party may, without demand and without advertisement, notice, hearing or process of law, all of which the Debtor hereby waives, at any time or times, sell and deliver all or any part of the Collateral held by or for it at public or private sale, for cash, upon credit or otherwise, at such prices and upon such terms as the Secured Party deems advisable, in its sole discretion and further may notify the account debtor or other person obligated on the Collateral to make payment or otherwise render performance to or for the benefit of Secured Party. In addition to all other sums due the Secured Party hereunder, the Debtor shall pay the Secured Party all costs and expenses incurred by the Secured Party, including reasonable attorneys' fees and court costs, in obtaining, liquidating or enforcing payment of Collateral or the Secured Obligations or in the prosecution or defense of any action or proceeding by or against the Secured Party or the Debtor concerning any matter arising out of or connected with this Security Agreement or the Collateral or the Secured Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code (or any successor statute). Any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Debtor in accordance with Section 10(b) hereof at least 10 days before the time of sale or other event giving rise to the requirement of such notice; *provided however,* no notification need be given to the Debtor if the Debtor has signed, after an Event of Default has occurred, a statement renouncing any right to notification of sale or other intended disposition. The Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. The Secured Party may be the purchaser at any such sale. The Debtor hereby waives all of its rights of redemption from any such sale. The Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, be made at the time and place to which the sale was postponed or the

Secured Party may further postpone such sale by announcement made at such time and place. The Secured Party may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral or any part thereof, including disclaimers of any warranties of title or the like, and the Debtor acknowledges and agrees that the absence of such warranties shall not render the disposition commercially unreasonable.

(c)    Without in any way limiting the foregoing, upon the occurrence and during the continuation of any Event of Default, the Secured Party shall have the right to exercise any and all rights with respect to all Deposit Accounts of the Debtor, including, without limitation, the right to direct the disposition of the funds in each Deposit Account to collect, withdraw and receive all amounts due or to become due or payable under each such Deposit Account.

(d)    The powers conferred upon the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose on it any duty to exercise such powers. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equivalent to that which the Secured Party accords its own property, consisting of similar type assets. This Agreement constitutes an assignment of rights only and not an assignment of any duties or obligations of the Debtor in any way related to the Collateral, and Secured Party shall have no duty or obligation to discharge any such duty or obligation. The Secured Party shall have no responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral. Neither the Secured Party nor any party acting as attorney for the Secured Party shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct as finally determined by a court of competent jurisdiction; *provided* that, in no event shall they be liable for any punitive, exemplary, indirect or consequential damages.

(e)    Failure by the Secured Party to exercise any right, remedy or option under this Agreement or any other agreement between the Debtor and the Secured Party or provided by law, or delay by the Secured Party in exercising the same, shall not operate as a waiver; and no waiver by the Secured Party shall be effective unless it is in writing and then only to the extent specifically stated. The rights and remedies of the Secured Party under this Agreement shall be cumulative and not exclusive of any other right or remedy which the Secured Party may have.

*Section 8.*    *Application of Proceeds.* The proceeds and avails of the Collateral at any time received by the Secured Party after the occurrence and during the continuation of any Event of Default shall, when received by the Secured Party in cash or its equivalent, be applied by the Secured Party as follows:

(i)    first, to the payment and satisfaction of all sums paid and costs and expenses incurred by the Secured Party hereunder or otherwise in connection herewith, including such monies paid or incurred in connection with protecting, preserving or realizing upon the Collateral or enforcing any of the terms hereof, including reasonable attorneys' fees and court costs, together with any interest thereon (but without preference or priority of principal over interest or of interest over principal), to the extent the Secured Party is not reimbursed therefor by the Debtor; and

Lender Reference:  Loan Number 103

(ii)     second, to the payment and satisfaction of the remaining Secured Obligations, whether or not then due (in whatever order the Secured Party elects), both for interest and principal.

The Debtor shall remain liable to the Secured Party for any deficiency.  Any surplus remaining after the full payment and satisfaction of the foregoing shall be returned to the Debtor or to whomsoever the Secured Party reasonably determines is lawfully entitled thereto.

Section 9.     *Continuing Agreement*.  This Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until all of the Secured Obligations, both for principal and interest, and all fees and other expenses, have been fully paid and satisfied and all agreements of the Secured Party to extend credit to or for the account of the Debtor have expired or otherwise have been terminated.  Upon such termination of this Agreement, the Secured Party shall, upon the request and at the expense of the Debtor, forthwith release its Lien hereunder.

Section 10.     *Miscellaneous*.

(a)     This Agreement cannot be changed or terminated orally.  All of the rights, privileges, remedies and options given to the Secured Party hereunder shall inure to the benefit of its successors and assigns, and all the terms, conditions, covenants, agreements, representations and warranties of and in this Agreement shall bind the Debtor and its legal representatives, successors and assigns, provided that the Debtor may not assign its rights or delegate its duties hereunder without the Secured Party's prior written consent.

(b)     All notices hereunder shall be given in accordance with the terms of the Loan Agreement.

(c)     In the event and to the extent that any provision hereof shall be deemed to be invalid or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Agreement shall to such extent be construed as not containing such provision, but only as to such locations where such law or interpretation is operative, and the invalidity or unenforceability of such provision shall not affect the validity of any remaining provisions hereof, and any and all other provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

(d)     This Agreement shall be deemed to have been made in the State of Delaware and shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any provision hereof.

(e)     This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterpart signature pages, each constituting an original, but all together one and the same instrument.  The Debtor acknowledges that this Agreement is and shall be effective upon its execution and delivery by the Debtor to the Secured Party, and it shall not be necessary for the Secured Party to execute this Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

(f)     The Debtor hereby submits to the nonexclusive jurisdiction of final and binding arbitration before Judicial Arbitration and Mediation Services, Inc. ("JAMS") in Wilmington, Delaware, for purposes of all legal proceedings arising out of or relating in any way to this Agreement or the transactions contemplated hereby.  The Debtor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a forum and any claim that any such proceeding brought in such a forum has been brought in an inconvenient form.  THE DEBTOR AND THE SECURED PARTY EACH HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGE TO FOLLOW]

Lender Reference:  Loan Number 103

IN WITNESS WHEREOF, the Debtor has caused this Security Agreement to be duly executed and delivered as of the date first written above.

Corrales Law PC



Name:    Manuel Corrales, Jr.

Title:    Director

Accepted and agreed to as of the date first written above.

EQUAL ACCESS JUSTICE FUND LP

By: BEB Partners LLC
Its: General Partner

By _____

Name:  Benjamin E. Blank

Title:   Manager

[Signature Page to Security Agreement]

**SCHEDULE A**

This Schedule forms a part of the Security Agreement.

(A)   Full Legal Name, Type of Organization, Jurisdiction of Organization, Chief Executive Office/Principal Place of Business and Organizational Identification Number of each entity Debtor.

| FULL LEGAL NAME | TYPE OF ORGANIZATION | JURISDICTION OF ORGANIZATION | MAIN OFFICE | ORGANIZATION I.D.# |
|---|---|---|---|---|
| Corrales Law PC | Professional Corporation | California | 17140 Bernardo Center Drive, Suite 358 San Diego, CA 92128 | C4756406 |

(B)   Other Names (including any Trade Name or Fictitious Business Name) under which any Grantor currently conducts business:  None.

(C)   Changes in Name, Jurisdiction of Organization, Chief Executive Office or Sole Place of Business and Corporate Structure within past five (5) years:  None.

(D)   Commercial Tort Claims: None.

Lender Reference:  Loan Number 103

# EXHIBIT F



# Secretary of State

**Business Programs Division**
1500 11th Street,  Sacramento, CA 95814

---

CORPORATION SERVICE COMPANY
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DR
SPRINGFIELD, IL  62703

August 18, 2021 11:36 AM

File No.:   U210076609124

## Lien Acknowledgment

This acknowledges the filing of the attached Lien document relavant to the information below. To access free copies of filed UCC documents, enter the File No. above in the Search module on the UCC Online web portal at bizfileonline.sos.ca.gov/search/ucc.

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | CORRALES LAW PC |
| Debtor Address: | 17140 BERNARDO CENTER DR. STE. 358 |
| | SAN DIEGO, CA 92128 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | CORPORATION SERVICE COMPANY, AS REPRESENTATIVE |
| Secured Party Address: | PO BOX 2576 UCCSPREP@CSCINFO.COM |
| | SPRINGFIELD, IL 62708 |

**FILING INFORMATION**

| | |
|---|---|
| Lien Type: | UCC |
| Lien File No.: | U210076609124 |
| File Date: | 8/18/2021 11:31 AM |
| Lapse Date: | 8/18/2026 11:59 PM |





U210076609124

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210076609124 |
| Date Filed: 8/18/2021 |

**Submitter Information:**

| | |
| --- | --- |
| Contact Name | CORPORATION SERVICE COMPANY |
| Organization Name | CORPORATION SERVICE COMPANY |
| Phone Number | 18008585294 |
| Email Address | SPRFiling@cscglobal.com |
| Address | 801 ADLAI STEVENSON DR
SPRINGFIELD, IL 62703 |

**Debtor Information:**

| Debtor Name | Mailing Address |
| --- | --- |
| CORRALES LAW PC | 17140 BERNARDO CENTER DR. STE. 358
SAN DIEGO, CA 92128 |

**Secured Party Information:**

| Secured Party Name | Mailing Address |
| --- | --- |
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | PO BOX 2576 UCCSPREP@CSCINFO.COM
SPRINGFIELD, IL 62708 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All Assets, including but not limited to, all equipment, inventory, documents, accounts, instruments, chattel paper and general intangibles.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
2168 14753

B0422-0204  08/18/2021  11:31 AM Received by California Secretary of State

# EXHIBIT G



December 9, 2024

Mr. Manuel Corrales
Corrales Law PC
17140 Bernardo Center Drive, Suite 358
San Diego, CA 92128

RE: Corrales Law PC Payoff Letter

Dear Mr. Corrales,

Per your request for payoff information for the loan made pursuant to the Loan Agreement dated August 16, 2021, please see the information below regarding the total outstanding balance as of a payoff date of August 16, 2024. Should the payoff occur after 5:00pm Eastern Time on this date, you will need to add the interest per diem for each additional calendar day.

| As of: | 8/16/2024 |
|---|---|
| Outstanding Principal(1): | $ 1,098,264.02 |
| Outstanding Interest: | $ 671.16 |
| Outstanding Fees: | $ 27,296.16 |
| Total Balance Outstanding: | $ 1,126,231.34 |
| **Additional Interest per day after 8/16/24:** | **$ 671.16** |

*(1) Inclusive of interest capitalized on each anniversary date, if any.*

Equal Access Justice Fund LP (Lender) as lender confirms that upon receipt of the total payoff balances and any accrued daily interest (as set forth above) (a) all obligations and other amounts owing to Lender pursuant to the Loan Agreement dated August 16, 2021 between Corrales Law PC (Borrower) and Lender, among others, and any related documents shall have been satisfied and paid in full, (b) all liens on the assets and property, tangible or intangible, of Borrower and any Guarantors granted under or in connection with the Loan Agreement and any related documents in favor of Lender shall be released and terminated, (c) other than those terms within the documents which survive termination, the Loan Agreement and related documents shall be automatically terminated and be of no further force and effect, and (d) Lender will file all necessary Uniform Commercial Code termination statements evidencing the release of the liens referred to in clause (b) above.

Please make payment in the form of a wire transfer to the instructions below:

| | |
|---|---|
| Bank Name: | Synovus Bank |
| ABA Routing Number: | 061-100-606 |
| Account Name: | Equal Access Justice Fund LP |
| Account Number: | 1015563776 |
| Reference: | Corrales – Loan Payoff |

To verify this amount or wiring instructions, please contact me anytime at the number provided below.

Best Regards,

Joseph A. Fleming, CFA
CFO | Chief Operations Officer

---



**Jason V. Stitt**
D: 513.639.3964
jstitt@kmklaw.com

December 18, 2024

**VIA EMAIL AND UPS: MANNYCORRALES@YAHOO.COM**

Corrales Law PC.
ATTN: Manuel Corrales, Jr., Esq.
17140 Bernardo Center Drive, Suite 358
San Diego, California 92128

Re:    Notice of Maturity Default and Demand for Payment

Dear Mr. Corrales:

Keating Muething and Klekamp PLL is litigation counsel to Equal Access Justice Fund LP (the "Lender") in regards to that certain Loan Agreement dated as of August 16, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among you, as the guarantor, Corrales Law PC, a California professional corporation (the "Borrower"), and the Lender. All capitalized terms used, but not otherwise defined, herein having the respective meanings given to such terms in the Loan Agreement.

The Loan matured on August 16, 2024. You have not paid the Obligations. Pursuant to Section 8 of the Loan Agreement, as a result of the maturity, the Lender hereby declares that an Event of Default has occurred (the "Maturity Default"). The Lender has elected to accelerate the Loan and enforce the guaranty. The Maturity Default is in addition to previous Defaults or Events of Default of which you have been advised in writing. All rights are expressly reserved in regards to all other Defaults or Events of Default by the Borrower or you, as Guarantor, under the Loan Agreement or the other Loan Documents.

**As of December 16, 2024, you and the Borrower owe the Lender $1,208,113.02, including fees owed to date, plus interest accruing at the Default Rate. The Lender demands full payment immediately. If full payment is not made by Friday, January 3, 2024, the Lender has authorized me to move forward and exercise any rights to collect this debt. This matter is very serious and I urge you to contact me as soon as possible to discuss this outstanding debt.**

No oral representation or course of dealing on the part of the Lender or any of its officers, employees or agents, and no failure, delay or forbearance by the Lender with respect to the exercise of any right, power, privilege or remedy under the Loan Agreement, any other Loan Document or applicable law shall operate as a modification or waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy. Until such time as the Lender agrees in writing to a waiver of

Corrales Law PC
December 18, 2024
Page 2

or a consent to any default, non-compliance, Maturity Default, or Event of Default now existing or hereafter arising under the Loan Agreement or the other Loan Documents or a modification of the Loan Agreement or any other Loan Document, no such waiver, consent or modification shall exist or be implied. This letter does not attempt to summarize all of the existing Defaults or Events of Default by the Borrower or you, as Guarantor, under the Loan Agreement or the other Loan Documents (including, without limitation, the Maturity Default), and shall not entitle the Borrower or you as the guarantor to any other action or further notice or demand on the part of the Lender.

Furthermore, the holding of any discussions between or among the Borrower, you as the guarantor, and/or the Lender regarding the administration of the Loans or proposals regarding amendments to, or modifications or restructurings of the Loan Agreement or any Loan Document shall not constitute any waiver of any Default or Event of Default (including, without limitation, the Maturity Default), or an agreement to forbear from the exercise of the Lender's rights and remedies under the Loan Agreement or any other Loan Document, or applicable law, nor shall it be construed as an undertaking by the Lender to continue such discussions or to enter into any such amendments, modifications or restructurings. For the avoidance of doubt, all provisions of the Loan Agreement and the other Loan Documents remain in full force and effect and are unaffected by any Default or hereby.

Sincerely,

Jason V. Stitt

cc:    Timothy H. Birnbaum (via e-mail)

14147893.1



**EXHIBIT "2"**

## US Claims Agreement

From:  Manuel Corrales (mannycorrales@yahoo.com)

To:    ross@sdllaw.com

Cc:    dave@beblankco.com; ben@beblankco.com; tim@beblankco.com

Date:  Friday, July 8, 2022 at 03:57 PM PDT


Mr. Spence:

Per ypur request, attached are the following:

1.   2018 operative US Claims Non-Recourse Agreement (which was not a loan), showing the non-recourse lien on Miwok v. Zinke in federal court

2.   UCC Filing

3.   Summary judgment ruling against the Miwok Tribe in Miwok v. Zinke

4.   Court of Appeals Decision affirming the summary judgment ruling.

The case was never appealed to the Supreme Court.  These documents show that US Claims had no legitimate enforceable lien, because the case was lost.

Manny


Manuel Corrales, Jr., Esq.

Attorney at Law

17140 Bernardo Center Drive, Suite 358

San Diego, California 92128

Tel: (858) 521-0634

Fax: (858) 521-0633

mannycorrales@yahoo.com

 USClaims2018Agreement.pdf
913.5 KB



 USClaimsUCClien.pdf
113.4 KB

 SummaryJmtRulingMiwokZinke.pdf
765.4 KB

 9thCirCtAppealAffirmSmjmtMiwokZinke.pdf
111.8 KB



May 21, 2018

Manuel Corrales Jr , Esquire
Manuel Corrales, Jr., Esq.
17140 Bernardo Center Drive
Suite 358
San Diego, CA 92128

   *Re:  Manuel Corrales Re California Valley Miwok Tribe v Jewel et al*

Dear Counselor:

   Enclosed please find the US Claims file insert containing a copy of your client's fully executed contract.  Please refer to the payment schedule contained within the contract at the time of distribution.  Payment should be made in accordance with the schedule and processed as follows:

| | |
|---|---|
| **Check payable to:** | US Claims Opco LLC |
| **USPS Mailing Address:** | Post Office Box 5252<br>New York, NY 10008-5252 |
| **Overnight Address:** | Klik Technologies Corp<br>Attn: Batching Department lbx#305252<br>711 Executive Blvd<br>Suite H<br>Valley Cottage, NY 10989 |

   Please do not hesitate to contact me if you have any questions or require additional information.  Thank you.

                    Sincerely yours,

                    *Servicing Department*


Enclosure


**USCLAIMS**®

1221 N. Church St., Ste. 103
Moorestown, NJ 08057
Toll Free: (855) 340-8388
Fax: (888) 491-3613

## PURCHASE, SALE, ASSIGNMENT & EQUITABLE LIEN AGREEMENT
### This is not a loan. This is a purchase and sale of property rights.

### DISCLOSURE STATEMENT
Dated: May 17, 2018

**1. Seller:** Manuel Corrales Jr , Esquire, Individually and on behalf of The Law Office of Manuel Corrales, Jr. (the "Seller," "I," or "me"), with a principal place of business at 17140 Bernardo Center Drive Suite 358 San Diego, CA 92128 and with Social Security Number 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.

**2. Litigation:** Seller is engaged to represent the plaintiff(s) in the matter(s) referenced in Appendix attached hereto (the "Litigation"), which may be amended from time to time. In the event that the proceeds resulting from the resolution of the then-current Litigation (via judgment, settlement or otherwise) are insufficient or expected to be insufficient to pay the full amount due to US Claims OPCO LLC ("USC") per Section 4 below or to secure Seller's obligations thereunder, Seller shall promptly pledge additional litigation matter(s) that is(are), in the opinion of USC, sufficient to pay USC and secure Seller's obligations under the Agreement. In such an event, the Appendix shall be amended accordingly. For purposes of this Disclosure Statement and the Purchase, Sale, Assignment & Equitable Lien Agreement (the "Agreement"), the term "Litigation" shall collectively refer to any and all litigation matters listed in the Appendix, as amended.

**3. Total of Advance:** $200,350.00 ("Purchase Price")

**4. Total to Be Paid by Seller:** 7.50% for every three months, or portion of three months, from the date of the Purchase, Sale, Assignment & Equitable Lien Agreement (the "Agreement") until the date the proceeds subject of the Agreement (the "Property") are delivered to US Claims Opco LLC ("USC") . In no event shall the amount due to USC hereunder exceed three (3) times the Purchase Price.

**5. Prior Liens to be Paid Off (if any):** The Purchaser will make the following payments on my behalf, deducted from the Purchase Price, and I will receive the remainder of the Purchase Price pursuant to my funding instructions to US Claims:

NA

**6. Compounding Period:** None.

Seller's Initials: ___

**7. Annualized Rate:**     **30%[1]**

**8. Illustrative Payment Schedule:**

| Purchase Price | $200,350.00 |
|---|---|
| Processing Fee | $350.00 |
| Origination Fee | $0.00 |
| Payoff Previous Lien to | $0.00 |
| Net Amount Received by Me | $200,000.00 |

| Date of Payment to USC | Number of Months | Amount of USC's Property/Amount due USC |
|---|---|---|
| On or before August 17, 2018 | 03 | $215,376 |
| After August 17, 2018 and on or before November 17, 2018 | 06 | $230,403 |
| After November 17, 2018 and on or before February 17, 2019 | 09 | $245,429 |
| After February 17, 2019 and on or before May 17, 2019 | 12 | $260,455 |
| After May 17, 2019 and on or before August 17, 2019 | 15 | $275,481 |
| After August 17, 2019 and on or before November 17, 2019 | 18 | $290,508 |

After November 17, 2019, USC's Property will increase by $15026 for each additional 3-month period (or portion thereof), as described in the section entitled "Total to Be Paid by Seller." USC's Property will CAP at $601,050.00, which is 3 times the Purchase Price.

I HAVE READ THIS DISCLOSURE STATEMENT AND THE AGREEMENT. I UNDERSTAND AND AGREE TO THE TERMS OF THE ADVANCE I AM RECEIVING FROM US CLAIMS. I ALSO REPRESENT THAT THERE ARE NO OUTSTANDING LIENS AGAINST ME AND THAT I HAVE NOT ASSIGNED THE PROCEEDS FROM THE LITIGATION, OR ANY PORTION THEREOF, TO ANY PERSON, FIRM OR CORPORATION, EXCEPT AS SPECIFICALLY LISTED ABOVE IN SECTION 5 OF THIS DISCLOSURE STATEMENT.

SELLER: Manuel Corrales Jr , Esquire, Individually and on behalf of The Law Office of Manuel Corrales, Jr.

---

[1] This annualized rate is an estimate and assumes the advance is recovered exactly 365 days from the date of the Agreement. My actual rate may vary considerably from this estimate and will likely be higher depending upon the actual time periods involved.

Seller's Initials: (

## APPENDIX TO DISCLOSURE STATEMENT

Dated: May 17, 2018

The following constitute(s) the Litigation for purposes of the Purchase, Sale, Assignment & Equitable Lien Agreement between US Claims OPCO LLC and Manuel Corrales, Jr. Esquire, Individually and on behalf of The Law Office of Manuel Corrales, Jr.:

- Claim(s) by California Valley Miwok Tribe, a federally-recognized Indian tribe, The General Council, Silvia Burley, Rashel Reznor; Anjelica Paulk; and Tristan Wallace arising from an accident/incident occurring on or about April 20, 2012 against or involving Ryan Zinke, Michael Black, and Weldon Loudermilk, The California Valley Miwok Tribe, The Tribal Council, Yakima Dixie, Velma Whitebear, Antonia Lopez, Michael Medibles, Gilbert Ramirez, Jr. Antoinette Lopez and Iva Sandoval Docket No. 17-16321 In the United States Court of Appeals for the Ninth Circuit Court. And Sally Jewel, in her official capacity as U.S. Secretary of Interior; Lawrence S. Roberts, in his official capacity as Acting Assistant Secretary of Interior Indian Affairs; Michael Black, in his official capacity as Director of the Bureau of Indian Affairs. Case No.: 2:16-CV-01345-WBS-CKD in the United States District Court Eastern District of California. The Seller is entitled to receive compensation for legal services performed in connection with the Litigation.

Seller's Initials: ( _____ )

USCLAIMS

## PURCHASE, SALE, ASSIGNMENT & EQUITABLE LIEN AGREEMENT
### This is not a loan. This is a purchase and sale of property rights.

**THIS AGREEMENT** (the "Agreement") is made and dated as of May 17, 2018, between Seller and US Claims Opco LLC (the "Purchaser" or "USC"), whose address is 1221 N. Church Street, Suite 103, Moorestown, NJ 08057. Unless otherwise defined in this Agreement, all capitalized terms are defined in the disclosure statement dated as of today's date, and attached to and made part of this Agreement (the "Disclosure Statement").

A. Seller has been engaged to represent the plaintiff(s) in the Litigation, as more fully described in the Disclosure Statement. The Litigation has been settled and Seller is entitled to receive monies from such settlement as compensation for legal services performed in connection with the Litigation (the "Proceeds").

B. USC has agreed to purchase from Seller a portion of the Proceeds in exchange for the Purchase Price. Seller has agreed to pay a Processing Fee and, if applicable, an Origination Fee. The Processing Fee and the Origination Fee (if any) will be deducted from the Purchase Price to be paid to Seller at Closing. Seller understands and agrees that USC shall be entitled to discharge any adverse claims against any of the Proceeds whether or not such adverse claims are disclosed, at Seller's cost, and any such amounts paid by Purchaser will be deducted from the Purchase Price.

**USC AND SELLER AGREE AS FOLLOWS:**

1. **PURCHASE, SALE, ASSIGNMENT AND GRANTING OF EQUITABLE LIEN**

   a. **Immediate Assignment**: To the extent permitted by applicable law, Seller hereby sells and assigns to USC and USC hereby purchases from Seller, Seller's entire right, title, and interest in, to and under a portion of the Proceeds as described in the Disclosure Statement. The portion of the Proceeds subject of this Agreement shall be referenced herein as the "Property".

   b. **Springing Assignment**: To the extent that a current assignment of the Proceeds or any portion thereof is impermissible under applicable law, then paragraph 1(a) shall be deemed null and void. In such an event, Seller agrees and sells and assigns to USC and USC hereby agrees to purchase Seller's entire right, title and interest in, to and under a portion of the Proceeds as described in the Disclosure Statement at the instant such Proceeds come into being by virtue of a judgment, settlement, verdict or other disposition of the Litigation or when the Proceeds are paid to the Seller. In that event, Seller grants to USC an equitable lien, in, to and upon Seller's right to the Proceeds resulting from the Litigation and the claims asserted therein to secure USC's receipt of the benefits of the bargain it is making under the terms of this Agreement to the fullest extent permitted by law.

   c. **Delivery of Property.** Seller agrees and acknowledges that USC shall be immediately paid from the Proceeds collected by Seller as a result of the Litigation. Seller's use of any Proceeds prior to the full payment to USC of its Property may constitute an illegal conversion and may be a crime. Seller understands that should Seller send USC a check for less than the sum actually due USC, Seller consents to USC's immediate deposit of such check through Seller's fiduciary without prejudice to collect the entire amount owed and that may accrue until USC is paid in full, even if such check is marked in any way to indicate that it is in full satisfaction or in full release of USC's claim, unless USC provides written acceptance of said lesser sum. In the event this assignment is not permitted by law, Seller agrees to pay USC the full amount of the monies paid by all of the funds due under this Agreement immediately upon the payment of the Proceeds as a separate and independent obligation.

   d. **Purchase Price**: In full payment for the Property and in consideration of its sale and assignment to USC, USC shall pay Seller the Purchase Price at Closing, per Section 2 below upon satisfaction of all Conditions Precedent as hereinafter defined and Purchaser's satisfaction that all the representations are truthful and complete in all respects.

2. **CLOSING.** USC will pay Seller the Purchase Price at "Closing," which means five (5) business days after: (a) satisfaction of the Conditions Precedent per Section 4; (b) delivery to Purchaser of all documents that US Claims



requests, including without limitation (i) the fully executed Agreement and (ii) evidence of the settlement satisfactory to Purchaser; and (c) Purchaser's satisfaction that all representations are truthful and complete in all respects.

3.  **SELLER'S REPRESENTATIONS, COVENANTS AND WARRANTIES.** Seller represents, covenants and warrants as follows:

    a.  The tax identification number of Seller is the one identified in the Disclosure Statement.

    b.  Seller's principal place of business is the address first set forth above. Seller will notify USC in writing within 72 hours if the principal place of business changes.

    c.  If Seller is a legal entity, Seller represents that it is in good standing with the corresponding authorities and that the undersigned has full power and authority to enter into this Agreement and execute the Agreement and any other document in connection with the transaction contemplated hereunder.

    d.  Seller recognizes and agrees that this transaction is of a commercial nature and, if Seller is a natural person, that the Purchase Price will not be used for personal, family or household purposes.

    e.  Seller has the authority to sell the Property to Purchaser, without needing the consent of any third party.

    f.  The following is a complete list of all equity partners, shareholders and/or owners of the Seller, if applicable:

_____

_____

    g.  Seller is not subject to any outstanding judgment, levy, claim, or lien of any nature.

    h.  There are no lawsuits pending or threatened against Seller, and Seller knows of no basis for any such lawsuit or claim against Seller.

    i.  There are no security interests, whether perfected or not, which do or could encumber the Property.

    j.  Neither the Seller nor any partner, shareholder and/or equity owner of the Seller (if applicable) is indebted to any present or former spouse for support, maintenance or similar obligations, nor is Seller nor any partner, shareholder and/or equity owner of Seller (if applicable) indebted for child support or other similar obligations, and Seller has never received Aid to Families with Dependent Children, food stamp benefits or low income energy assistance benefits, and the Proceeds are not subject to any lien by any governmental agency to which payment for such benefits would be owed.

    k.  Seller and each partner, shareholder and/or equity owner of Seller (if applicable) has paid all Federal, state and local taxes due through and including the date hereof, or has made adequate provision for such payments.

    l.  All statements of Seller made to Purchaser in this Agreement or in any other document or communication made in connection with this Agreement are true, accurate and complete and do not omit to disclose anything which make such statements incomplete or materially misleading and the information set forth in the Recitals first appearing above is true and correct in all material respects.

    m.  Seller hereby authorizes USC or its agents to conduct such credit and other searches it may consider necessary in connection with this Agreement and shall cooperate fully with USC in this regard, including the execution of such other documents as USC may require, at its sole option and in discretion.

    n.  Seller will in good faith participate in the Litigation and cooperate in all respects with the prosecution of the Litigation to a successful conclusion and collection of all amounts due on account thereof, including the Proceeds.

    o.  No broker, finder or other person was involved or instrumental in arranging for the within transaction, and no other person is entitled to a fee, payment, commission or otherwise in respect of any matters provided for herein.

    p.  **This transaction is a purchase and sale.**

    q.  Seller has not assigned all or any portion of the Proceeds to any person or entity, except to Purchaser as set forth herein. Seller will not hereafter assign or grant to any party any interest in or to the Proceeds nor permit or suffer the attachment of any lien in or to the Proceeds. Any assignment, sale, conveyance, hypothecation, security interest or lien, or attempt to do any of the foregoing by Seller in violation of this Paragraph 3 shall be wholly void and of no effect.

    r.  All statements made by me in this Agreement and in any other document delivered to USC by Seller or on its behalf (including by any broker) relating to or in connection with this Agreement, including those relating to Seller's personal information as stated in the Disclosure Statement, are true, accurate and complete and do not omit to disclose anything which make such statements incomplete or materially misleading.

4.  **CONDITIONS PRECEDENT.** Notwithstanding anything herein to the contrary, the parties' respective obligations are subject to and conditional upon the satisfaction of the following conditions (the "Conditions Precedent"), unless



[AF-G-11/17]                          Agreement- Page 2 of 7

USC waives any such Condition Precedent in writing: (a) receipt or completion by USC of searches that USC may require, in its discretion, which may include State and Local UCC searches, Federal and State Tax Lien searches and Bankruptcy searches; (b) receipt by USC of properly executed Agreement; (c) receipt by USC of a copy of the settlement agreement; and, (d) any other condition that USC requires in writing.

5.  **GRANT OF SECURITY INTEREST.** By signing this Agreement, Seller grants to USC a security interest and a lien over the title, rights and interest in, to, and under the Proceeds (regardless of whether these result from a final verdict, award, settlement or otherwise), as well as accounts, payment intangibles or contractual rights relating to the Proceeds or the Litigation, and any and all derivatives of the foregoing, whether presently existing or hereafter acquired (the "Collateral"). USC shall have all rights and remedies of a secured party under the Uniform Commercial Code. Seller authorizes USC to file one or more UCC financing statements regarding their security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by USC to perfect and maintain the perfection of USC's security interest.

6.  **EVENTS OF DEFAULT.** The occurrence of any one or more of the following events shall be an event of default by Seller under this Agreement (each, an "Event of Default"):

    a.  The failure by Seller to pay the Property to USC within thirty (30) days after the Proceeds are received by Seller upon payment of the Proceeds to Seller;

    b.  Seller's failure to perform or comply with any of the obligations, covenants or agreements contained in this Agreement, including but not limited to a timely response by Seller to a request from USC for information; or

    c.  If USC discovers any material misrepresentation or inaccuracy in any representation or warranty made by Seller to USC in this Agreement.

7.  **AGREEMENT TO ARBITRATE.**

    a.  **Agreement.** USC and Seller (collectively, the "Parties") agree that any and all controversies, claims, disputes, suits or causes of action of any nature between the Parties, including those arising out of or relating to the Litigation, this Agreement, to the negotiations thereto related, to the breach thereof, to the relationships resulting therefrom, or to the formation, validity and/or enforceability of this Agreement, (each, an "Arbitration Claim"), including but limited to the question of arbitrability of any such Arbitration Claim, *shall* be settled by binding arbitration. This agreement to arbitrate is binding upon and inures to the benefit of each of the Parties' respective heirs, executors, administrators, successors and assigns, as applicable, in which case they shall be treated as a Party for purposes of this Agreement. The Parties agree that the dealings between the Parties involve interstate commerce and that this agreement to arbitrate is subject to the Federal Arbitration Act. This agreement to arbitrate is binding upon and inures to the benefit of each of the Parties' respective heirs, executors, administrators, successors, agents (including attorneys) and assigns, as applicable, in which case they shall be treated as a "Party" for all purposes hereunder.

    b.  **Initiation of Arbitration.** Arbitration shall be initiated by a Party (in such capacity, the "Claimant") serving with a written demand to the other Party (in such capacity, the "Respondent") via USPS Certified Mail. Arbitration must be initiated within a reasonable time after an Arbitration Claim has accrued. In no event shall an Arbitration Claim be entertained by the Arbitrator if the demand (or counter-demand, as the case may be) is filed after the date when institution of a suit based on such Arbitration Claim would be barred by the applicable statute of limitations. If a Party raises untimeliness of the filing of the demand or counter-demand, the Arbitrator must resolve that question prior to holding the hearing on the merits of that Arbitration Claim. If a Party refuses to arbitrate and court intervention is required to compel arbitration, that Party shall be responsible for paying the fees and expenses (including attorneys' fees) incurred by the Party seeking an order to compel arbitration.

    c.  **Administration.** The arbitration shall not be administered by any arbitration organization but shall be privately administered by the Arbitrator appointed pursuant hereto. The Commercial Rules of the American Arbitration Association (the "AAA Rules") shall govern the arbitration process and the arbitrator must follow the AAA Rules, except those regarding the administration of the arbitration process by the American Arbitration Association (the "AAA") or those as to which this agreement to arbitrate otherwise provides. In

the case of inconsistencies between this Agreement and the AAA Rules, the terms of this Agreement shall govern.

d. **The Arbitrator.** The arbitration shall be held before a single arbitrator (the "Arbitrator"). The Claimant shall nominate the Arbitrator within 20 calendar days of the commencement of the arbitration, by sending the name and resume of the Arbitrator (the "Nomination") to the Respondent via USPS Certified Mail. The Respondent has 7 calendar days of receipt of the Nomination to send an objection in writing to Claimant. If no such objection is sent to Claimant within the 7-day period, the Arbitrator nominated by the Claimant shall be deemed appointed. If a written objection is sent to the Claimant within the 7-day period, the Arbitrator must be selected by agreement from a list of arbitrators obtained by the Claimant from the AAA, from the New Jersey Academy of Mediators and Arbitrators, from any other statewide or nationwide organization that provides names of arbitrators, or from an organization with arbitrators who are former judges (the "Approved Organizations"). If the Parties are unable to agree upon an arbitrator within 15 calendar days after the arbitration is initiated, each Party will have 15 additional calendar days to select an appointing arbitrator from the foregoing the Approved Organizations. The appointing arbitrators shall then select and appoint the single Arbitrator from any of the Approved Organizations within 10 calendar days. If a Party fails to timely select an appointing arbitrator, the other Party's(ies') appointing arbitrator shall be deemed appointed as Arbitrator. Each Party is responsible to directly pay the fees for that Party's appointing arbitrator and an equal amount of the total fees of the Arbitrator fees as these become due; however, either Party may, in its discretion, pay 100% of all such fees, expenses and costs.

e. **Process.** The arbitration will be held in New Jersey. Each Party shall be entitled to submit one set of interrogatories, one request for production of documents, and one set of requests for admissions. Additional discovery shall be allowed only if agreed by the Parties or at Arbitrator's discretion. All discovery shall be conducted in accordance with the Federal Rules of Civil Procedure. The hearing and any pre-hearing conferences shall be held telephonically or electronically, if requested by a Party. The arbitration proceeding and all information disclosed during the arbitration shall be maintained as confidential. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the Agreement any other agreement between the Parties.

f. **Notices and Service.** Each of the Parties expressly agrees that service of the demand for arbitration and all notices to relating to the Arbitration shall be made to the address included for the other Party in the Agreement, unless such Party has sent a written notice pursuant to this paragraph designating a new address. I agree that service of the demand for arbitration to me may be made to my Attorney, so long as a copy of the demand is also sent to the address included for me in the introductory paragraph of the Agreement.

g. **Other Provisions.** No arbitration of a Claim shall include (by consolidation, joinder or other method) a person or entity who is not a Party, except by written consent containing a reference to the Agreement and the specific Claim to be arbitrated and the signature of both Parties and the person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any Claim not described in the written consent or with a person or entity not named therein or who has not signed the consent. There shall be no right or authority for any Claim to be arbitrated on a class action basis or on any basis involving Claims brought in a purported representative capacity on behalf of the general public or other persons or entities similarly situated. SELLER UNDERSTANDS THAT SELLER WILL NOT HAVE AND HEREBY WAIVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS IN ANY PROCEEDING PERTAINING OR RELATING TO A CLAIM AND THE RIGHT TO SEEK RELIEF IN A COURT OF LAW. SELLER UNDERSTANDS THAT SOME RIGHTS THAT SELLER WOULD HAVE IF SELLER WENT TO COURT MAY NOT BE AVAILABLE IN ARBITRATION. Should any portion of this agreement to arbitrate be rendered invalid, the Parties agree that such invalid portion is severable and that this agreement to arbitrate shall be enforceable and valid to the fullest extent of the law.

h. **The Award.** The arbitrator shall rule in accordance with the laws of the State of New York without regard to its choice of law provisions. The award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law in any competent court with jurisdiction. Such award shall identify the substantially prevailing Party and shall award that Party fees and expenses of arbitration, including attorneys'

fees, expert fees, arbitrator fees and costs of arbitration. Notwithstanding anything in the AAA Rules to the contrary, the arbitrator may issue a default award, in the event a party fails to appear or to participate in the arbitration. Judgment may be entered upon the award in any competent court with jurisdiction.

8. **WAIVERS.** SELLER HEREBY UNCONDITIONALLY: (A) RELEASES AND WAIVES ALL CLAIMS THAT THIS TRANSACTION IS A LOAN OR IS OTHER THAN A PURCHASE AND SALE; (B) WAIVES ANY CLAIMS THAT THE PROCEEDS ARE NOT ASSIGNABLE OR THAT ANY OTHER PROVISION OF THIS AGREEMENT AND THE EXHIBITS IS INVALID OR UNENFORCEABLE IN ANY RESPECT; (C) WAIVES ANY AND ALL RIGHTS TO BRING ANY CLAIM AGAINST USC AS A CLASS ACTION OR TO JOIN OR OTHERWISE PARTICIPATE IN A CLASS ACTION AGAINST USC; AND, (D) WAIVES THE RIGHT TO JURY TRIAL IN ANY COURT ACTION, TO THE EXTENT THAT THE AGREEMENT TO ARBITRATE IS INVALIDATED OR HELD UNENFORCEABLE IN WHOLE OR IN PART.

9. **ASSIGNMENT.** This Agreement will be binding upon and inure to the benefit of USC and Seller, and each of our respective heirs, executors, administrators, successors and assigns, as applicable. Seller understands and agrees that Seller has no right or power to assign Seller's rights or obligations under this Agreement, and acknowledge that USC may assign or transfer this Agreement, or its obligations or rights, without Seller's prior approval. Seller acknowledges that, if this Agreement or the rights thereunder is assigned to a third party, such third party will rely upon the truth and accuracy of the representations and warranties that Seller has given USC here and in connection with this transaction. When requested by USC or any assignee, Seller will sign and deliver any and all reasonably requested documents as USC or such assignee may require to confirm the various rights and obligations of the parties under this Agreement.

10. **AUTHORIZATIONS.** Seller authorizes USC, its agents, or designees to: (a) discharge on Seller's behalf any liens or adverse claims against Seller or the Property, whether or not these are disclosed by Seller, and to pay any amounts necessary to discharge such liens or claims, provided the Purchaser gives Seller prior written notice, and to deduct such payments from the Purchase Price; (b) endorse on Seller's behalf settlement checks payable to Seller with respect to the Litigation, as may be necessary for the consummation and enforcement of this transaction (authorization which shall survive Seller's death or disability); and (c) to contact Seller by phone (including cellphone), email and regular mail to send offers, requests and information for potential future transactions, including sending texts using an autodialer. Seller understand that my consent under (c) is not a condition for a future sale, that Seller can withdraw my consent at any time, and that message and data rates may apply.

11. **MISCELLANEOUS**

   a. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement. An electronic copy of a fully executed version of this Agreement (e.g., on portable document format (.pdf)) will be considered for all purposes as originals.

   b. **Entire Agreement.** This Agreement, together with the Disclosure Statement and the Exhibit, constitutes the entire agreement and understanding of the parties with respect to the purchase of the specific portion of the Proceeds contemplated hereby and supersedes any and all prior agreements and understanding with respect thereto.

   c. **Severability.** If any part of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of (i) any other part of this Agreement, and the Agreement shall be modified to the extent possible to legally carry out the intent of this Agreement and (ii) any agreement between USC and any other party.

   d. **Amendment and Waiver.** This Agreement may not be amended or modified and the performance of the parties and the covenants or agreements herein cannot be waived or modified except under an instrument signed by both parties. The waiver or modification by a party of performance, or of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent or other performance or breach thereof.

   e. **Attorney's Fees.** Should USC retain the services of an attorney to enforce the terms of this Agreement, Seller will be responsible for any fees and expenses incurred by USC, including reasonable legal and expert fees, and the amount of USC's Property shall be increased in an amount equal to USC's costs and expenses.



f.  **Governing Law/Venue.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York without regard to its choice of law provisions.

SELLER:

Manuel Corrales Jr, Esquire, Individually
and on behalf of Law Office of Manuel
Corrales, Jr.

Date:  5/17/2018

BUYER:
US CLAIMS OPCO LLC

By:

Name:  Danielle Dela Cruz

Title:  Authorized Rep

Date:  5/18/18

## US CLAIMS--FUNDING INSTRUCTION SHEET

**I, Manuel Corrales Jr, Esquire, Individually and on behalf of The Law Office of Manuel Corrales, Jr., SHALL NOT SELL ANY PORTION OF THE PROCEEDS OF MY CLAIM TO ANY OTHER FUNDING OR LENDING ENTITY.**

| | |
|---|---|
| Purchase Price | $200,350.00 |
| Processing Fee | $350.00 |
| Origination Fee | $0.00 |
| If applicable, Payoff Prior Funding to | $0.00 |
| *Net Amount Received by Me* | $200,000.00 |

**Signed agreements may take up to 48 hours (2 business days) to process. Call for details.**

**OPTION 1:**  **MONEY NETWORK® VISA® PAYMENT CARD (up to $20,000.00)**

☐

**OPTION 2:**  **CASH TRANSFER**

☐  **MoneyGram.**  Quick Cash (up to $5,000)

The funds will be collected in the State of _____
** Valid Photo ID Required (Please Provide One of the Following):
☐ Passport    ☐ Driver License    ☐ State ID
    Expiration Date _____
** Two forms of ID required for amounts over $3,000.00 (one of the above **and** ss card)

**OPTION 3:**  **ACH OR DOMESTIC WIRE TRANSFER– Account MUST be in Client's Name**
**(US Claims cannot transfer funds to Debit Cards or Direct Deposits)**

☐  ACH    Transfer will take 48 hours
☒  Checking Account
☐  Savings Account

1.  Account Number (print clearly)   316285 37 63
2.  Name on Account   Manuel Corrales, Jr., Attorney at Law
3.  Routing Number   021000021
4.  Name of Bank   JP Morgan Chase Bank, N.A.
5.  Bank Telephone   1-800-935-9935

**OPTION 4:**  **CHECK**

☐  Route to the Attorney
    ☐  U.S. Mail      Allow 7-10 Business Days
    ☐  FEDEX        (No Weekend Delivery)

**AUTHORIZATION TO PAY THIRD PARTY VENDORS: I hereby authorize US Claims to pay the following third party vendor(s), and I understand that any amounts paid to such third party vendor(s) shall be deducted from the Purchase Price to be paid to me:**

_____

Seller's Signature:  _____  Date: 5/17/2018
                     Manuel Corrales Jr, Esquire, Individually
                     and on behalf of The Law Office Manuel Corrales, Jr.

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Lien Solutions |
| 800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| Lien Solutions |
| P.O. Box 29071 |
| Glendale, CA 91209-9071 |
| USA |

DOCUMENT NUMBER: 70206960002
FILING NUMBER: 18-7649587449
FILING DATE: 05/21/2018 07:06

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Corrales | Manuel | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 17140 Bernardo Center Drive, Suite 358 | San Diego | CA | 92128 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Manuel Corrales Jr., Esquire | | | |
| OR | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 17140 Bernardo Center Drive, Suite 358 | San Diego | CA | 92128 | USA |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| US Claims Opco LLC | | | |
| OR | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1221 N. Church Street Suite 103 | Moorestown | NJ | 08057 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All rights, title and interest in, to and under the Proceeds of the Litigation (regardless of whether these result from a final verdict, award, settlement or otherwise), as well accounts, payment intangibles or contractual rights relating to such Litigation, and any and all derivatives of the foregoing, whether presently existing or hereafter acquired. Capitalized terms are defined in the security agreement included in the "Purchase, Sale, Assignment & Equitable Lien Agreement" with US Claims OPCO LLC, dated May 17, 2018,
with any amendments. The security agreement can be made available upon request.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
CA-0-64206964-55204513

**FILING OFFICE COPY**

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

2017 WL 2379945
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

CALIFORNIA VALLEY MIWOK TRIBE, a
federally-recognized Indian tribe, the
General Council, Silvia Burley, Rashel
Reznor; Anjelica Paulk; and Tristian
Wallace, Plaintiffs,
v.
Ryan ZINKE, in his official capacity as
U.S. Secretary of Interior; Michael Black,
in his official capacity as Acting Assistant
Secretary of Interior-Indian Affairs;
Weldon Loudermilk, in his official
capacity as Director of the Bureau of
Indian Affairs, Defendants.

CIV. NO. 2:16-01345 WBS CKD
|
Signed 05/31/2017
|
Filed 06/01/2017

**Attorneys and Law Firms**

Manuel Corrales, Jr., Law Offices of Manuel Corrales, Jr., San Diego, CA, for Plaintiffs.

Jody Schwarz, US Department of Justice ENRD, Washington, DC, for Defendants.

MEMORANDUM    AND    ORDER    RE:
CROSS-MOTIONS FOR SUMMARY JUDGMENT

WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

*1 Plaintiffs Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace ("Burley faction") brought this action against defendants Secretary of Interior Ryan Zinke, Acting Assistant Secretary of Interior Michael

Black, and Director of the Bureau of Indian Affairs ("BIA") Weldon Loudermilk[1] ("federal defendants") for violation of the Administrative Procedures Act ("APA"), declaratory relief, injunctive relief, and due process violations arising out of a BIA decision on the tribal membership and recognized government of the California Valley Miwok Tribe ("Tribe"). Several alleged Tribe members, including Yakima Dixie, intervened ("intervenor defendants"). (Docket No. 30.) Plaintiffs, federal defendants, and intervenor defendants now move for summary judgment. (Docket Nos. 44, 46-47.)

I. Factual and Procedural Background
This action is part of a long-running leadership dispute over the Tribe between the Burley faction and Yakima Dixie that has resulted in actions in state courts, federal courts, and administrative agencies. See Cal. Valley Miwok Tribe v. United States, 424 F. Supp. 2d 197 (D.D.C. 2006) ["Miwok I"]; Cal. Valley Miwok Tribe v. United States, 515 F.3d 1262 (D.C. Cir. 2008) ["Miwok II"]; Cal. Valley Miwok Tribe v. Jewell, 5 F. Supp. 3d 86 (D.D.C. 2013) ["Miwok III"]. The Tribe is a federally recognized tribe, formerly known as the "Sheep Ranch Rancheria of Me-Wuk Indians of California." (2015 AR 1397.)[2]

In 1915, John Terrell of the Office of Indian Affairs conducted a census of "Sheepranch Indians" in Calaveras County, California. (2011 AR 3-5.) At the time of the census, there were thirteen Sheepranch Indians. (2011 AR 3.) In 1916, the United States acquired a 0.92 acre parcel of land, known as "Sheep Ranch Rancheria," for these Indians. (2011 AR 3-6.)

In 1934, Congress passed the Indian Reorganization Act ("IRA"), which required the BIA to hold elections where a tribe would decide whether to accept provisions of the IRA, including provisions permitting tribes to organize and adopt a constitution. 25 U.S.C. §§ 5123, 5125. The BIA found that there was only one eligible adult Miwok Indian, Jeff Davis, living on the rancheria in 1935.[3] (2011 AR 13, 20.) He voted in favor of adopting the IRA but the Tribe never pursued formal organization. (2011 AR 13, 20.)

Amended in 1964, the California Rancheria Act authorized the termination of federal recognition of California Rancherias by distributing each rancheria's assets to the Indians residing on the rancheria. (2011 AR 1687; 2015 AR 1399.) At that time, Mabel Dixie was the

WESTLAW

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

sole Miwok resident on the land. (2011 AR 38.) She voted to accept the land distribution plan and terminate the trust relationship between the federal government and the Tribe. (2011 AR 47-51.) The BIA failed, however, to take the necessary steps to complete the termination of the rancheria. (2011 AR 83-84.)

*2 Mabel Dixie died in 1971 and an Administrative Law Judge ordered the distribution of her estate. (2011 AR 61.) Her common law husband and four sons, including Yakima Dixie, received an undivided interest in the land. (Id.) By 1994, Yakima Dixie represented that he was the only living descendant of Mabel and recognized Tribe member. (2011 AR 82.)

A. Leadership Dispute

In 1998, the Burley faction received Dixie's permission to enroll in the Tribe. (2011 AR 110-14.) In September 1998, the BIA met with Dixie and Burley in order to discuss formal organization of the Tribe. (2011 AR 172-76.) The BIA noted that it believed that the original tribal membership was limited to the heirs of Mabel Dixie because of the land distribution during probate. (2011 AR 173.) The Tribe's membership then expanded with the addition of the Burley faction. (2011 AR 173.)

In November 1998, the BIA drafted, and Dixie and Burley signed, Resolution #GC-98-01 ("1998 Resolution"). (2011 AR 177-79.) The 1998 Resolution listed Dixie and the four member Burley faction as Tribe members. (2011 AR 177.) It also established "a General Council to serve as the governing body of the Tribe." (2011 AR 178.) In 1999, Burley submitted Dixie's resignation as tribal chairman to the BIA, but Dixie claimed he did not resign. (2011 AR 180, 1573.) The BIA affirmed the General Council's authority as the governing body of the Tribe in February 2000 and continued to recognize the General Council and Burley's leadership through 2005. (2011 AR 249-54, 2691.)

In February 2004, Burley submitted a tribal constitution to the BIA "in an attempt to demonstrated that it is an 'organized' Tribe" under the IRA. (2011 AR 1095.) The BIA rejected the constitution because it did not reflect the involvement of "the greater tribal community." (2011 AR 1095-96.) The BIA restated this position in February 2005 when it concluded that it did not recognize any tribal government or tribal chairperson for the Tribe. (2011 AR 610-11.)

B. Miwok I and Miwok II

The Burley faction challenged the denial of their proposed constitution. Miwok I, 424 F. Supp. 2d at 201. The court reasoned that while the Tribe has flexibility in organizing under the IRA, the BIA has an obligation to ensure that governing documents "have been 'ratified by a majority vote of adult members.' " Id. at 202. Because the Tribe "failed to take necessary steps to protect the interests of its potential members," the court dismissed the complaint. Id. at 202-03.

The D.C. Circuit affirmed the district court. Miwok II, 515 F.3d at 1268. The court reasoned that "tribal organization under the [IRA] must reflect majoritarian values," the Burley faction admits the Tribe has a potential membership of 250, and the proposed constitution did not involve the majority of those members. Id. at 1267-68.

C. 2010 Decision and Miwok III

While Miwok II was pending, the BIA met with the parties in order to promote organization under the IRA. (2011 AR 1261.) In November 2006, the BIA published notice of a General Council meeting in order to initiate the reorganization process. (Id.) The Burley faction appealed this decision. The Regional Director affirmed the November 2006 notice, reasoning that the purpose of the meeting was to identify the putative group who has a right to participate in the Tribe's organization. (2011 AR 1494-98.)

*3 Burley appealed this decision to the Interior Board of Indian Appeals ("IBIA"), who affirmed, in part, the Regional Director. (2011 AR 1502, 1684-705.) The IBIA also noted that the April 2007 decision involved an "enrollment dispute." (2011 AR 1703.) Because the IBIA lacks jurisdiction over enrollment disputes, it referred this issue to the Assistant Secretary for Indian Affairs. (Id.)

In August 2011, the Assistant Secretary issued a decision ("2011 Decision") that was "a 180-degree change of course" from the BIA's previous position on the Tribe. (2011 AR 2049-50.) The Assistant Secretary concluded: (1) the Tribe is a federally recognized tribe; (2) the Tribe's citizenship consists solely of Dixie and the Burley faction; (3) the Tribe operates under a General Council government under the 1998 Resolution; (4) the "General Council is vested with the governmental authority of the Tribe"; (5) the Tribe is not organized under the IRA and is not required to organize under it; and (6) the United States cannot treat tribes not organized under the IRA differently than tribes organized under the IRA. (2011 AR

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

2049-50.) Dixie challenged this decision in federal district court.

The district court in Miwok III focused on the Tribe's citizenship and the recognition of the General Council as the Tribe's government. Miwok III, 5 F. Supp. 3d at 96. The court held that the 2011 Decision was arbitrary and capricious because the Assistant Secretary assumed, without explanation, that the Tribe was comprised of only five members and the General Council was the recognized tribal government. Id. at 97-100. The record was replete with contrary evidence, but the Assistant Secretary "ma[de] no effort to address any of this evidence in the record." Id. at 98. The court vacated the 2011 Decision and remanded the case to the Assistant Secretary to reconsider the number of tribal members and validity of the General Council. Id. at 100-01.

D. December 2015 Decision
The Assistant Secretary issued his December 2015 Decision in response to the Miwok III remand. He held, based on the record and previous federal court decisions, "that the Tribe's membership is more than five people, and that the 1998 General Council does not consist of valid representatives of the Tribe." (2015 AR 1402.) He further concluded that the General Council was a tribal body that could manage the process of reorganizing the Tribe, but the majority of eligible Tribe members did not approve the General Council. (2015 AR 1401.)

Plaintiffs challenged the December 2015 Decision and brought this suit against federal defendants under the APA. The court granted intervenor defendants' Motion to intervene on August 25, 2016. (Docket No. 29.) The court previously denied plaintiffs' Motion to stay enforcement of the December 2015 Decision. (Oct. 24, 2016 Order 8:1-4 (Docket No. 37).)

II. Legal Standard
The APA governs judicial review of administrative agency actions. In reviewing the administrative decision, the district court "is not required to resolve any facts" that may exist in the underlying administrative record. Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985). Rather, the court must "determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." Nehemiah Corp. v. Jackson, 546 F. Supp. 2d 830, 838 (E.D. Cal. 2008) (Karlton, J.); see also Occidental Eng'g,

753 F.2d at 769-70.

*4 Under the APA, the reviewing court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts in an arbitrary and capricious manner when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency[ ] or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). "The arbitrary and capricious standard of review is 'highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency.' " Aguayo v. Jewell, 827 F.3d 1213, 1226 (9th Cir. 2016) (quoting San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014)).

"Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may be reasonably discerned.' " Ala. Dep't of Envtl. Conservation v. E.P.A., 540 U.S. 461, 497 (2004) (quoting Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)). A court will "sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1090 (9th Cir. 2005).

III. Supplementing the Administrative Record and Judicial Notice
Plaintiffs request that the court take judicial notice of over forty documents, many of which are not part of the administrative record. (See Docket Nos. 44-3, 45, 48-1.) Plaintiffs filed these requests almost one month after the deadline to file a motion to supplement the administrative record. (See Status Order 2:28-3:1 (Docket No. 41).)

Generally, the reviewing court is limited to the administrative record. Great Basin Mine Watch v. Hankins, 456 F.3d 955, 975 (9th Cir. 2006). When asking for judicial notice of documents in a case where the court is reviewing an agency action, the requesting party must meet one of four exceptions:

(1) admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) if the agency has relied on documents not in the record, (3) when supplementing

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith. Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005); see Rybachek v. E.P.A., 904 F.2d 1276, 1296 n.25 (9th Cir. 1990) (construing a motion for judicial notice as a motion to supplement the record).

Plaintiffs do not mention these exceptions, let alone discuss how the supplemented documents qualify under any exception. They only argue that these documents are relevant to their various arguments. Plaintiffs have not "met [their] heavy burden to show that the additional materials ... are necessary to adequately review" the Assistant Secretary's decision. See Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010). The court denies plaintiffs' request for judicial notice of extra-record materials.

IV. Discussion
The December 2015 Decision reached two conclusions that plaintiffs argue are arbitrary and capricious. First, membership in the Tribe is not limited to five people. (See 2017 AR 1399.) Second, the United States does not recognize a valid government for the Tribe. (See 2017 AR 1401.)

A. Whether Tribe is Made up of More than Five People
The December 2015 Decision found that membership in the Tribe is not limited to five people. (2015 AR 1399.) Instead, the Tribe's membership consists of:

*5 (1) the individuals listed on the 1915 Terrell Census and their descendants; (2) the descendants of Rancheria resident Jeff Davis (who was the only person on the 1935 IRA voters list for the Rancheria); and, (3) the heirs of Mabel Dixie (the sole Indian resident of the Rancheria eligible to vote on its termination in 1967). (2015 AR 1400.)[4] The Assistant Secretary based this conclusion on: (1) the Miwok I and Miwok II decisions that held the Tribe consisted of more than five people; (2) the Miwok III conclusion that "the record is replete with evidence that the Tribe's membership is potentially significantly larger than just the[ ] five individuals"; and (3) the meaning of the term "rancheria" and the Department of Interior's treatment of the California Rancherias. (2015 AR 1399-400.) Plaintiffs argue that the administrative record does not support this conclusion.

Federal defendants argue that preclusion prevents plaintiffs from now attempting to re-litigate the issue of

Tribe members because this issue was resolved in a prior proceeding. A prior court decision will have preclusive effect under the doctrine of issue preclusion where:

(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.

Hydranautics v. FilmTec Corp., 204 F.3d 880, 885 (9th Cir. 2000) (quoting Younan v. Caruso, 51 Cal. App. 4th 401, 406-07 (2d Dist. 1996)). The party asserting issue preclusion bears the burden of showing what the prior judgment determined. Id. "[T]he concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." Allen v. McCurry, 449 U.S. 90, 95 (1980) (quoting Montana v. United States, 440 U.S. 147, 153 (1979)).

First, Miwok I and Miwok II necessarily decided whether three members constituted a majority of the Tribe.[5] Miwok I and Miwok II affirmed the Secretary's decision not to approve a proposed tribal constitution submitted by the Burley faction. See Miwok II, 515 F.3d at 1263. Only three Burley members approved the proposed constitution they submitted. Id. at 1266. The courts held that the three Burley members who approved the constitution did not constitute a majority of the Tribe, and therefore, their proposed constitution was an "antimajoritarian gambit [that] deserve[d] no stamp of approval from the Secretary."[6] Id. at 1267. Because the Burley faction did not represent "anything close to a majority of the [T]ribe," the courts in Miwok I and Miwok II denied the Burley faction's proposed constitution. Id.

*6 The issue here is whether the Tribe consists of more than five members—the four Burley members plus Dixie. The Miwok I and Miwok II determination that the three Burley members were not a majority of the Tribe necessarily means that the Tribe must also consist of more than five members, which is the challenged issue here.

Plaintiffs, relying on Miwok III dicta, argue the issue here is different than in Miwok I and Miwok II because the issue there "was whether the Secretary had the authority to refuse to approve a constitution submitted under IRA § 476(h)(1)." See Miwok III, 5 F. Supp. 3d at 101 n.15. The court recognizes that Miwok III stated that Miwok I and Miwok II did not address whether the Tribe's membership consists of five members. This is, however, an inaccurate and incomplete characterization of Miwok I and Miwok II.

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

Miwok I and Miwok II decided that the Secretary had the authority to deny the proposed constitution because the constitution did "not enjoy sufficient support from [the T]ribe's membership" and it was only approved by "Burley and her small group of supporters." Miwok II, 515 F.3d at 1267. If the three Burley members did not constitute a majority of the Tribe, the Tribe must necessarily consist of more than five individuals. Thus, Miwok I and Miwok II did decide the issue of whether the Tribe consists of more than five members when denying a proposed constitution approved by only three Burley members.

Second, the prior proceeding ended with a final judgment on the merits. The prior proceeding resulted in a dismissal of the Burley faction's complaint for failure to state a claim upon which relief could be granted. Miwok I, 424 F. Supp. 2d at 197. The Burley faction had the opportunity to, and did, appeal the Miwok I decision, which resulted in the Miwok II decision. There is no indication that the Burley faction "did not have a 'full and fair opportunity' to litigate" this issue in Miwok I or Miwok II. See Allen, 449 U.S. at 95.

Third, the party against whom preclusion is asserted was a party at the first proceeding. The Burley faction brought suit on behalf of the Tribe in Miwok I and Miwok II. This is the group that defendants argue are precluded from litigating the issue of tribal membership here.

Issue preclusion prevents plaintiffs from relitigating whether the Tribe consists of more than five members.[7] Accordingly, the December 2015 Decision was not arbitrary and capricious on this basis.

### B. Whether United States Recognizes Tribal Leadership

The December 2015 Decision found that the United States does not recognize any leadership for the Tribe, including the General Council established by the 1998 Resolution. (2015 AR 1401.) In reaching this conclusion, the Assistant Secretary noted that he "must ensure that [tribal] leadership consists of valid representatives of the Tribe as a whole," which requires "a process open to the whole tribal community." (Id.) Neither Burley nor Dixie established that a majority of eligible Tribe members ratified their form of tribal government, however.[8] (2015 AR 1401-02.) The December 2015 Decision's that the United States does not recognize a tribal government is reasonable in light of the facts contained in the administrative record.

**\*7** The federal government has a "distinctive obligation of trust" in its dealings with Indians. See, e.g., United States v. Jicarilla Apache Nation, 564 U.S. 162, 192 (2011). As part of this obligation, the Assistant Secretary must ensure that the United States is conducting government-to-government relations with "valid representatives of the [tribe] as a whole." Seminole Nation of Okla. v. Norton, 223 F. Supp. 2d 122, 140 (D.D.C. 2002); see Aguayo v. Jewell, 827 F.3d 1213, 1224 (9th Cir. 2016) ("The [Assistant] Secretary properly exercises discretion not to approve a governing document when it does not 'reflect the involvement of the whole tribal community.' "); cf. Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942) ("Payment of funds at the request of a tribal council which ... was composed of representative faithless to their own people ... would be a clear breach of the Government's fiduciary obligation.").

As previously discussed, other federal court decisions have held that the Tribe consists of more than five people. (See 2017 AR 1401.) Only two individuals, Dixie and Burley, approved the 1998 Resolution that established the General Council.[9] (2011 AR 179.) Plaintiffs cannot show that these two individuals were "a majority of those eligible to take part in a reorganization of the Tribe." (2017 AR 1401.) Because plaintiffs have not shown that the majority of adult members approved the General Council and the Assistant Secretary has an obligation to ensure that the United States interacts with valid tribal representatives, the Assistant Secretary was not arbitrary and capricious in declining to recognize a tribal government.

Plaintiffs argue that, consistent with BIA policy, a majority of Tribe members approved the 1998 Resolution because only Dixie and the Burley faction were eligible to form a tribal government. Under plaintiffs' argument, Dixie was the only original eligible Tribe member because he resided on the rancheria, until he adopted the Burley faction into the Tribe. This argument is flawed for several reasons.

First, "[a]n Indian tribe has the power to define membership as it chooses." Williams v. Gover, 490 F.3d 785, 789 (9th Cir. 2007). "[G]iven a tribe's sovereign authority to define its own membership, it is unclear how the BIA could have any [ ] policy" limiting original tribal membership to those residing on the land. See id. at 791.

Second, residence on the rancheria was a membership requirement only for rancherias restored under the Hardwick settlement. In those instances, the United States agreed to restore illegally terminated rancherias and

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

defined original membership on the restored rancherias as those listed on the "distribution plans," who were the individuals who lived on the land at the time of termination. See Alan-Wilson v. Acting Sacramento Area Director, 33 IBIA 55, 57 (1998). That approach is inapplicable in this case because the Tribe was never terminated.

Third, the BIA has previously treated lineal descendants of individuals listed on census base rolls as the eligible members for organizational purposes. (See Apr. 24, 2012 Memorandum (Docket No. 50-2) (declining "to decide who are the current citizens of the [Tejon Indian] Tribe," but noting that the tribe's citizens are those who "were enumerated on and are descended from the 1915 Terrell BIA Census")); Alan-Wilson v. Bureau of Indian Affairs, 30 IBIA 241, 249-50 (1997) ("Unorganized Federally recognized tribes would look to historical records and rolls to determine recognized membership for organizational purposes."); cf. Lewis v. Norton, 424 F.3d 959, 960-61 (9th Cir. 2005) (noting that a tribe's governing documents defined membership as all lineal descendants of persons named on base rolls with a certain percentage of "Indian blood"). The December 2015 Decision applies the same approach.

**\*8** Plaintiffs also argue that Dixie's challenge to the 1998 Resolution in Miwok III was time-barred and therefore the December 2015 Decision resulting from the Miwok III remand is based on a time-barred claim. Under 28 U.S.C. § 2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." When challenging an agency action, "[t]he right of action generally accrues at the time the agency action becomes final." Aguayo, 827 F.3d at 1226.

Even if Dixie's claim was time-barred, this does not deprive the Assistant Secretary of his obligation to ensure the United States interacts with a majoritarian government. "A cornerstone of this obligation is to promote a tribe's political integrity, which includes ensuring that the will of tribal members is not thwarted by rogue leaders...." Miwok II, 515 F.3d at 1267; see also Seminole Nation, 223 F. Supp. 2d at 140 ("[T]he [BIA] has the authority and responsibility to ensure that the [tribe]'s representatives, with whom it must conduct government-to-government relations, are the valid representatives of the [tribe] as a whole."); cf. 25 U.S.C. § 2.

The Assistant Secretary was fulfilling his obligation to "ensure that [tribal] leadership consists of valid representatives of the Tribe as a whole" in the December

2015 Decision. (2015 AR 1401.) The Assistant Secretary's obligation to ensure that the United States is interacting with valid tribal representatives was the basis for the December 2015 Decision, not a time-barred claim.[10]

Plaintiffs also argue that because the purpose of the General Council is to serve as the governing body of the Tribe and the BIA once recognized the General Council, the BIA must now recognize the General Council as the valid tribal government. (See 2011 AR 177-78.) First, the stated purpose of General Council is not dispositive as to whether the United States must recognize it as the valid tribal government. See Seminole Nation, 223 F. Supp. 2d at 140. Second, the fact that the BIA once recognized the General Council does not preclude the BIA from later questioning its legitimacy. Cf. F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 514-15 (2009) (holding "agency action representing a policy change" is not subject to a heightened standard than agency action adopting a policy in the first place). Doing so "is not consistent with the 'distinctive obligation of trust' the federal government must employ when dealing with Indian Tribes." Miwok III, 5 F. Supp. 3d at 100.

In light of the record, the court finds that the Assistant Secretary was not arbitrary and capricious in finding that the 1998 Resolution and General Council did not "sufficiently reflect[ ] the will of the [Tribe] in order to warrant the acknowledgement of the federal government." Cf. Aguayo, 827 F.3d at 1228 (holding the Assistant Secretary was not arbitrary and capricious in accepting a tribal constitution where it reflected the will of the tribe).

Plaintiffs have failed to show how the Assistant Secretary was arbitrary and capricious in issuing the December 2015 Decision.[11] Because plaintiffs cannot show that the Assistant Secretary was arbitrary and capricious, plaintiffs' claims must fail. Accordingly, the court must grant defendants' Motions for summary judgment and deny plaintiffs' Motion for summary judgment.

**\*9** IT IS THEREFORE ORDERED that plaintiffs' Motion for summary judgment (Docket No. 44) be, and the same hereby is, DENIED; and

IT IS FURTHER ORDERED that defendants' Motions for summary judgment (Docket Nos. 46, 47) be, and the same hereby are, GRANTED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2379945

WESTLAW

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

**Footnotes**

1    Federal defendants are automatically substituted for their predecessors pursuant to Federal Rule of Civil Procedure 25(d).

2    Because the administrative decision challenged here is a reconsideration of a prior 2011 administrative decision following remand in Miwok III, there are two administrative records. The court will refer to the 2011 Decision's administrative record with the citation (2011 AR XX) and the 2015 Decision's administrative record with the citation (2015 AR XX).

3    The Department of the Interior's 1935 census found that the Sheep Ranch Rancheria had an approximate population of sixteen members, but only Davis lived on the property. (See 2011 AR 2062.)

4    The December 2015 Decision refers to these categories of members as the "Eligible Groups."

5    The issue here is not identical to the issue in Miwok III. Miwok III did not determine the number of tribal members; it found that the Assistant Secretary was arbitrary and capricious for failing to address any evidence regarding tribal membership size. See Miwok III, 5 F. Supp. 3d at 98-99.

6    The Miwok II court also took judicial notice of the fact that the Burley faction alleged in another action that the Tribe has a potential membership of 250. Miwok II, 515 F.3d at 1265 n.5; (see 2011 AR 299.)

7    Federal defendants also argue that claim preclusion prevents challenging the entire decision. Claim preclusion does not apply because the claim litigated in this action is whether the December 2015 Decision was arbitrary and capricious. This was not a claim that the parties could have previously litigated because all other cases preceded the December 2015 Decision.

8    The Burley faction is the only party that challenges this conclusion.

9    Reznor was an adult at the enactment of the 1998 Resolution, but did not sign it. (See 2011 AR 179.)

10   Further, the statute of limitations applies to "civil action[s] commenced against the United States"; it does not bar an administrative official from considering an issue in an administrative proceeding. See 28 U.S.C. § 2401(a).

11   Plaintiffs devote substantial time arguing that Dixie and a non-party to this suit, Chadd Everone, committed fraud upon the court and falsely created the tribal leadership dispute. This issue is not relevant to whether the December 2015 Decision was arbitrary and capricious. The December 2015 Decision did not turn on whether Dixie or Burley was the leader of the Tribe, and it found that neither Dixie nor Burley was the recognized leader.

WESTLAW

California Valley Miwok Tribe v. Zinke, Not Reported in Fed. Supp. (2017)

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works

California Valley Miwok Tribe v. Zinke, 745 Fed.Appx. 46 (2018)

745 Fed.Appx. 46 (Mem)
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 9th Cir.
Rule 36-3.
United States Court of Appeals, Ninth Circuit.

CALIFORNIA VALLEY MIWOK TRIBE
et al., Plaintiffs-Appellants,
v.
Ryan K. ZINKE, in his official capacity as
U.S. Secretary of Interior; et al.,
Defendants-Appellees,
California Valley Miwok Tribe et al.,
Intervenor-Defendants-Appellees.

No. 17-16321
|
Argued and Submitted November 15, 2018 San
Francisco, California
|
Filed December 11, 2018

**Attorneys and Law Firms**

Manuel Corrales, Jr., Esquire, Attorney, Law Office of
Manuel Corrales, Jr., San Diego, CA, for
Plaintiffs-Appellants

Jody Helen Schwarz, Trial Attorney, John Luther
Smeltzer, Attorney, DOJ - U.S. Department of Justice,
Environment & Natural Resources Division, Washington,
DC, for Defendants-Appellees

Robert J. Uram, Attorney, James F. Rusk, Sheppard
Mullin Richter & Hampton LLP, San Francisco, CA, for
Intervenor-Defendants-Appellees

Appeal from the United States District Court for the
Eastern District of California William B. Shubb, District
Judge, Presiding, D.C. No. 2:16-cv-01345-WBS-CKD

Before: GRABER, THACKER,* and BENNETT, Circuit
Judges.

**Footnotes**

\*    The Honorable Stephanie Dawn Thacker, Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by

**MEMORANDUM**\*\*

Plaintiff California Valley Miwok Tribe ("Tribe"),
represented by the Burley Council, appeals from summary
judgment entered in favor of Defendants the California
Valley Miwok Tribe, represented by the Dixie Council,
and the United States. The district court held that the 2015
Decision ("Decision") by the Assistant Secretary–Indian
Affairs ("Assistant Secretary") did not violate the
Administrative Procedure **\*47** Act ("APA"). Reviewing
de novo, Chemehuevi Indian Tribe v. Jewell, 767 F.3d
900, 903 (9th Cir. 2014), we affirm.

The district court correctly held that the Decision did not
violate the APA.¹ Tribal membership is a matter to be
determined by the tribe, Santa Clara Pueblo v. Martinez,
436 U.S. 49, 72 n.32, 98 S.Ct. 1670, 56 L.Ed.2d 106
(1978), but the Department of the Interior also has the
responsibility to ensure that organized tribes are
representative of potential membership, Aguayo v. Jewell,
827 F.3d 1213, 1226 (9th Cir. 2016). The Decision
comported with that responsibility.

The Assistant Secretary recounted the Tribe's long
litigation history but did not rely on those earlier court
holdings to reach a decision. Instead, the Assistant
Secretary independently examined the facts and the law,
before determining that the Tribe was not reorganized,
that its membership is not limited to five individuals, and
that the United States does not recognize leadership of the
tribal government. The Decision was not arbitrary,
capricious, an abuse of discretion, or otherwise not in
accordance with the law, and therefore did not violate the
APA. Aguayo, 827 F.3d at 1226.

**AFFIRMED.**

**All Citations**

745 Fed.Appx. 46 (Mem)

California Valley Miwok Tribe v. Zinke, 745 Fed.Appx. 46 (2018)

designation.

** This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

1  We assume, without deciding, that issue preclusion does not bar our consideration of these issues on the merits.

End of Document                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT "3"**



August 10, 2021

Benjamin E. Blank
Founder / Chief Investment Officer
B.E. Blank & Company
105 South Narcissus Avenue, Suite 800
West Palm Beach, Florida 33401
Phone: (561) 566-5110
Email: ben@beblankco.com

Manuel Corrales, Jr., Esq.
Corrales Law PC
17140 Bernardo Center Drive, Suite 358
San Diego, CA 92128
Phone: (858) 521-0634
Email: mannycorrales@yahoo.com

*Via Email*

Subj: Senior Secured Credit Facility                    **CONFIDENTIAL**

Dear Manny,

Thank you for providing B.E. Blank & Company (the "Company") the opportunity to provide growth capital to Corrales Law PC ("Corrales Law" or the "law firm"). We believe that Corrales Law is a sustainably operated, stakeholder-centric law firm whose values, mission, and purpose align with our investment philosophy of conscious capitalism. While there are numerous law firms and options for capital providers, we seek only to partner with law firms who share our vision of fully integrating their mission and purpose into their business model to create outcomes that benefit all of the law firm's stakeholders – clients, employees, vendors, and capital partners – while pursuing justice in a manner that elevates humanity. As such, our investment committee is pleased to inform you that we are preliminarily approving your law firm for a senior secured credit facility, subject to the completion of due diligence and execution of definitive legal agreements.

### TERM SHEET

The following describes the proposed principal terms and conditions of the credit facility. This non-binding term sheet does not summarize all of the terms, conditions, representations, warranties, covenants, and other provisions that will be contained in definitive legal agreements once we satisfactorily complete our due diligence requirements.

| | |
|---|---|
| **TARGET CLOSING DATE:** | Subject to the law firm timely providing all necessary due diligence items to B.E. Blank & Company, we expect to complete due diligence and fund the transaction by August 13, 2021. |
| **BORROWER:** | Corrales Law and all current and future related legal entities from which Manuel Corrales, Jr. collects legal fees. |

**CONFIDENTIAL**

| | |
|---|---|
| **GUARANTORS:** | Manuel Corrales, Jr. will sign a personal guarantee with standard provisions for a credit facility of this nature. |
| **FINANCIER:** | Equal Access Justice Fund LP |
| **CREDIT FACILITY:** | A senior secured credit facility of $700,000. The first draw on the facility will be $600,000. Reborrowing principal that is repaid will be permitted if the facility is in compliance and within covenant. Any undrawn amount of the total maximum credit facility will not accrue interest or incur fees. |
| **INTEREST RATE:** | The credit facility will have a 22% interest rate that compounds on an annual basis. |
| **MATURITY DATE:** | The earlier of (i) three (3) years from the date of execution or (ii) the date on or after an event of default in the definitive legal agreements for the credit facility. The credit facility may be renewed annually following the three-year term at the Financier's discretion. |
| **USE OF PROCEEDS:** | The facility will be used solely by the Borrower to (i) fund the ongoing business expenses of the Borrower, (ii) repay any of the Borrower's existing indebtedness, (iii) pay third-party loan consulting fees disclosed to Financer prior to closing, and (iv) repay any portion of the credit facility. |
| **COLLATERAL:** | The credit facility is secured by a valid and perfected first priority lien and security interest in all of the Borrower's current and future assets. Aside from SBA loans, all other secured borrowings, including U.S. Claims, of the Borrower will be repaid with the proceeds of the facility at closing. The Guarantors agree to have all paid-off secured creditors release their liens on the Borrower after closing. |
| **PRE-PAYMENT TERMS:** | The law firm will pay the Financier a minimum of 50% of the attorney's fees and reimbursed expenses received on encumbered legal matters until the principal and interest of the credit facility are fully repaid. |
| **PRE-PAYMENT PENALTY:** | There is no pre-payment penalty. |
| **CLOSING FEE:** | The closing fee is 2.00% of the principal loan balance. |
| **SERVICING FEE:** | The annual servicing fee is 1.00% of the outstanding loan balance with the initial year's payment deducted at closing from the proceeds of the credit facility. |
| **OTHER FEES & CHARGES:** | Borrower may be assessed (i) a fee of $1,000 per month for late payments on the Servicing Fee or Pre-Payments and/or (ii) reimbursement charges for Financier's costs associated with actions |

CONFIDENTIAL

undertaken by Financier to enforce, collect, or protect its rights under the definitive legal agreements.

**REPORTING REQUIREMENTS:**    Borrower and Guarantors will be required to provide copies of the following on an ongoing periodic basis during the term of the credit facility:

- Annual tax returns for the Borrower and all related legal entities
- Annual tax returns for all Guarantors
- Malpractice insurance renewals
- Life insurance renewals
- Quarterly Sustainability and Legal Matter Certification
- Quarterly certification that the Borrower has no third party secured or unsecured loans, security interests, or liens (including tax liens) above the limits set forth in the definitive legal agreements
- Quarterly income statements and balance sheets
- Monthly copies of the Borrower's bank and IOLTA account statements
- Default notices
- Any other updates that may be required by the Financier

**UCC FINANCING STATEMENT:**    Financier requires that certain Uniform Commercial Code (UCC) financing statements are filed to perfect Financier's security interest in the legal matters. As such, the Borrower authorizes Financier to file UCC-1 financing statements. Financier, Borrower and their respective counsels are authorized to terminate the UCC-1 financing statements when Financier's credit facility is paid in full.

**LIFE INSURANCE/ SUCCESSION PLAN:**    Continued ownership and collateral assignment of life insurance policy on the life of the Guarantor(s), each which must maintain a face amount not less than 125% of the size of the credit facility. The Guarantor(s) must assign the coverage within thirty (30) days post-closing to ensure Financier will be repaid in full upon the untimely death of a Guarantor.

**MALPRACTICE INSURANCE:**    Borrower will be required to maintain malpractice insurance at all times during the term of the credit facility.

**GOVERNING LAW:**    Delaware Law

**DISCLAIMER:**    Financier reserves the right at any time to cancel or modify this non-binding term sheet for any reason, including any proposed terms presented herein for discussion. This non-binding term sheet and all proposed terms set forth herein are confidential, and the content may not be disclosed without the prior express written consent of the Financier. Borrower and Financier acknowledge and agree that Financier does not have a contingent or other interest in the outcome of any legal matters. Financier will have no direct contact with

**CONFIDENTIAL**

Borrower's clients, and Financier will have no influence or control over the legal strategy of any legal matters. Nothing herein will require Borrower to disclose to Financier any attorney-client privileged information. Financier will not interfere with the attorney-client relationship.

If these terms are acceptable to you, please sign below and return this non-binding term sheet by August 12, 2021.

We look forward to working with you as your financial partner. If you have any questions, please contact me anytime at the email address or telephone number listed above.

Best regards,

Benjamin E. Blank

Agreed to and Accepted:

CORRALES LAW PC

By:   Manuel Corrales, Jr., Esq.
Title: Director
Date: August 12, 2021

**EXHIBIT "4"**



August 11, 2021

Manuel Corrales Jr., Esquire
Manuel Corrales, Jr., Attorney at Law
**Via Email: mannycorrales@yahoo.com**

      Re: <mark>California Valley Miwok Tribe v. Sally Jewel</mark>
      Reference#: **CON00302961**

To Whom It May Concern,

It has come to our attention that the above-referenced case has recently settled. As you know USClaims advanced you funds against your fee(s) on this case. As a result, we are providing you with the payoff notice and request that you remit funds to USClaims as follows:

**$518,650.00 due on or before August 17, 2021**

If you have not confirmed receipt of funds by August 17, 2021, please contact our office for an updated payoff amount, as this lien continues to accrue.

| **PAYMENT BY CHECK:** | **PAY BY WIRE TRANSFER:** |
|---|---|
| **Check Payable to:** USClaims | **Bank Name:** Wells Fargo Bank |
| **Please Include Reference#:** CON00302961 | **Bank ABA:** 121000248 |
| | **Account #:** 4298292491 |
| **USPS Mailing Address:** | **Account Name:** |
| Post Office Box 789867 | Collectio I Lockbox SPV, LLC |
| Philadelphia, PA 19178-9867 | |
| | **Bank Address:** |
| **Overnight Mailing Address:** | 420 Montgomery Street |
| Lockbox Services 789867 | San Francisco, CA 94104 |
| MAC Y1372-045 | **Reference#:** CON00302961 |
| 401 Market Street | |
| Philadelphia, PA 19106 | |

Please note that payments sent to our lockbox account are automatically deposited. Payments received for less than the amount due are accepted as partial payment only, even if marked "payment in full" or language of similar import, and shall not discharge the obligation to pay USClaims in full.

Do not hesitate to contact me if you have any questions or require additional information at (844) 605-8179 or payoff@usclaims.com.

Sincerely yours,

*Nandakash.S*
Servicing Manager
payoff@usclaims.com

V10 2.3.2021



At Last! Enjoy funding with low fees, a 2x cap, and an experienced team that does all the legwork for you.

FUNDING SIMPLIFIED    easy@usclaims.com | (877) USCLAIMS

④

**EXHIBIT "5"**







We understand your pain points. So we've created fast, flexible   financial products to solve your challenges and accelerate your growth. And we move quickly – often less than five weeks to fund your firm.

Get in touch today to see if B.E. Blank can help finance your law firm's operations.

**Learn more**

📢 Sponsored       🎵 Tony Dark Eyes • Flex

Add a comment

Sent from Yahoo Mail for iPhone





Sent from Yahoo Mail for iPhone





Sent from Yahoo Mail for iPhone





Sent from Yahoo Mail for iPhone